# EXHIBIT "C"

NJ01/NUGEK/98650.1

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0435p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

OFFICEMAX, INC.,

        *Plaintiff-Appellee,*

v.

UNITED STATES OF AMERICA,

        *Defendant-Appellant.*

No. 04-4009

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 03-00961—Patricia A. Gaughan, District Judge.

Argued: July 29, 2005

Decided and Filed: November 2, 2005

Before: ROGERS and SUTTON, Circuit Judges; ROSEN, District Judge.[*]

---

## COUNSEL

**ARGUED:** Teresa E. McLaughlin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Henry D. Levine, LEVINE, BLASZAK, BLOCK & BOOTHBY, LLP, Washington, D.C., for Appellee. **ON BRIEF:** Teresa E. McLaughlin, Robert W. Metzler, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Henry D. Levine, Stephen J. Rosen, LEVINE, BLASZAK, BLOCK & BOOTHBY, LLP, Washington, D.C., Stephan J. Schlegelmilch, BAKER & HOSTETLER, Cleveland, Ohio, for Appellee. David Isaacson, New York, New York, for Amicus Curiae.

SUTTON, J., delivered the opinion of the court, in which ROSEN, D. J., joined. ROGERS, J. (pp. 16-20), delivered a separate dissenting opinion.

---

## OPINION

SUTTON, Circuit Judge. When a party presents the question whether "and" means "or," it is tempting to be dismissive of the claim or, worse, to make a crack about the demise of the rule of law. But in this instance the disputed "and" appears in the context of several uses of the term that are alternately conjunctive and disjunctive and as much as nine billion dollars in potential tax refund

---

[*]The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

claims (according to the government) rest on the resolution of the issue in this case and others, both of which prompt us to be anything but dismissive of the question.

At issue is the meaning of "toll telephone service," which Congress has subjected to a three-percent federal excise tax. The relevant legislation defines the phrase as "a telephonic quality communication for which [ ] there is a toll charge which varies in amount with the distance *and* elapsed transmission time of each individual communication." 26 U.S.C. § 4252(b)(1) (emphasis added). According to the IRS, the definition means that the tax applies when the telephone company assesses a toll charge that varies in amount by *either* the distance or elapsed transmission time of each individual communication, or both. According to OfficeMax, the definition means that the tax applies when the telephone company assesses a toll charge that varies in amount by *both* the distance and elapsed transmission time of each individual communication. Given the traditional presumption that Congress uses "and" conjunctively, given other contextual clues supporting a conjunctive reading, given the awkwardness of construing the provision as the government does and given the historical fact that the one provider of long-distance telephone service in 1965, when the definition was adopted, charged for phone calls both by distance and time, we conclude that a toll charge must vary by both distance and elapsed transmission time in order to be taxed. We thus hold for the taxpayer and affirm.

I.

A.

In 1898, 22 years after Alexander Graham Bell's work led to the invention of the telephone, Congress imposed the first tax on telephone service. Designed to curb the federal deficit caused by the Spanish-American War, the temporary tax applied to "every person, firm or corporation owning or operating any telephone line or lines" and charged one cent for "messages or conversations transmitted over their respective lines . . . for which a charge of fifteen cents or more was imposed." 30 Stat. at 460, Pub. L. No. 55-133 (1898). Congress repealed the tax as scheduled in 1902. *See* Louis Alan Talley, The Federal Excise Tax on Telephone Service: A History 1 (Congressional Research Service 2001), *available at* http://www.law.umaryland.edu/marshall/crsreports/crsdocuments/RL30553_01042001.pdf (hereinafter "Talley"). Beginning in 1914 and continuing through 1916, in response to falling revenues caused by the start of World War I, Congress reenacted the tax—this time applying it to owners or operators of "any telegraph or telephone line or lines" and charging the same one cent for "dispatches, messages, or conversations originated at each of their respective exchanges, toll stations, or offices, and transmitted thence over their lines . . . for which a charge of 15 cents or more was imposed." 30 Stat. at 761, Pub. L. No. 217; *see* Talley at 1–2. Between 1917 and 1924, in response to the United States' entry into the war, Congress imposed a higher tax—"5 cents upon each telegraph, telephone, or radio, dispatch, message, or conversation, which originates within the United States, and for the transmission of which a charge of 15 cents or more is imposed." 40 Stat. 300, Pub. L. No. 50. Congress increased the tax to 10 cents for calls costing more than 50 cents in 1919. *See* Talley at 3.

