elapsed time and distance. The distance between the originator and receiver of the call would fall within one of several concentric mileage bands measured from the call's origin. The per-minute rate of the call varied depending on which mileage band applied. This system was codified in § 4252(b)(1). The second method, known as "Wide Area Telephone Service" or "WATS," calculated one charge per billing period, based on either a flat rate or the total elapsed time of all calls made during the period. This charge entitled the customer to an unlimited number of calls regardless of distance, and it was codified in § 4252(b)(2). *See* 1965 USCCAN 1676–77.

All of this supports our interpretation. It shows why Congress would define toll telephone service as requiring a charge that varied both by time and distance. And it shows why Congress would define taxable telephone calls based on how a private company billed the calls: There was just one company; AT&T's job was to collect the tax, not to pay it; and its monopoly status eliminated any commercial pressure to accommodate tax-sensitive clients.

Persisting, the government points out that (1) Congress crafted the new definitions "to make it clear that it is the service as such which is being taxed and not merely the equipment being supplied," 1965 USCCAN 1676, not to exempt certain long-distance phone calls from taxation, and (2) Congress added an important exemption for "private communication services" (e.g., intercoms) but again did not aim to eliminate from taxation certain long-distance calls because of the way they were billed. Even if we were to infer from these shards of legislative evidence that Congress meant to tax all long-distance service as it existed in 1965—through the creation of a definition based on extant billing methods—that does not mean we should interpret the same language to include all long distance service as it exists today. A statute enacted in 1890 that imposed an excise tax on sales, say, of "any vehicle of transportation" would cover airplanes, even though they were not invented until several years after 1890. Yet a statute enacted in 1890 that taxed sales of "any vehicle of transportation designed to convey passengers by land or sea" would not cover sales of traditional airplanes, even though the legislator's purpose in 1890 could fairly be characterized as taxing all modes of transportation. Why should it be any different for this tax when time brings to an end an uncompetitive communications market and leads to wireless telephone communication (for which distance-based billing may make less sense)? As these examples suggest and as the terms of the 1965 legislation require, "[i]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 79–80 (1998).

A legislature that chooses to define eligibility for taxation based on how a *private entity* chooses to charge for the service, moreover, can hardly be treated as a body that means to impose a tax for all time. Just the opposite seems true, as the approach ultimately cedes the taxing authority to private entities, which is presumably why this method of taxation infrequently appears in Title 26.

A party willing to invoke broad generalizations of legislative purpose, at any rate, must account for equally plausible—yet vastly different—characterizations of that intent. When Congress wrote the present definition of toll telephone service in 1965, it planned to eliminate the tax in its entirety over the following three years. Entitled the "Excise Tax Reduction Act," the 1965 legislation imposed an immediate reduction of the telephone tax (from 10 percent to 3 percent), established an annual one-percent reduction of the tax, then called for the elimination of the tax on January 1, 1969. *See* 1965 USCCAN 1676; *id.* at 1645, 1649 (noting that the legislation "either in the current fiscal year, or over the next 3 subsequent years, removes entirely [the] miscellany of selective excise taxes [including the communications services excise tax] except those designed to serve certain specific purposes"); *id.* at 1655 (House committee report noted that "[i]n large part, these taxes were imposed as emergency wartime measures (either in World War II or the Korean War) or as an emergency method of raising revenues at the time of the depression of the 1930's"). The Congress that enacted this legislation thus did not contemplate the continued application of the

language past January 1, 1969, let alone to 1999. No matter how clear its design to include the lion's share of long-distance service in existence between 1965 and 1969, that does not lead to the inference that the 1965 Congress meant to tax the lion's share of long distance service in existence between 1999 and 2002. In the end, "application of 'broad purposes' of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action." *Board of Governors of Federal Reserve System v. Dimension Financial Corp.*, 474 U.S. 361, 373–74 (1986); *Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (per curiam) ("[I]t frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law.").

