26 U.S.C. § 4252(b)(2) (emphasis added). The government does not contend that OfficeMax paid a flat amount for unlimited service. It instead contends that because the toll charge for each individual communication varied by elapsed transmission time alone, the service amounted to a periodic-charge service determined on the basis of total elapsed transmission time. Not so. OfficeMax's monthly bill was a total of toll charges calculated for each individual call. And for each of these calls, MCI rounded up to the next billing increment and multiplied by a variable rate to determine the individual call's charge. The rate was subject to variation depending on other individual characteristics of the call as well, including "the time of day in which the call was made," *OfficeMax, Inc. v. United States*, 309 F. Supp. 2d 984, 987 (N.D. Ohio 2004). The end result is not a "periodic charge" based on total elapsed time (or even total elapsed time *itself* rounded up to the next billing increment) but rather a monthly bill based on a summation of toll charges for individual communications. Due to the rounding, the total actual elapsed time of a bill could vary significantly without a change in the total amount due. The government's argument also eschews the dichotomy that the legislation sets in place between services billed by call and services billed by period regardless of the number of calls. OfficeMax's phone services fall on the by-call side of this line. Finally, the government's argument departs from the requirements that the service must be both "unlimited" and to "a specified area." *See* 26 U.S.C. § 4252(b)(2). The statutory language mirrors the concept of AT&T's traditional WATS service, which for a flat rate allowed customers to make as many calls as they wanted to one of AT&T's six U.S. service areas. OfficeMax's phone service, as noted, levels charges for each call made, eschewing any reasonable definition of "unlimited" and allows calls to any non-local portion of the country, stretching the limits of "specified area." All other courts reaching this issue have concluded similarly. *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328 (11th Cir. 2005) (reversing *Am. Bankers Ins. Group, Inc. v. United States*, 308 F. Supp. 2d 1360 (S.D. Fla. 2004)); *Am. Online, Inc. v. United States*, 64 Fed. Cl. 571 (Ct. Cl. 2005); *Honeywell Int'l, Inc. v. United States*, 64 Fed. Cl. 188 (Ct. Cl. 2005); *Hewlett-Packard Co. v. United States*, No. 04-03832, 2005 U.S. Dist. LEXIS 19972 (N.D. Cal. Aug. 5, 2005); *Reese Bros. v. United States*, No. 03–745, 2004 U.S. Dist. LEXIS 27507 (W.D. Pa. Oct. 20, 2004); *Fortis, Inc. v. United States*, No. 03 Civ. 5137, 2004 U.S. Dist. LEXIS 18686 (S.D.N.Y. Sept. 16, 2004). Indeed, even the government has elsewhere argued that § 4252(b)(2) applies exclusively to the traditional AT&T WATS service. *See AMTRAK v. United States*, 338 F. Supp. 2d 22, 28 (D.D.C. 2004) ("The IRS argues that 'Congress drafted §4252(b)(2) *purely* to cover WATS service.'"(emphasis added)).

Next, the provision defines "local telephone service" as "(1) the access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and (2) any facility or service provided in connection with a service described in paragraph (1)." 26 U.S.C. § 4252(a). "The term 'local telephone service,'" the statute adds, "does not include any service which is a 'toll telephone service.'" *Id.* The government argues that OfficeMax's plan must be a service provided in connection with a local telephone service because all long-distance services eventually require access to local telephone systems. The only obstacle to a long distance service qualifying as a local telephone service, it adds, is the language excluding toll telephone service from the definition of local telephone service. Once it is determined that the OfficeMax plan does not qualify as a toll telephone service, the government concludes, it is eligible to be taxed as a local telephone service.

Yet the definition of local-telephone service requires "access to a" local telephone system, not "access to every" local telephone system included within the boundaries of a long-distance plan. Not surprisingly, given its application to "local" telephone service, the definition contemplates a service with limited geographic reach, not a plan that makes use of an untold number of local services. Applying the local-telephone definition to the long-distance telephone definition, moreover, not only blurs the line between two statutorily defined services but also is puzzling. It makes one wonder why Congress would not eliminate the definition of toll telephone service altogether and apply the tax to all telephone services of any kind.

No. 04-4009            *OfficeMax, Inc. v. United States*                              Page 15

IV.

For these reasons, we affirm.

---

## DISSENT

---

ROGERS, Circuit Judge, dissenting. A host separately asked two prospective guests what they liked to drink. One said, "I like bourbon and water." The other said, "I like beer and wine." When the second guest arrived at the event, the host served the guest a glass of beer mixed with wine. "What's that awful drink?" said the guest, to which the host answered, "You said you liked beer and wine." Replied the guest: "Pfui! You know what I meant. Quit playing word games and get me something I can drink."