The Great Depression prompted the next iteration of the tax, and it has existed in one form or another ever since. *Id.* In 1932, Congress enacted a tax on "each telegraph, telephone, cable, or radio dispatch, message, or conversation, which originates . . . within the United States," applying different rates to each service. 47 Stat. at 270, Pub. L. No. 154. In 1958, Congress changed the organization and labeling of the "communication services" tax, 72 Stat. at 1289, Pub. L. No. 85-859, dividing it into six categories, two of which concern us here: (1) "general telephone service," i.e., local telephone services; and (2) "toll telephone service," i.e., long-distance service involving a toll charge. 72 Stat. at 1290, Pub. L. No. 85-859. The local ("general") and long-distance ("toll") telephone service taxes continued at varying rates through 1959, when Congress passed legislation

repealing the tax on July 1, 1960. But by that date new legislation had enacted a one-year extension, and subsequent one-year extensions maintained the tax through 1965. Talley at 4–5.

In 1965, Congress enacted the Excise Tax Reduction Act, which called for the repeal of most excise taxes, including an immediate reduction of the telephone tax from ten percent to three percent followed by an annual one-percent reduction thereafter until the tax was completely repealed on January 1, 1969. 79 Stat. at 145, Pub. L. No. 89-44. The 1965 legislation retained three categories of taxable services: "local telephone service," "toll telephone service" and "teletypewriter exchange service." As to toll telephone service, originally defined in the 1958 legislation as "a telephone or radio telephone message or conversation for which (1) there is a toll charge, and (2) the charge is paid within the United States," Congress enacted the following definition, unchanged to this day:

> (1) a telephonic quality communication for which (A) there is a toll charge which varies in amount with the distance and elapsed transmission time of each individual communication and (B) the charge is paid within the United States, and
>
> (2) a service which entitles the subscriber, upon payment of a periodic charge (determined as a flat amount or upon the basis of total elapsed transmission time), to the privilege of an unlimited number of telephonic communications to or from all or a substantial portion of the persons having telephone or radio telephone stations in a specified area which is outside the local telephone system area in which the station provided with this service is located.

79 Stat. at 146, Pub. L. No. 89-44; 26 U.S.C. § 4252(b). When Congress enacted this legislation (and for many years before and after its passage), the country had just one provider of long-distance service—AT&T. *See, e.g.*, *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1333 (11th Cir. 2005). And when Congress passed this version of the tax, AT&T already imposed a toll charge based on variations in both the time and distance of each call. *Id.*

In 1966, in response to spending pressures brought on by the Vietnam War, Congress began another series of extensions of the tax. The extensions continued through the 1970s and 1980s, with legislation maintaining the tax at varying rates through 1991. During these years, long-distance telecommunications transformed from a service offered by only one commercial provider to a service offered by several companies in a competitive market. The Federal Communications Commission issued a 1971 Specialized Common Carrier decision opening the long distance market to competition. *See* Michael R. Ward, Bureau of Economics Staff Report: Measurements of Market Power in Long Distance Telecommunications (Federal Trade Commission 1995), *available at* http://www.ftc.gov/reports/telecomm.pdf. An antitrust suit filed by the Department of Justice and the eventual settlement of that litigation in 1982 spurred further competition in the long-distance market. "While AT&T's share of the long distance market's revenues in 1982 was 95%, by 1987 its market share had fallen to 80%, and [in 1993 was] about 60%. By 1991, MCI's and Sprint's revenue market shares had climbed to 17% and 10% respectively." *Id.* at 4 (citation omitted).

In 1990, Congress made the excise tax permanent at a three-percent rate, and, aside from a 1997 amendment clarifying that calling cards were taxable, it did not revisit the issue again during that decade. The 1990s, however, did see a change in the way companies billed for long-distance telephone services, with long-distance companies beginning to offer for the first time nationwide long-distance plans for flat per-minute rates. AT&T abandoned its distance-and-time formula in favor of a time-only formula in 1997.

Congress most recently considered the tax in 2000, when it enacted a package of spending and tax bills that proposed repealing the tax. A presidential veto, however, prevented the bill from becoming a law.

No. 04-4009　　　*OfficeMax, Inc. v. United States*　　　Page 4

B.