   The government also fails to gain ground by emphasizing that "the statute does *not* state that the charge must vary with '*both* distance and elapsed time.'" U.S. Br. at 27. The presumption that "and" has a conjunctive meaning, however, spares legislative drafters from having to use a belt-and-suspenders approach (or, shall we say, both belt-and-suspenders approach) every time they deploy the term. The argument also comes perilously close to suggesting an interpretive presumption in favor of the government and against the taxpayer. Regardless of the current status of the "traditional canon that construes revenue-raising laws against their drafter," *United Dominion Indus. v. United States*, 532 U.S. 822, 839 (2001) (Thomas, J., concurring), the government has not identified any case establishing an opposite presumption. *See Bowers v. New York & Albany Literage Co.*, 273 U.S. 346, 350 (1927) ("The provision is part of a taxing statute; and such laws are to be interpreted liberally in favor of the taxpayers."); *United States v. Merriam*, 263 U.S. 179, 188 (1923) ("If the words are doubtful, the doubt must be resolved against the government and in favor of the taxpayer."); *Benziger v. United States*, 192 U.S. 38, 55 (1904); *American Net & Twine Co. v. Worthington*, 141 U.S. 468, 474 (1891); *Leavell v. Blades*, 141 S.W. 893, 894 (Mo. 1911) ("When the tax gatherer puts his finger on the citizen, he must also put his finger on the law permitting it.").

   The government next urges us to defer to a 1979 IRS revenue ruling holding that a ship-to-shore satellite service that charged users *without reference to distance* satisfied the definition of "toll telephone service." Rev. Rule 79-404, 1979-2 C.B. 382. But the one-page analysis in this revenue ruling does not contain the traditional hallmarks for receiving deference, whether under *Chevron*, or under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). The revenue ruling acknowledges that "[l]iterally, the service provided in this case does not come within the definition of . . . 'toll telephone service' . . . because the charge for such service does not vary with distance and therefore does not meet the requirement of section 4252(b)(1)." Rev. Rule 79-404, 1979-2 C.B. 382, *3. It then echoes the point, explaining that "[t]he toll charges described in section 4252(b)(1) . . . vary in amount with *both* distance and elapsed transmission time of the individual communication." *Id.* at *6 (emphasis added). Despite this "literal[]" meaning of the statute, the IRS determined that the communications service was "essentially" a toll telephone service "in order to comport with the legislative intent" of the statute, which it discerned as seeking to encompass all long-distance service in existence in 1965 and therefore all long-distance service in the future (including what was being provided in 1979). In the IRS's words:

> The service in this case is essentially "toll telephone service" as described in section 4252(b)(1) of the Code, even though the charge for calls between remote maritime stations and stations in the United States vary with elapsed transmission time only. The toll charges described in section 4252(b)(1), that vary in amount with both distance and elapsed transmission time of the individual communication, reflect Congress' understanding of how the charges for long distance calls were computed at the time the section was enacted. The intent of the statute would be frustrated if a new type of service otherwise within such intent were held to be nontaxable merely because charges for it are determined in a manner which is not within the literal language of the statute.

No. 04-4009          *OfficeMax, Inc. v. United States*                                    Page 11

*Id.* at *6–7.

When the Court decided *Chevron*, five years after this revenue ruling, we do not think it had in mind deferring to tax administrators who wished to impose taxes on services that were "essentially," but not "literally," within the contours of a taxing statute. Even if this circuit gave *Chevron* deference to revenue rulings, which it does not, *see Aeroquip-Vickers, Inc. v. Comm'r*, 347 F.3d 173, 181 (6th Cir. 2003) (declining to give *Chevron* deference to revenue rulings because they lack the "force of law"); *Ammex, Inc. v. United States*, 367 F.3d 530, 535 n.2 (6th Cir. 2004) (same), this revenue ruling would not clear step one of the *Chevron* test.

Likewise, even assuming revenue rulings were entitled to *Skidmore* respect, *cf. United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 220 (2001) (declining to decide whether revenue rulings are entitled to deference at all), that deference would apply to a revenue ruling "only to the extent that [it has] the 'power to persuade.'" *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (quoting *Skidmore*, 323 U.S. at 140). Under *Skidmore*, courts should consider "'the thoroughness evident in [the ruling's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (quoting *Skidmore*, 323 U.S. at 140). Generated by an agency that frequently insists that its citizens "turn square corners," *Rock Island, Ark. & Lou R.R. Co. v. United States*, 254 U.S. 141, 143 (1920), this revenue ruling no more supports an "essential" method of tax imposition than it does an "essential" method of tax payment. As other parts of our opinion explain, neither the legislative history nor one-sided generalizations about the purpose of the law make the case for straying from the ordinary meaning of the language in the statute. Agencies in the end receive *Skidmore* respect because of the persuasiveness of their reasoning, not in spite of it.