Of course the host *was* "playing word games," because the meanings of both "I like bourbon and water" and of "I like beer and wine" are clear. In the first sentence "I like" applies to "bourbon and water" together, whereas in the second sentence "I like" applies to each of "beer" and "wine" separately. Stated differently, the preceding words are distributed over the conjoined elements in the second sentence, so that the meaning is "I like beer and [I like] wine." But the preceding words are not distributed over the conjoined elements in the first sentence, so that the meaning is "I like (bourbon and water)." In each sentence the word "and" has the same *conjunctive* meaning—the difference lies in whether the preceding words are distributed over the conjoined elements or not. Whether to interpret the preceding words as distributed over the conjoined elements or not depends on the context of the sentence, and what we externally know about the conjoined elements. Given what we know about the social context, and what we know about bourbon, water, beer and wine, the meanings of the two sentences are not at all ambiguous.

I respectfully dissent in this case because it is similarly clear—from the regulatory context and what we know about telephone toll charges—that the words preceding the conjoined elements of "distance and elapsed transmission time" in the definition of "toll telephone service" are to be distributed over the two conjoined elements. That is, "a telephonic quality communication for which there is a toll charge which varies in amount with the distance and elapsed transmission time of each individual communication" means "a telephonic quality communication for which there is a toll charge which varies in amount with the distance and (a telephonic quality communication for which there is a toll charge which varies in amount with the) elapsed transmission time of each individual communication." This natural language interpretation of the statutory language entirely disposes of OfficeMax's contention that it does not owe a 3% excise tax on telephone toll charges that vary based on elapsed time, but do not vary based on distance. The tax is obviously owed.

What we know about the context and about the nature of the conjoined elements strongly supports this interpretation. It is undisputed that, at the time of enactment of the language in question, the excise tax covered all home and business telephone charges, with the exception of an itemized list of special categories, such as services to certain news services and to state and local governments. It strains credulity that Congress intended that the phone company could unilaterally repeal a substantial tax on its customers by the simple expedient of combining its 6 or 7 long distance bands into one single band. It also strains credulity that Congress repeatedly refrained from repealing the excise tax on telephone charges, presumably because it counted on the revenue, while simultaneously intending to effect a repeal of the tax on the simple condition that phone companies find it practical to combine their long distance charging bands into one band.

Of course without context or external knowledge, it is just as possible that all taxable toll charges have to vary both by distance and elapsed time. Maybe the second guest really wanted beer and wine in the same glass. Such a possibility at most creates an ambiguity. In the presence of an ambiguity, however, we are instructed by cases such as *Skidmore v. Swift & Co.* generally to defer to a long-standing agency interpretation. *See Skidmore*, 323 U.S. 134, 139-40 (1944). This is not

*Chevron* deference, which if applicable would unquestionably require a ruling in the government's favor.[1] Instead, it is deference based on two powerful underlying considerations: (1) the agency is better positioned than the court to interpret specialized language, given its greater familiarity with the context in which the words are to be effectuated, and (2) congressional acquiescence in the agency interpretation may be inferred from Congress's inaction in the face of agency application of the challenged interpretation. These two considerations, to the extent that they are warranted, support the idea that the agency properly interpreted what Congress wanted.[2]

While the first of these considerations is reasonably strong in this case, the second is exceptionally powerful. *Skidmore* states that the weight of an agency interpretive opinion depends in part on "its consistency with earlier and later pronouncements." 323 U.S. at 140. The logical basis for taking consistency into account is perforce that Congress must have acquiesced in the agency's interpretation where it has been consistently applied. In contrast, where the agency has gone back and forth on an interpretation, there is much less reason to expect Congress to step in and fix the interpretation. *See Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 142-43 (1976). In the mine run of administrative interpretations, of course, this analysis has a fictional air to it. It is hard to say with confidence that members of Congress are really tracking the interpretive determinations of agencies, even when such determinations are consistent. Instead, the most we can say is that a consistent interpretation that adversely affects certain interests would be drawn to congressional attention in a way that might provoke a congressional response. In the absence of such a response, Congress can be assumed to be satisfied with the consistent interpretation, in the sense that Congress is politically comfortable with the results of the interpretation.