From the first quarter of 1999 through the last quarter of 2002, OfficeMax purchased long distance telephone service from MCI. During this time, MCI charged OfficeMax one flat per-minute rate for every long distance call it made between States, another flat per-minute rate for long distance calls within each State (the rate of which varied by State) and another flat per-minute rate for long distance calls to international destinations (the rate of which varied by the destination country). At the end of each call, MCI rounded up to the nearest minute, multiplied the number of minutes by the flat per-minute rate, and assessed a total charge for the call. At the end of the billing cycle, MCI added up the total charges for all of the calls and billed OfficeMax for the amount. In addition, MCI collected from OfficeMax, and remitted to the federal government, the three-percent excise tax ostensibly imposed on these calls. On April 6, 2002, and February 13, 2003, OfficeMax filed claims with the federal government for a full refund of the $380,296.72 in excise taxes it had paid through MCI. In seeking a refund, OfficeMax argued that MCI was not providing a taxable service—neither a "toll telephone service, a "local telephone service" nor a "teletypewriter exchange service," as Congress has defined those phrases. Most pertinently, the company argued, it had not provided a "toll telephone service" because it did not provide "a telephonic quality communication for which [ ] there is a toll charge which varies in amount with the *distance* and elapsed transmission time of each individual communication," 26 U.S.C. § 4252(b)(1) (emphasis added).

The district court granted OfficeMax's motion for summary judgment, reasoning that the statutory language requires a telephone service plan's charges to vary both with the distance and elapsed time of each call. It also rejected the IRS's alternative arguments that OfficeMax's long-distance plan met (1) an alternative definition for "toll telephone service" provided in § 4252(b)(2) or (2) the definition of "local telephone service," § 4252(a), both of which must pay the same tax.

II.

Section 4251 of Title 26 imposes a tax on "amounts paid for communications services." It defines "communications services" as "(A) local telephone service; (B) toll telephone service; and (C) teletypewriter exchange service." *Id*. Section 4252 defines "toll telephone service" as:

> (1) a telephonic quality communication for which (A) *there is a toll charge which varies in amount with the distance and elapsed transmission time of each individual communication* and (B) the charge is paid within the United States, and
>
> (2) a service which entitles the subscriber, upon payment of a periodic charge (determined as a flat amount or upon the basis of total elapsed transmission time), to the privilege of an unlimited number of telephonic communications to or from all or a substantial portion of the persons having telephone or radio telephone stations in a specified area which is outside the local telephone system area in which the station provided with this service is located.

26 U.S.C. § 4252(b) (emphasis added). The section defines "local telephone service" as:

> (1) the access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and
>
> (2) any facility or service provided in connection with a service described in paragraph (1).

No. 04-4009                 *OfficeMax, Inc. v. United States*                            Page 5

26 U.S.C. § 4252(a). The section defines "teletypewriter exchange service" as:

> the access from a teletypewriter or other data station to the teletypewriter exchange system of which such station is a part, and the privilege of intercommunication by such station with substantially all persons having teletypewriter or other data stations constituting a part of the same teletypewriter exchange system, to which the subscriber is entitled upon payment of a charge or charges (whether such charge or charges are determined as a flat periodic amount, on the basis of distance and elapsed transmission time, or in some other manner).

26 U.S.C. § 4252(c).

As these sections of the tax code reveal, Congress used "and" in more than one sense when it enacted these provisions in 1965—giving it a conjunctive meaning (requiring all items) in some places and giving it a disjunctive or cumulative meaning (allowing any of the items) in other places. Section 4252(b)(1), for example, requires that the toll charge vary in amount with the distance and elapsed time of each individual communication "and" that the charge be paid within the United States. Both sides of this "and," the parties agree, must be satisfied for the telephone service to be taxable. The same is true of other uses of the term in these provisions. *See* 26 U.S.C. § 4252(a)(1) (defining one alternative meaning of "local telephone service" as "access to a local telephone system, *and* the privilege of telephonic quality communication with . . . such local telephone system") (emphasis added); § 4252(c) (defining "teletypewriter exchange service" as "access . . . to the teletypewriter exchange system . . . *and* the privilege of intercommunication . . . with substantially all persons . . . [in] the same teletypewriter exchange system") (emphasis added).

At times, however, Congress used the term differently. Take § 4251: it defines "communications services" as "local telephone service, toll telephone service, *and* teletypewriter exchange service." 26 U.S.C. §4251 (emphasis added). No one doubts the disjunctive (or cumulative) nature of this usage because the definitions of the services in § 4252 are generally mutually exclusive and because no service exists that can satisfy all three definitions at once. Section 4252 likewise uses "and" to connect a list of alternative definitions of toll telephone service found in §§ 4252(b)(1) and (b)(2). Here, too, no one contests that a "toll charge which varies in amount with the distance and elapsed transmission time of each individual communication," § 4252(b)(1), cannot simultaneously be a "periodic charge (determined as a flat amount or upon the basis of total elapsed transmission time) [for] the privilege of an unlimited number of telephonic communications," § 4252(b)(2).