No more availing is the government's argument that, no matter how unpersuasive the revenue ruling is, we must defer to it because Congress repeatedly has reenacted the excise tax since 1979. The Supreme Court has not spoken with one mind on this issue. On the one hand, the Court has said that "[w]here an agency's statutory construction has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned." *North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982). On the other hand, the Court has said: "We walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle." *Helvering v. Hallock*, 309 U.S. 106, 121 (1940); *see also Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 186 (1994). Never mind: even the cases applying the reenactment doctrine impose limitations on it that are applicable here—"where the law is plain, subsequent reenactment does not constitute an adoption of a previous administrative construction." *Brown*, 513 U.S. at 121. And the doctrine does not apply when "the record of congressional discussion preceding reenactment makes no reference to the [interpretation], and there is no other evidence to suggest that Congress was even aware of the [agency's] interpretive position." *Id.* Here, the government fails to identify any evidence in the telephone-excise-tax legislation from 1979 to the present that discusses or acknowledges the existence of the 1979 revenue ruling.

The government alternatively urges us to accept another interpretation of the provision, one not yet embraced by any administrative ruling. It claims that "'distance' clearly is shorthand for toll rate," so that even if the statute requires that the toll charge vary by both distance and elapsed time, a service would qualify if the toll charge varied by both toll rate (even a constant toll rate) and elapsed time. U.S. Br. at 35. Under AT&T's billing method in 1965, the government explains, all calls within a certain mileage band were charged at the same per-minute rate regardless of any difference in actual distance spanned by a given call. Because this system could produce equal billing for calls of modestly different distances (but the same time), all that the statute must require

is some per-minute rate, however constant, by which to multiply the elapsed time. But, in making this argument, the government cannot escape the reality that the distance of each individual call under the AT&T system, measured by miles spanned and nothing more, *did* play a crucial role in the calculation of that call's charge. Without knowing the call's distance in miles—hence the reason they were called "mileage bands"—no one could ascertain the appropriate charge for the call. That AT&T bundled concentric mileage ranges into a series of rate quanta does not change this fact. In juxtaposition to the 1965 billing method used by AT&T, MCI's model for billing OfficeMax during the tax years at issue does not take into account the distance of the call.

Nor may the government prevail by comparing AT&T's mileage bands with certain political zones—namely different States for intrastate calling and different countries for international calling—that yield different per-minute rates under the MCI plan for OfficeMax. The crucial variable under OfficeMax's plan is the location of the call's destination (for international calls) or the location of the call's origin and destination (for intrastate calls) within the legal/political boundaries that serve as the dividing line between federal and state regulation of telephone service. That is, the differences in rates do not serve as a proxy for call distance, but instead accommodate the FCC's regulatory jurisdiction over interstate and international calls and the states' regulatory jurisdiction over intrastate calls. *See Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 360 (1986); *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 381 n.8 (1999). Moreover, any possible correlation between political boundaries and a call's total distance is imperfect at best and does not convert any of the political zones into a measure of call distance. In many instances, for example, intrastate calls (which on average would seem to span a shorter distance than the longest of interstate calls) command *higher* per-minute rates than interstate calls.

Judge Rogers' dissent prompts a few responses. We agree with him that "and" may have a cumulative meaning or what comes to the same thing—a non-exclusive disjunctive meaning. And we agree that his examples—"I like bourbon and water" and "I like beer and wine"—begin to illustrate the difference. While context and common sense suggest that the former means both together, they suggest that the latter means either or both independently. But from the vantage point of the regulator or the regulated in 1965, the better analogy for "time and distance" was "bourbon and water," not "beer and wine." In 1965, "time and distance" were used in combination to measure telephone fees in 1965 by the only telephone company on the market. Just as "bourbon and water" in context unambiguously requires both items, so does "time and distance."