This case is far from the mine run of administrative cases in this respect, however. This is not a case where the agency interpretation has been consistently applied to a series of five or ten administrative litigants around the country. And it is not a case where the politically relevant repercussions have not been felt. Instead, based squarely on the interpretation at issue in this case, millions of phone bills have charged the excise tax, and billions of dollars have been paid. Virtually every congressperson, every congressional staff member, every tax lobbyist, every accountant, and every person familiar with the terms of the statute received phone bills for years reflecting an excise tax on phone charges that varied only by elapsed time. Even more compelling is the political reality that the Government took and spent the money, and Congress, in making revenue determinations, took into account the money so taken in. When Congress debated whether to repeal the excise tax on telephone calls in 2000, at least one member of the House expressed concern over the impending loss of revenue.[3] The inference that Congress acquiesced in the agency's interpretation is thus not

---

[1] *Chevron* held that agency interpretations of ambiguous statutory terms are analogous to agency exercises of statutorily-granted legislative rulemaking power. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984). In *United States v. Mead Corp.*, however, *Chevron* was held not to apply when the agency determination was sufficiently ad hoc that Congress cannot have considered the determination to be the exercise of delegated power to make binding interpretations. 533 U.S. 218, 231-32 (2001). While an argument could be made that *Chevron* deference applies here, by virtue of the innumerable adjudications in which the agency consistently applied its interpretation that the excise tax covered toll charges varying only by elapsed time, it is unnecessary to rely on *Chevron* deference in this case. The weaker but nonetheless substantial *Skidmore* form of deference, clearly applicable here, more than adequately requires that any ambiguity in this case be resolved in favor of the agency.

[2] This contrasts with *Chevron* deference, where the deference is based on the idea that Congress delegated to the agency the power to make decisions by interpreting ambiguous provisions. *See Chevron*, 467 U.S. at 843-44.

[3] *See, e.g.*, 146 Cong. Rec. E884 (2000) (statement of Rep. Stark) ("This bill recklessly cuts $20 billion in taxes that could be used for meaningful legislation . . . ."). The House Committee on Ways and Means in 2000 considered, and reported favorably upon, a bill to eliminate the excise tax on telephone services. H.R. Rep. No. 106-631 (2000). The bill, H.R. 3916, would have phased out the excise tax. From this bill, another argument can be made that Congress, as recently as May 2000, understood that the excise tax covered most long distance charges as they existed at the time.

fictional, but compelling. Congress not only acquiesced in the interpretation, it relied upon it in a very concrete and substantial way. *Skidmore* accordingly strongly supports the conclusion that an ambiguity should be construed in favor of the agency in this case.

The Government's position in this litigation has doubtless been weakened by the remarkably counterintuitive nature of some its arguments. The Government argues among other things that "and" means "or," that "local" means nationwide, and that "distance" means "toll rate." None of these anomalous contentions, however, is necessary to conclude that "toll telephone service" includes a toll charge varying solely by elapsed time.

In particular, it is absolutely *not necessary* for the Government to argue that "and" means "or" in this case, or that "and" has a disjunctive meaning. Two meanings may be possible when elements are conjoined by "and" because of ambiguity as to whether the surrounding words apply to the conjoined elements separately or only together. But under *both* possibilities the elements are *con*joined, added, cumulative. There is nothing disjunctive about it. Thus any discussion of whether "and" should be interpreted conjunctively or disjunctively is beside the point.

An argument could be made that Congress, if it desired to tax telephone charges based only on elapsed time, could have used the disjunctive. That is, Congress could have said, "varies in amount with the distance *or* elapsed transmission time of each individual communication." While Congress could have used such language, that language has the potential for a different set of possible interpretations. Some would argue that such language excludes charges that vary on both bases.

The argument, moreover, is the equivalent of the social host giving the following retort to the second guest: "If you wanted beer or wine, you should have said 'or.'" In another case involving a long-standing agency interpretation asserted to be contrary to plain statutory meaning, the Supreme Court rejected a comparable argument. In *Young v. Community Nutrition Institute*, the Court was asked to determine whether, under 21 U.S.C. § 346, the Food and Drug Administration ("FDA") had a mandatory or discretionary duty to promulgate regulations determining the tolerance levels for harmful, but unavoidable, substances in food. 476 U.S. 974, 978 (1986). Section 346 provided that "the Secretary shall promulgate regulations limiting the quantity therein or thereon to such extent as he finds necessary for the protection of the public health." *Id.* at 977. The FDA had long interpreted the phrase "to such extent as he finds necessary" as modifying the word "shall." *Id.* at 979. A consumer and two public interest groups argued that "to such extent" modifies only "the quantity therein or thereon," thereby requiring the FDA to promulgate tolerance levels. *Id.* at 980. The Court reasoned as follows:

> While we agree with the Court of Appeals that Congress in § 346 was speaking directly to the precise question at issue in this case, we cannot agree with the Court of Appeals that Congress unambiguously expressed its intent through its choice of statutory language. The Court of Appeals' reading of the statute may seem to some to be the more natural interpretation, but the phrasing of § 346 admits of either respondents' or petitioner's reading of the statute. As enemies of the dangling participle well know, the English language does not always force a writer to specify which of two possible objects is the one to which a modifying phrase relates. A Congress more precise or more prescient than the one that enacted § 346 might, if it wished petitioner's position to prevail, have placed "to such extent as he finds necessary for the protection of public health" as an appositive phrase immediately

---

If the Committee thought that the excise tax did *not* cover modern long-distance charges, there would be no need to enact a phase-out. Accordingly, it can be assumed that the Committee believed that without intervention, the excise tax would continue to apply to modern long distance service.

after "shall" rather than as a free-floating phrase after "the quantity therein or thereon." A Congress equally fastidious and foresighted, but intending respondents' position to prevail, might have substituted the phrase "to the quantity" for the phrase "to such extent as." But the Congress that actually enacted § 346 took neither tack. In the absence of such improvements, the wording of § 346 must remain ambiguous.

The FDA has therefore advanced an interpretation of an ambiguous statutory provision.

> "This view of the agency charged with administering the statute is entitled to considerable deference; and to sustain it, we need not find that it is the only permissible construction that [the agency] might have adopted but only that [the agency's] understanding of this very 'complex statute' is a sufficiently rational one to preclude a court from substituting its judgment for that of [the agency]."

*Id.* at 980-81 (citing *Chem. Mfrs. Assn. v. Natural Res. Def. Council, Inc.*, 470 U.S. 116, 125 (1985)).

Finally, the fact that most telephone charges in 1965 varied both by distance and elapsed time does not say anything about what Congress intended when charges were later based solely on elapsed time.[4] The majority suggests that if Congress contemplated charges based solely on time elapsed, Congress must also have had the "strange" intent of imposing a tax on the "curious" practice of billing solely by distance, regardless of elapsed time. For the following reasons, the conclusion simply does not follow.

---

[4]The legislative history of § 4251 supports the position that Congress would have intended the 1965 definition to cover long distance service today and that modern sessions of Congress also thought that current long distance was subject to the tax.

Contrary to the district court's characterization, the definition of toll telephone service was not "narrowed" in 1965 in an attempt to reduce the coverage of the excise tax. The 1965 Excise Tax Reduction Act had multiple goals. The House and Senate Committees did view the excise tax on communication services to be undesirable, because the tax "fell with greater severity on those with low incomes" and harmed businesses. H.R. Rep. No. 89-433 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 1645, 1676. In order to achieve the goal of first reducing the tax, then eliminating the tax altogether, the Act reduced the rate of the tax from its original 10% to 3% in the first year, 2% in the second year, 1% in the third year, with the tax to be eliminated in 1969. *Id.; see also* S. Rep. No. 89-324 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 1690, 1725. (As explained by the majority, the phase-out was later repealed for revenue-related reasons.)

The definition of toll telephone service was not changed to help in the reduction or elimination of the tax. The definition was "updated and modified to make it clear that it is the service as such which is being taxed and not merely the equipment being supplied." 1965 U.S.C.C.A.N. at 1676, 1725. This update was unrelated to the reduction goal, which was addressed in its entirety by the phase-out provisions described above.

No. 04-4009        *OfficeMax, Inc. v. United States*                           Page 20

We can think of charging by elapsed time and charging by distance as overlapping circles, where area A is charging by elapsed time, area C is charging by distance, and area B is charging by both distance and elapsed time. The issue in this case is whether Congress meant to include all charges in areas A, B, and C, or only charges in area B. The majority's argument is based on the idea that, for practical purposes, Congress assumed that areas A and C did not exist; there was only B at the time of enactment. (i.e., the circles happened to be congruent and cover identical areas at the time.) But what do we draw from this? One conclusion is that Congress never intended to create the possibility of a gap in the form of areas A and C. This is the more likely answer, for the reasons given above. Another conclusion is that Congress expressly limited itself to area B, and inadvertently created the gap of A and C, when those possibilities arose. This is less likely given Congress' intention to tax substantially all long distance service. *See supra* note 4.



The majority's point—that area C was a null set in 1965 and continues to be a null set now—really does not affect the analysis one way or another. The issue is whether Congress meant to draw a line around all of A, B, and C, or whether it meant to draw a line around only B. That Congress apparently did not anticipate a gap leads to the conclusion that it did not intend to create one.

In my view, we should not encourage lawyers to play word games at the expense of the public fisc. I respectfully dissent.