As these different usages reveal, there is more to "and" than meets the eye. The case, then, does not simply turn on the intuition that "and" means "and," "or" means "or," and never the twain shall meet. For several reasons, however, the "and" at issue in this dispute requires a telephone company's toll charge to vary both by distance and time to be taxable.

*First*, dictionary definitions, legal usage guides and case law compel us to start from the premise that "and" usually does not mean "or." Dictionaries consistently feature a conjunctive definition of "and" as the primary meaning of the word, *see, e.g.,* Webster's Third New International Dictionary 80 (2002) ("along with or together with . . . added to or linked to . . . as well as"), or the first usage of the word historically, *see* Oxford English Dictionary (2d ed, 1989) ("[i]ntroducing a word, clause, or sentence, *which is to be taken side by side with, along with,* or *in addition to,* that which precedes it"); Caleb Nelson, *Originalism and Interpretive Conventions*, 70 U. Chi. L. Rev. 519, 519 (2003) ("In all living languages, the conventional usages of individual words change over time. For illustrations, one need only consult the Oxford English Dictionary, which arranges its definitions of each word so that they proceed from the earliest usages to those that were introduced more recently."). *Cf.* Webster's Third New International Dictionary 80 (2002)

(alternative six of the second definition of "and": "reference to either or both of two alternatives . . . esp[ecially] in legal language when also plainly intended to mean *or*").

Legal usage guides are to the same effect. *See* 1A Norman J. Singer, Statutes and Statutory Construction § 21.14 at 179–80 (6th ed. 2002) ("Statutory phrases separated by the word 'and' are usually to be interpreted in the conjunctive." ); *id.* at 183–84 ("While there may be circumstances which call for an interpretation of the words 'and' and 'or,' ordinarily these words are not interchangeable. The terms 'and' and 'or' are often misused in drafting statutes. . . . The literal meaning of these terms should be followed unless it renders the statute inoperable or the meaning becomes questionable."); 1 *Bouvier's Law Dictionary and Concise Encyclopedia* 194–95 (3d Revision 1914) ("A conjunction connecting words or phrases expressing the idea that the latter is to be added to or taken along with the first. It is said to be equivalent to 'as well as.'"); *id.* at 195 ("It is sometimes construed as meaning 'or.'"); Bryan A. Garner, *A Dictionary of Modern Legal Usage* 55 (2d ed. 1995) ("Oddly, *and* is frequently misused for *or* where a single noun, or one of two nouns, is called for. . . . Sloppy drafting sometimes leads courts to recognize that *and* in a given context means *or*, much to the chagrin of some judges." (quoting *MacDonald v. Pan Am. World Airways, Inc.*, 859 F.2d 742, 746 (9th Cir. 1988) (Kozinski, J., dissenting) ("We give our language, and our language-dependent legal system, a body blow when we hold that it is reasonable to read 'or' for 'and.'"))).

Reflecting these traditional assumptions about the meaning of the term, the Supreme Court has said that "and" presumptively should be read in its "ordinary" conjunctive sense unless the "context" in which the term is used or "other provisions of the statute" dictate a contrary interpretation. *See Crooks v. Harrelson*, 282 U.S. 55, 58 (1930) ("We find nothing in the context or in other provisions of the statute which warrants the conclusion that the word 'and' was used otherwise than in its ordinary sense."); *United States v. Field*, 255 U.S. 257, 262 (1921) ("These conditions are expressed conjunctively; and it would be inadmissible, in construing a taxing act, to read them as if prescribed disjunctively."); *City of Rome v. United States*, 446 U.S. 156, 172 (1980) ("By describing the elements of discriminatory purpose and effect in the conjunctive, Congress plainly intended that a voting practice not be precleared unless *both* discriminatory purpose and effect are absent."). The federal courts of appeals have done likewise. *See, e.g., Bruce v. First Fed. Sav. & Loan Ass'n of Conroe Inc.*, 837 F.2d 712, 715 (5th Cir. 1988) ("The word 'and' is therefore to be accepted for its conjunctive connotation rather than as a word interchangeable with 'or' except where strict grammatical construction will frustrate clear legislative intent.").