But whether one prefers "bourbon and water" or "beer and wine," each analogy is missing an ingredient featured here. Bourbon, water, beer and wine are all stand-alone items. Not so of "time and distance." Distance, as we have shown, was not then, is not now and never has been used as a stand-alone measure for billing a phone call. Because one half of the pair in this case cannot operate independently, the better analogy is to "bread and butter," "pancakes and syrup," "chips and dip," or less abstemiously, to "Corona and lime," or least appetizingly, to "tequila and worm." As in these examples, context and common sense indicate that the inability of one item in a conjoined pair to function independently means that they must be combined, that they must come two by two, not one by one. The same is true of "time and distance": While time can function alone, distance cannot. The same problem undermines the dissent's Venn-diagram argument, which mistakenly suggests that distance can exist as a stand-alone item.

Lastly, for the dissent, it suffices to say three things in resolving this case: (1) "and" may have an in-combination meaning or a cumulative meaning: (2) the statute thus is ambiguous; and (3) the government thus should prevail under *Skidmore* deference. Leaving to the side the question of how many statutory "ands" in the United States Code would be eligible for ambiguity status under this interpretation, let us start by reiterating that context, common sense, history and the conjunctive time-and-distance formulation deployed in the tax for teletypewriter service in 1965 ("whether such charge or charges are determined as a flat periodic amount, on the basis of distance and elapsed

transmission time, or in some other manner," 26 U.S.C. § 4252(c)) all show that this "and" unambiguously has a conjunctive, in-combination meaning.

But even were that not the case, it would not alter our conclusion. *Skidmore* breathes deference into an agency's interpretation based "upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements"—based upon, in short, its "power to persuade." 323 U.S. at 140. But the revenue ruling at issue here takes an approach that the dissent castigates. The ruling acknowledges that "and" "literally" requires both time and distance: "The toll charges described in section 4252(b)(1), that vary in amount with both distance and elapsed transmission time of the individual communication, reflect Congress' understanding of how the charges for long distance calls were computed at the time the section was enacted." Rev. Rule 79-404, 1979-2 C.B. 382. In abandoning this natural interpretation, the revenue ruling says that "a new type of service" cannot avoid taxation "merely because charges for it are determined in a manner which is not within the literal language of the statute." *Id.* The dissent does not defend that reasoning, and it does not defend the government's litigating position in this case. *Cf. Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."). *Skidmore* deference does not apply to a line of reasoning that an agency could have, but has not yet, adopted.

That leaves only the possibility of deferring to the agency's interpretation, not because it makes sense on its own terms, but because of its longevity. While the 1979 revenue ruling concerned the same definition of "toll telephone service" at issue in this case, it arose long before accessible cellular service (and other developments) led telephone companies to begin charging on the basis of time alone and it arose in the context of ship-to-shore satellites, a service that (contrary to the dissent's suggestion) would not necessarily grab the attention of members of Congress and their staff. The real test for the agency came in the last decade when taxpayers began filing refund claims based on the decisions of long-distance carriers to begin charging on the basis of time alone. What the agency did at that point remains unclear. The taxpayer in this case argues that the IRS has settled many of these claims for well less than 100 cents on the dollar but claims it has been stymied in its attempts to obtain access to IRS records to establish whether that is true. At oral argument, we did not receive a clear answer one way or another. Under these circumstances and with respect to this anomalously reasoned revenue ruling, we are not prepared to defer to a ruling that only became relevant to today's debate in the last decade and that may or may not have been followed consistently by the agency. Accordingly, whether the "and" in § 4252(b)(1) is ambiguous or not, the government has not identified any tenable bases for deferring to its position—save for the facts that it is the government and we depend on its fiscal health, which are not enough.

III.

The government argues that if it may not tax OfficeMax's service under § 4252(b)(1), it may tax the company under the so-called WATS-line definition of "toll telephone service," § 4252(b)(2), or under the definition of "local telephone service," § 4252(a). We disagree.

The alternative definition of "toll telephone service," recall, covers:

> a service which entitles the subscriber, upon payment of a *periodic charge (determined as a flat amount or upon the basis of total elapsed transmission time)*, to the privilege of an *unlimited number* of telephonic communications to or from all or a substantial portion of the persons having telephone or radio telephone stations in a *specified area* which is outside the local telephone system area in which the station provided with this service is located.