When courts have interpreted "and" disjunctively, they have done so only to avoid an incoherent reading of a statute. *See Slodov v. United States*, 436 U.S. 238, 246–47 (1978) (interpreting a statute disjunctively that limited personal liability to "any person required to collect, truthfully account for *and* pay over any tax imposed by this title" because a conjunctive reading would lead to an absurd result: "Because the duty to pay over the tax arises only at the quarter's end, a 'responsible person' who willfully failed to collect taxes would escape personal liability for that failure simply by resigning his position."(quotations and brackets omitted)); *Sosa v. Chase Manhattan Mortgage Corp.*, 348 F.3d 979, 981, 983 (11th Cir. 2003) (interpreting as disjunctive the phrase "[n]o person shall give and no person shall accept any portion" because "[e]xtending liability only if there were both a culpable giver and acceptor of an unearned fee would lead to irrational results"); *United States v. Bonilla-Montenegro*, 331 F.3d 1047, 1050–51 (9th Cir. 2003) (interpreting as disjunctive a definition of "crime of violence"—"an offense . . . that has as an element the use . . . of physical force . . . *and* [ ] includes murder, manslaughter, kidnapping, [etc.]"—because it would "def[y] common sense" to require an enumerated crime of violence also to have a use-of-force element (quotation omitted)); *Peacock v. Lubbock Compress Co.*, 252 F.2d 892, 893 (5th Cir. 1958) (interpreting as disjunctive "an employer engaged in . . . the ginning *and* compressing of cotton" because "compressing is an operation entirely removed from ginning and [ ] the two are never carried on together").

*Second*, consistent with the inquiry proposed by these definitions and cases, there is nothing unusual (or for that matter absurd) about requiring a telephone toll charge to vary both with distance and time before subjecting it to tax. That is exactly the way long-distance calls were charged for a considerable period of time. In 1965, when Congress enacted this definition, the country had just one long-distance telephone provider, and AT&T billed for long-distance calls based both on the distance and time of the call or on a WATS-line basis (i.e., a flat rate for unlimited calling). Not surprisingly, when the drafters of § 4252 defined taxable long-distance service, they adopted a definition that turns on the distance-and-time measure of charging for the call, *see* § 4252(1), and a definition that turns on the WATS-line method of billing, *see* § 4252(2).

There *is* something odd, by contrast, about giving the distance-and-time requirement a disjunctive interpretation. Why would Congress write a statute that says toll charges may vary by time or distance? In the last decade, it is true, *time*-varied toll charges have proved to be a viable stand-alone option. How strange, however, to impose a toll charge that varies solely by *distance*, with all calls from, say, Columbus, Ohio to Bozeman, Montana costing the same amount regardless of whether they last 60 seconds, 60 minutes or 60 days. At no point in this litigation has the government given us any indication that there is now, or ever has been, such a curious billing practice.

The government, we suppose, might respond that the drafters had a different disjunctive interpretation of "and" in mind. Instead of taxing calls charged on one basis (distance) or the other (time), what Congress really meant to do was to tax calls charged on the basis of time and distance together or on the basis of time alone. Given the presumption that "and" has a conjunctive meaning and given the understandable reason why Congress would have embraced that meaning here, it is hard to see why we should adopt not just a disjunctive reading of the term but such a nuanced and changeable one.

*Third*, context bolsters this conclusion. In writing the 1965 legislation, Congress defined three types of taxable communication services: "toll telephone service," "local telephone service" and "teletypewriter exchange service." It chose to define local telephone service simply by reference to "access" to "a" local telephone system; it chose to define the other two services by reference to the method of charging for those services. As to toll telephone service, we have seen, Congress taxed long-distance phone calls charged on the basis of time and distance. In defining teletypewriter exchange, it chose not to use a time-and-distance methodology alone and chose not to deploy the all-purpose, protean "and" that the government claims was used in defining toll telephone service. Rather than limit the taxable communication services to one billing method, it imposed the tax on charged teletypewriter services "whether such charge or charges are determined as a flat periodic amount, on the basis of distance and elapsed transmission time, or in some other manner." 26 U.S.C. § 4252(c).

This phrase, enacted at the same time as § 4252(1)(A), shows that Congress used a distance-and-time formulation elsewhere in the same bill and plainly meant it to have a traditionally conjunctive connotation there. *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 570 (1995) (recognizing "that identical words used in different parts of the same act are intended to have the same meaning"(quotation omitted)). And it shows the ease with which Congress could have demonstrated the taxability of different methods of toll charges or all charges ("or in some other manner") had it wished to do so when defining toll telephone service.

*Fourth*, in reaching this conclusion, we are not alone. Every court to reach this issue—save one district court subsequently reversed—has concluded that the statute unambiguously requires variance by both distance and elapsed transmission time. *See Am. Bankers Ins. Group v. United States*, 408 F.3d 1328 (11th Cir. 2005) (reversing *Am. Bankers Ins. Group, Inc. v. United States*, 308 F. Supp. 2d 1360 (S.D. Fla. 2004)); *Am. Online, Inc. v. United States*, 64 Fed. Cl. 571 (Ct. Cl. 2005);

No. 04-4009       *OfficeMax, Inc. v. United States*                                              Page 8

*Honeywell Int'l, Inc. v. United States*, 64 Fed. Cl. 188 (Ct. Cl. 2005); *AMTRAK v. United States*, 338 F. Supp. 2d 22 (D.D.C. 2004); *Hewlett-Packard Co. v. United States*, No. 04-03832, 2005 U.S. Dist. LEXIS 199972 (N.D. Cal. Aug. 5, 2005); *Reese Bros. v. United States*, No. 03-745, 2004 U.S. Dist. LEXIS 27507 (W.D. Pa. Oct. 20, 2004); *Fortis, Inc. v. United States*, No. 03 Civ. 5137, 2004 U.S. Dist. LEXIS 18686 (S.D.N.Y. Sept. 16, 2004). We are comfortable in charting a similar course here.

Attempting to counter this conclusion, the government first argues that we must account for the other uses of "and" in this legislation that have a disjunctive or cumulative meaning. But the case law referenced above adequately accounts for this argument. As those cases provide, "and" presumptively has a conjunctive meaning save when that interpretation makes little or no sense in context. Sections 4251 and 4252, it is true, contain three instances where "and" is not used in its customary conjunctive sense. But in each case, context requires the term to be construed disjunctively because it conjoins a list of mutually exclusive alternatives. *See* § 4251(b)(1) (taxing "(A) local telephone service; (B) toll telephone service; *and* (C) teletypewriter exchange service") (emphasis added); § 4252(b) (defining "toll telephone service" as the definition at issue in this case "*and*" an alternative definition that could not be satisfied simultaneously) (emphasis added); § 4252(a) (defining "local telephone service" as "(1) [a substantive definition] *and* (2) any facility or service provided in connection with a service described in paragraph (1)") (emphasis added). In marked contrast, a toll charge simultaneously may be based on variations in distance and time.

The government next argues that these other uses of "and" at a minimum establish ambiguity about the meaning of the term in § 4252(b)(1)(A). "[A]mbiguity," however, "is a creature not of definitional possibilities but of statutory context." *Brown v. Gardner*, 513 U.S. 115, 118 (1994). And the question whether a statute is ambiguous arises after, not before, a court applies traditional canons of interpretation—the most important here being the context in which the word appears and the presumption that "and" carries a conjunctive connotation. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984) ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").

Nor does the government's invocation of legislative history advance its cause. For one, the government has not presented the necessary warrant—a case of statutory ambiguity—for commencing a search of the statute's legislative history. *See Ex parte Collett*, 337 U.S. 55, 61 (1949); *Chapman v. The Higbee Co.*, 319 F.3d 825, 829 (6th Cir. 2003); *see also United States v. R.L.C.*, 503 U.S. 291, 307–11 (1992) (Scalia, J., concurring).

For another, even the most far-reaching search of the legislative history behind the 1965 Act uncovers little. The committee report describing this provision elucidates nothing; it merely parrots the language that Congress ultimately enacted into law. *Cf.* Pub. L. No. 89-44, 79 Stat. 136, 146, *with* H.R. Rep. No. 433 (1965), *reprinted in* 1965 U.S.C.C.A.N. 1645, 1677 ("Toll telephone service is defined as being a telephonic quality communication for which a toll charge is made which varies in amount with the distance and the lapsed transmission time of individual communications, but only if the charge is paid within the United States.").

And the explanations for passing the 1965 Act do as much to undermine the government's position as to support it. When Congress enacted the present definition of toll telephone service in 1965—changing it from a broad definition of a service for which a toll was charged and paid within the United States, Pub. L. No. 85-859, 72 Stat. 1275, 1290 (1958)—it defined the phrase in a way that accounted for two distinct billing methods employed in 1965 by AT&T, the sole long-distance provider at that time. As we have noted, the first method calculated a charge for each call based on