## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MBNA America Bank, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 05-cv-257 |
| | ) | |
| United States of America, | ) | |
| | ) | |
| Defendant. | ) | |

---

## UNITED STATES' BRIEF OPPOSING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT and SUPPORTING UNITED STATES' CROSS MOTION FOR SUMMARY JUDGMENT

---

Dated:      February 28, 2006

COLM F. CONNOLLY
United States Attorney

IVAN C. DALE (admitted *pro hac vice*)
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 227
Ben Franklin Station
Washington, DC 20044
Telephone (202) 307-6615

## TABLE OF CONTENTS

NATURE OF THE PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

COUNTER-STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.    THE HISTORICAL AND STRUCTURE OF THE
      COMMUNICATIONS EXCISE TAX AS IT RELATES TO
      PLAINTIFF'S TELEPHONE SERVICES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.   THE SERVICES AT ISSUE CONSTITUTE TAXABLE TOLL
      TELEPHONE SERVICE UNDER 26 U.S.C. § 4252(b)(1). . . . . . . . . . . . . . . 13

A.    The language of § 4252(b)(1) is ambiguous, thus requiring resort to
      legislative history to determine its true meaning. . . . . . . . . . . . . . . . . . . . 13

      1.    *A result which at first seems counterintuitive may be the most logical:*
            *why "and" can mean "or.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      2.    *"And" is used disjunctively elsewhere in the statute.* . . . . . . . . . . . . . 18

      3.    *The statutory language also contains other ambiguous terms, such*
            *as "distance," which is shorthand for the applicable toll rate.* . . . . . . . . 23

B.    The statute's structure, purpose, and legislative history demonstrate
      that the services at issue are taxable toll telephone service
      under § 4252(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

C.    Even if the services do not fall within a hypertechnical reading of §
      4252(b)(1), the statute should not be construed in a manner so
      demonstrably at odds with the intention of the drafters. . . . . . . . . . . . . . . 27

      1.    *The conclusion that the services are "toll telephone service" under*
            *§ 4252(b)(1) is supported not only by the statute's purpose and*
            *legislative history, but also by the conclusion reached in a*
            *longstanding Revenue Ruling, which should be followed.* . . . . . . . . . . . 27

2.    *The longstanding agency construction, coupled with specific evidence of Congressional understanding that the tax applied to all long-distance calls, merits application of the reenactment doctrine.* . . . . . . . . . . . . . . 32

D.    Even under taxpayer's "distance sensitive" approach, the services are included in § 4252(b)(1)**.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

III.    IF (AND ONLY IF) THE SERVICES DO NOT CONSTITUTE "TOLL TELEPHONE SERVICE" UNDER § 4252(b)(1), THEN THE SERVICES ARE "TOLL TELEPHONE SERVICE" UNDER § 4252(b)(2). . . . . . . . . . . . . . . . . . . . . . 36

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## TABLE OF CITATIONS

26 U.S.C. § 4251 (Appendix A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

26 U.S.C. § 4252 (Appendix A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

26 U.S.C. § 4253 (Appendix A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Bingler v. Johnson, 394 U.S. 741 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

Trans-Lux Corp. v. United States, 696 F.2d 963 (Fed. Cir. 1982) . . . . . . . . . . . . . . . . . . . . 8

Am. Bankers Ins. Group (ABIG) v. United States,
408 F.3d 1328 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 17-19, 31, 34

OfficeMax v. United States, 428 F.3d 583 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . 17, 31, 34

Nat'l R.R. Passenger Corp. v. United States, 431 F.3d 374 (D.C. Cir. 2005) . . 17, 21-22, 26

Honeywell Int'l, Inc. v. United States, 64 Fed. Cl. 188 (2005) . . . . . . . . . . . . . . . . 17, 31, 34

Reese Bros., Inc. v. United States, 94 A.F.T.R.2d (RIA) 7229 (W.D. Pa. 2004) . . . 17, 31, 34

America Online, Inc. v. United States, 64 Fed. Cl. 571 (2005) . . . . . . . . . . . . . . . 17, 31, 34

Fortis v. United States, 94 A.F.T.R.2d (RIA) 6005 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . 17

H. Comm. on Ways and Means, 89th Cong., Material Prepared by the Executive
Branch Concerning Recommendations Proposed by the President Relative to
Excise and Fuel Taxes (Comm. Print May 17, 1965) ("Executive Branch Material")
(Appendix B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 27

H.R. Rep. No. 89-433, reprinted in 1965 U.S.C.C.A.N. 1645
(excerpts at Appendix C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 22, 25

S. Rep. No. 89-324 (1965), reprinted in 1965 U.S.C.C.A.N. 1690
(excerpts at Appendix D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 22, 25

United States v. Fisk, 70 U.S. (3 Wall.) 445 (1865) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

<u>Peacock v. Lubbock Compress Co.</u>, 252 F.2d 892 (5th Cir. 1958) . . . . . . . . . . . . . . . . . . 16

<u>United States v. Gomez-Hernandez</u>, 300 F.3d 974 (8th Cir. 2002) . . . . . . . . . . . . . . . . . 16

<u>Bruce v. First Fed. Sav. & Loan Ass'n</u>, 837 F.2d 712 (5th Cir. 1988) . . . . . . . . . . . . . . . 16

<u>Wirtz v. Ocala Gas Co.</u>, 336 F.2d 236 (5th Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

<u>United States v. Cumbee</u>, 84 F. Supp. 390 (D. Minn. 1949) . . . . . . . . . . . . . . . . . . . . . . . 16

<u>Hensel, Bruckmann & Lorbacher v. United States</u>, 126 F. 576 (C.C.S.D.N.Y. 1903) . . . . 16

<u>Smith v. United States</u>, 508 U.S. 223 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

<u>Beecham v. United States</u>, 511 U.S. 368 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

<u>McCarthy v. Bronson</u>, 500 U.S. 136 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

<u>Slodov v. United States</u>, 436 U.S. 238 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20-21

<u>Haggar Co. v. Helvering</u>, 308 U.S. 389, 394 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

<u>Pub. Citizen v. United States Dep't of Justice</u>, 491 U.S. 440, 455 (1989) . . . . . . . . . . . . . 27

<u>Crandon v. United States</u>, 494 U.S. 152, 158 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Rev. Rul. 79-404, 1979-2 C.B. 382 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-28

<u>United States v. Am. Trucking Ass'ns</u>, 310 U.S. 534 (1940) . . . . . . . . . . . . . . . . . . . . . . . 28

<u>Chevron USA, Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837 (1984) . . . . . . . . . . . 29

<u>United States v. Correll</u>, 389 U.S. 299 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

<u>Nat'l Muffler Dealers Ass'n v. United States</u>, 440 U.S. 472 (1979) . . . . . . . . . . . . . . . . . . 29

<u>Cottage Sav. Ass'n v. Commissioner</u>, 499 U.S. 554 (1991) . . . . . . . . . . . . . . . . . . . . . 29, 32

<u>United States v. Cleveland Indians Baseball Co.</u>, 532 U.S. 200 (2001) . . . . . . . . . . . . 29, 32

<u>Atlantic Mut. Ins. Co. v. Commissioner</u>, 523 U.S. 382 (1998) . . . . . . . . . . . . . . . . . . . . . . 29

United States v. Mead Corp., 533 U.S. 218 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 31

Barnhart v. Walton, 535 U.S. 212 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

26 U.S.C. § 7805 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Treas. Order 111-2, 1981-1 C.B. 698, 699 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

26 C.F.R. § 601.601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

26 U.S.C. § 6662 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

26 C.F.R. § 1.6662-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Geisinger Health Plan v. Comm'r, 985 F.2d 1210 (3d Cir. 1993). . . . . . . . . . . . . . . . . .   31

Skidmore v. Swift & Co., 323 U.S. 134 (1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Ammex, Inc. v. United States, 367 F.3d 530 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . 31

## NATURE OF THE PROCEEDING

This is a civil action in which plaintiff seeks to recover certain monies paid over to the United States as taxes.   Specifically, this case concerns whether plaintiff's payments for telephone services are subject to the 3-percent excise tax imposed by 26 U.S.C. § 4251 on amounts paid for "communications services," including "toll telephone service" and "local telephone service."    On February 10, 2006, the United States moved for summary judgment, demonstrating that, even if plaintiff's allegations were true that the services did not constitute "toll telephone service" under § 4252(b)(1) or (2), they are nonetheless taxable as "local telephone service" under § 4252(a).   The same day, plaintiff cross-moved for summary judgment, arguing only that the services did not constitute "toll telephone service" under § 4252(b)(1) or (2).    This memorandum is submitted in opposition to plaintiff's cross-motion.

## SUMMARY OF ARGUMENT

1.       Amounts paid for "local telephone service" and "toll telephone service" are subject to a 3% communications excise tax.   "Toll telephone service" is defined in 26 U.S.C. § 4252(b).   The definition of "local telephone service" is in § 4252(a) and applies to charges for access to a local system, as well as to charges for all facilities and services in connection with access to a local system.   The definition of "local telephone service" specifically carves out "toll telephone service," thus acknowledging that the services described in § 4252(b) would otherwise fall under both definitions.   As demonstrated in

the United States' motion for summary judgment, the communications services

acquired by plaintiff from AT&T would fall in the "local telephone service" category if

they did not fall in the "toll telephone service" category.   As a result, the plaintiff is not

entitled to the relief it seeks.[1]   In particular, because all public telephone service is

taxable at the same 3% rate, the services in this case are still taxable, whether they are

denominated as "toll telephone service" under § 4252(b) or "local telephone service"

under § 4252(a).

A determination of the proper tax categorization of communications services is

important to tax administration, however, particularly to those taxpayers whose

exemptions under § 4253 depend on such categorization.  The services acquired by

plaintiff from AT&T are *properly* categorized as "toll telephone service" under § 4252(b)

(and thus are carved out of the definition of "local telephone service" under § 4252(a)).

Accordingly, the United States opposes the legal contentions set forth in plaintiff's

cross-motion for summary judgment, even if such contentions do not prove plaintiff's

case.

2.      26 U.S.C. § 4252(b)(1) defines "toll telephone service" as "a telephonic

quality communication for which . . . there is a toll charge which varies in amount with

---

[1]Because this issue was not raised in plaintiff's cross-motion for summary
judgment, the United States will not rehash its position on the issue here.   For a
statement of its position, the United States relies on the memorandum in support of its
motion for summary judgment already submitted to this Court (see Docket No. 39).

the distance and elapsed transmission time of each individual communication . . . ."
§ 4252(b)(1).   The quoted language, however, is ambiguous.   Plaintiff proposes an
interpretation which reads words into the statute that are not there.   Plaintiff contends
that the charge for a communication must vary by elapsed transmission time *and must
vary by the distance* of each individual communication.   This interpretation, in a vacuum,
is plausible.   However, the same statute is just as easily subject to alternate, "plain
language" interpretations which conflict with plaintiff's own.   As a result, resort to
legislative context and history is necessary.

        The statute's legislative history and purpose confirm that the statute does not
require, as a trigger to the tax, that the amount paid for telephone service vary by the
distance of each individual communication.   Under prior law, all long-distance calls for
which a toll charge was collected in the United States were taxable as "toll" calls.
According to the proposal that was adopted by Congress, the amended definition of
"toll telephone service" was to have basically the same definition as under prior law,
except that Wide Area Telephone Service, or WATS, was being transferred from the
"general" to the "toll" category because it was considered to be a long-distance service.
The tax was intended to be a significant source of revenue, and the change was
unaccompanied by an estimate of a resulting loss in revenue, confirming that Congress
did not intend the amendment to diminish receipts.

The specific language of the statute reflects AT&T's practice, at the time of enactment, of making charges for long-distance services on individually-billed calls based on the elapsed time of the call, multiplied by a per-minute rate determined by reference to mileage bands.  Although industry billing practices have since changed, such that many of mileage bands have been aggregated for interstate calls, it is clear that § 4252(b) was intended to apply to all long-distance telephone service, and it must be construed in keeping with that purpose.   Congress could not possibly have meant to allow telephone companies to opt their customers out of or into the tax through nothing more than a change in billing methods.   Yet plaintiff's proposed change in categorization would have just such an effect.

Even under a reading of the language that would require the charge to vary by the distance of the communication, the statute is satisfied.  At the very least, three distance-based bands remain: one for calls within state, one for calls between states, and another for calls between countries.  Although the variation in distance may no longer be according to mileage bands, different distances still continue to produce different rates.   Moreover, the contract itself indicates that the rate charged for plaintiff's long-distance telephone service between January 2001 and September 2004 includes distance as a factor in the charge for services.   As a result, plaintiff's communications services are taxable under 26 U.S.C. § 4252(b)(1).

3.      If (and only if) the services do not constitute toll telephone service under § 4252(b)(1) because a cramped reading does not cover them, they do constitute services that entitle the subscriber "upon payment of a periodic charge (determined as a flat amount or upon the basis of total elapsed transmission time)" for "the privilege of an unlimited number of telephonic communications" to or from an area outside the local service area under § 4252(b)(2).  Admittedly, there is evidence that Congress intended the subsection to apply only to WATS.  But if the Court must confine itself to a cramped reading of § 4252(b)(1), it must do likewise with regard to § 4252(b)(2).  Taxpayer had the right to an "unlimited" number of calls, billed on a monthly or "periodic" basis, and the charges therefor were determined by reference to "elapsed transmission time," which, if taken together, yield a bill based on "total elapsed transmission time."

## COUNTER-STATEMENT OF FACTS

The United States denies plaintiff's contention that "the terms of the contracts dictated that the charges for telecommunications were based exclusively on the duration of each call," and that "distance was never a factor in the charges under these contracts."  (Br. Supp. Pl's Mot. Summary J. at 3.)  Rather, the charges which plaintiff paid for long distance services are, by virtue of the service being carried on long distance network - as opposed to being confined to a local network - based both on the distance and elapsed transmission time of the calls.  In nearly all cases, the toll charges for calls made using the services at issue were computed by multiplying elapsed call

time by a toll rate or rates.  The toll rate or rates include distance as a component in the

calculus, and plaintiff paid different charges or rates for different long distance services

such as interstate, intrastate, and international calls.  (See Pearce Decl. ¶¶ 45-47).   If

plaintiff's contention were accurate -- that the charge for the services at issue is based

only on call duration – then the contract provisions on rate would be much shorter and

simpler than those appended to the Faerber declaration.   (See sealed attachments at

Docket No. 36).

       The United States further denies plaintiff's contention that it "did not have the

ability to make an unlimited number of calls within a specified geographic region for a

flat or periodic fee."   (Br. Supp. Pl's Mot. Summary J. at 3.)   Nothing in the contracts

submitted to the Court appears to limit the number of telephone calls which plaintiff

could make outside the local service area.   Moreover, the billing for such calls was

submitted to plaintiff on a periodic basis.

## ARGUMENT

I.     THE HISTORY AND STRUCTURE OF THE COMMUNICATIONS EXCISE TAX
       AS IT RELATES TO PLAINTIFF'S TELEPHONE SERVICES.

       An excise tax at the rate of three percent is imposed upon "amounts paid for

communications services," payable by the person paying for the services.  26 U.S.C.

§§ 4251(a)(1), (2), (b)(2).  "Communications services" is defined as "(A) local telephone

service; (B) toll telephone service; and (C) teletypewriter exchange service."  Id.

§ 4251(b)(1).  Those three types of services are in turn defined in § 4252(a), (b) and (c),

respectively.  "Local telephone service" is defined in § 4252(a) as access to local

telephone service and "any facility or service provided in connection" therewith,

exclusive of "toll telephone service" or a "private communication service," *i.e.*, private

lines or intercommunication services established for subscribers, see id. § 4252(d).  "Toll

telephone service" is (1) service for which "there is a toll charge which varies in amount

with the distance and elapsed transmission time of each individual communication and

. . . the charge is paid within the United States," id. § 4252(b)(1), and (2) "service which

entitles the subscriber, upon payment of a periodic charge (determined as a flat amount

or upon the basis of total elapsed transmission time), to the privilege of an unlimited

number of telephonic communications to or from" a specified area "outside the local

telephone system area" in question, id. § 4252(b)(2).

The language of § 4251(a) obviously sets the scope of the tax in sweeping terms,

so as to tax all telephone services, except for those specifically exempted.

"[E]xemptions from taxation are to be construed narrowly."  Bingler v. Johnson,

394 U.S. 741, 752 (1969).  Several exemptions from the tax, however, are prescribed by

§ 4253, including "toll telephone service" described in section 4252(b)(2) to the extent

that the amount so paid is for use by a common carrier, telephone or telegraph

company, or radio broadcasting station or network in the conduct of its business as

such."  26 U.S.C. § 4253(f).  Other exemptions are provided for certain coin-operated

telephone service (§ 4253(a)), services to servicemen in combat zones (§ 4253(d)), certain

news services (§ 4253(b)), and services to certain charitable and educational

organizations (§ 4253(c), (h), (j)), as well as state and local governments (§ 4253(i)).

Exemptions are also provided for items otherwise taxed (§ 4253(e)) and installation

charges (§ 4253(g)).[2]

The definition of "toll telephone service" currently in effect was enacted as part

of the Excise Tax Reduction Act of 1965, § 302, Pub. L. No. 89-44, 79 Stat. 136 (the

1965 Act).  Before 1965, § 4252(b) defined toll, *i.e.*, long-distance, telephone service in the

following broad language:

> (b) *Toll Telephone Service.*  For purposes of this subchapter, the term
> "toll telephone service" means a telephone or radio telephone message or
> conversation for which (1) there is a toll charge, and (2) the charge is paid
> within the United States.

§ 4252(b) (1958) (as amended by the Excise Tax Technical Changes Act of 1958, Pub. L.

No. 85-859, § 133(a), 72 Stat. 1275, 1289 (1958) (1958 Act)).  The purpose of the 1965

revisions was to reduce the tax rate and to exclude from the tax so-called "private line"

services, *i.e.*, long distance services provided to large users through dedicated telephone

lines outside the public telephone network.   However, Congress sought to continue the

---

[2] Although all communications services are taxed at the same 3% rate, the distinction between types of services is important to certain customers because some exemptions depend upon the classification as "local telephone service" "toll telephone service" or "typewriter exchange service."  See § 4253(a) (services paid for by inserting coins not taxable if they are "local telephone service," but are taxable for "toll telephone service" if charge exceeds 25 cents); § 4253(b) (media taxed on "local telephone service" but not other types of service).

imposition of tax on toll telephone calls other than calls via private lines.  <u>See</u> Excise

Tax Reduction Act of 1965, Pub. L. No. 89-44, 79 Stat. ("1965 Act"); H.R. Rep. No. 89-433

at 30, <u>reprinted in</u> 1965 U.S.C.C.A.N. 1645, 1676 (1965), S. Rep. No. 89-324 at 35,

<u>reprinted in</u> 1965 U.S.C.C.A.N. 1690, 1725 (1965);[3] <u>Trans-Lux Corp. v. United States</u>, 696

F.2d 963, 967-68 (Fed. Cir. 1982).    In defining the category that would encompass "toll

telephone service," Congress utilized the long-distance pricing methods then used by

AT&T, the only provider of public, long-distance services.

In 1965, AT&T had a monopoly on all long-distance telephone services except for

the private line services discussed above.   At that time, AT&T charged for long-

distance services (other than private line services) either (1) on the basis of the elapsed

time of each individual telephone call, multiplied by a per-minute charge, or (2) for so-

called Wide Area Telephone Service, or "WATS," by a periodic charge, calculated either

as a flat amount or on the basis of the total elapsed transmission time for all calls made

using the service during the relevant billing period.  For calls in the first category,

AT&T determined the applicable per-minute rate on the basis of time of day and

"mileage bands."  The charges for calls to locations that fell within the same mileage

band were made at the same per-minute rate, without regard to any variation in the

actual distance traveled by individual calls within the band.  (<u>See</u> Pearce Decl. ¶ 23.)

---

[3]These House and Senate reports were provided in the Appendix (Docket no. 40)
at C and D, respectively.

In order to identify the class of long-distance telephone communications that were subject to tax - namely, those which were not private line services - the Excise Tax Reduction Act of 1965 thus redefined "toll telephone service" as follows:

> (1)   a telephonic quality communication for which (A) there is a toll charge which varies in amount with the distance and elapsed transmission time of each individual communication and (B) the charge is paid within the United States, and
>
> (2)   a service which entitles the subscriber, upon payment of a periodic charge (determined as a flat amount or upon the basis of total elapsed transmission time), to the privilege of an unlimited number of telephonic communications to or from all or a substantial portion of the persons having telephone or radio telephone stations in a specified area which is outside the local telephone system area in which the station provided with this service is located.

Excise Tax Reduction Act of 1965, Pub. L. No. 89-44, § 302, 79 Stat. 136 (1965), codified at 26 U.S.C. §§ 4252(b).   These changes to the definition of "toll telephone service" originated in a White House proposal that characterized the changes to the definition prescribed in § 4252(b)(1) as being "basically the same as present law except for clarifying changes" and the enactment of § 4252(b)(2) as being prompted by the fact that "WATS is a long distance service" that "[u]nder present law, . . . is classified as 'general telephone service'; it would appear to be more properly classified as 'toll telephone service.'"[4]

---

[4]See H. Comm. on Ways and Means, 89th Cong., Material Prepared by the Executive Branch Concerning Recommendations Proposed by the President Relative to Excise and Fuel Taxes (Comm. Print May 17, 1965) ("Executive Branch Material") (Appendix B) at 8.   The effect of the categorizing WATS under § 4252(b), rather than

Congress adopted verbatim the language used in the White House proposal with respect to § 4252(b). Significantly, the accompanying House and Senate Reports do not dispute the White House analysis that, except for adding WATS lines to the definition of "toll telephone service," that definition was essentially the same as it had been under prior law--that is, "a telephone or radio telephone message or conversation for which (1) there is a toll charge, and (2) the charge is paid within the United States." See 26 U.S.C. § 4252(b) (1964 ed.); H.R. Rep. No. 89-433, at 30 (1965); S. Rep. No. 89-324, at 35 (1965). And although the Senate Report contained estimates of revenue losses expected for each significant alteration of the rate or base of the tax, it is devoid of any such estimate regarding the new language of § 4252(b)(1). S. Rep. No. 89-324, at 36-37. The absence of such an estimate underscores that Congress did not intend to dramatically reduce the tax base. Instead, the tax was to be "an important source of revenue." S. Rep. No. 89-324, at 35.

As a result of AT&T's then-existing practice, telephone communications in 1965 were taxed based upon the application of a toll telephone rate – determined largely by which distance band it fell within – times the call's duration. (Pearce Decl. ¶¶ 23, 33 and 38.) Over the years, significant changes occurred in the telephone industry, including the breakup of the Bell System in 1984 and the increased popularity of cell

---

under § 4252(a) was to exempt news organizations and soldiers in combat zones from paying the excise tax on WATS service. See § 4253(b),(d).

phones. In 1997, in response to increased competition from wireless services, which offered a flat, per-minute rate (sometimes with several hundred "anytime" minutes), AT&T ceased charging different amounts for interstate toll calls made within the continental United States to different mileage bands and instead began offering a single interstate, long-distance rate. MCI, its major competitor, followed suit in 2000. (See Pearce Decl. ¶¶ 33-38.)

Notwithstanding these changes, Congress reenacted the 1965 Act in 1968, 1969, 1970, 1980, 1981, 1982, 1984, 1987, and 1990, and added a provision relating to "prepaid telephone cards" in 1997, all without making any change to the definition of "toll telephone service."[5] Congress expects the current tax to raise significant revenues in the future. For example, when, because there was a budget surplus, Congress voted to repeal the communications excise tax (a measure that was vetoed), the anticipated revenue loss from the tax as a whole exceeded $55 billion for the years 2000-2010. S. Rep. No. 106-328, at 4, 7 (2000); H.R. 4516, § 1003; H.R. Doc. 106-306 at 1, 34.

---

[5]See also Revenue & Expenditure Control Act of 1968, Pub. L. No. 90-364, § 105, 82 Stat. 251, 265 (1968); Tax Reform Act of 1969, Pub. L. No. 91-172, § 702, 83 Stat. 487, 660 (1969); Excise, Estate, & Gift Tax Adjustment Act of 1970, Pub. L. No. 91-614, § 201(b), 84 Stat. 1836, 1843 (1970); Omnibus Reconciliation Act of 1980, Pub. L. No. 96-499, § 1151, 94 Stat. 2599, 2694 (1980); Economic Recovery Tax Act of 1981, Pub. L. No. 97-34, § 821, 95 Stat. 172, 351 (1981); Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, § 282(a), 96 Stat. 324, 568 (1982); Deficit Reduction Act of 1985, Pub. L. No. 98-369, § 26, 98 Stat. 494, 507 (1984); Tax Reform Act of 1986, Pub. L. No. 99-514, § 1801, 100 Stat. 2085, 2785 (1986); Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, § 10501, 101 Stat. 1339, 1330-438 (1987); Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 11217(a), 104 Stat. 133, 1338-437 (1990).

Significantly, Congress gave no hint that a large chunk of the tax base (the part attributable to individually-charged long-distance calls) had fallen away due to a mere change in billing methods.   Plaintiff, however, contends that it has.

From January 1, 2001 through September 30, 2004, plaintiff purchased various intrastate, interstate and international long-distance telephone services from AT&T. (Faerber Decl. ¶ 3.)  AT&T charged taxpayer for its long-distance calls based on the elapsed time of the call and the toll rate it set.   The varying rates were calculated based on an analysis of plaintiff's estimated usage, including, among other things, distance-based access charges.   (Pearce Decl. ¶¶ 42, 45-46).   The applicable rate varied, depending on whether the call was being made to an intrastate, interstate or international destination.  AT&T's toll rate had further variations, depending on the location in which an intrastate call was placed and the country to which an international call was placed.  (See, e.g., Pearce Decl. ¶¶ 45-47; AT&T Agreement (Faerber Decl. Exs.) at MBNA00014-22.)

The per-minute rate for interstate telephone calls purchased by plaintiff, however, no longer varies according to the mileage band within which the destination of the call is located.   The premise behind the present action for refund, then, is that the telephone excise tax, the source of billions of dollars of annual federal tax revenue, has been eliminated for telephone customers such as the plaintiff as a result of this change in industry billing methods.   This premise is incorrect as a matter of law, for a variety

of reasons, including those discussed in the United States' motion for summary

judgment and supporting brief.    The United States responds here only to the

arguments raised by plaintiff in its cross-motion for summary judgment.

II.    THE SERVICES AT ISSUE CONSTITUTE TAXABLE TOLL TELEPHONE
       SERVICE UNDER 26 U.S.C. § 4252(b)(1).

       A.    **The language of § 4252(b)(1) is ambiguous, thus requiring resort to
              legislative history to determine its true meaning.**

       At issue regarding the applicability of § 4252(b)(1) to the services at issue is the

meaning of the phrase "a telephonic quality communication for which . . . there is a toll

charge which varies in amount with the distance and elapsed transmission time of each

individual communication."    Plaintiff characterizes its approach to interpreting this

phrase as a "plain language" approach.    (Br. Supp. Pl.'s Mot. Summary J. at 6.)

Plaintiff's interpretation, however, reads words into the statute which are not there.

Plaintiff argues that the charge for a communication must vary by elapsed transmission

time *and must vary by the distance* of each individual communication.    (See id. ("The ...

statute includes both distance and duration as obligatory elements."))    This

interpretation, in a vacuum, is plausible.    However, the same statute is just as easily

subject to alternate, "plain language" interpretations which conflict with plaintiff's own.

       For example, § 4252(b)(1) may be read to include within the definition of "toll

telephone service" both (1) telephone calls for which the charge varies by distance and

(2) telephone calls for which the charge varies by elapsed transmission time.    See

1563533.1                                    -14-

<u>OfficeMax, Inc. v. United States</u>, 428 F.3d 583, 600-01 (6th Cir. 2005) (Rogers, J.,

dissenting).[6]   By reading the entire preceding phrase over each of the "distance" and

"time" elements of § 4252(b)(1) (rather than, as plaintiff does, reading only the "varies

with" language over each of these elements), the statute derives a wholly different

meaning.   As discussed below, this alternate "plain language" approach is already

used elsewhere in the very same section of the Internal Revenue Code.

Alternately, § 4252(b)(1) may be read to mean that "toll telephone service"

includes those calls for which the charge varies as a result of *any combination of* distance

and elapsed transmission time.[7]

Each of these three competing interpretations is equally plausible from the

language of the statute, but each produces different results.[8]   The first interpretation

---

[6]Judge Rogers' dissent in <u>OfficeMax</u> clarifies the distinction by analogy to the
phrases, "I like bourbon and water," and, "I like beer and wine."   <u>Id</u>. at 600.   The
former obviously expresses a preference for a mixture of bourbon and water, while the
latter expresses a preference for each of beer and wine.

[7]These distinctions can likewise be demonstrated by analogy to mathematics.
The addition sign, or "+," is the mathematical equivalent of the word "and."   Alone,
the addition function may seem the most fundamental and unambiguous in all of
mathematics.   However, its proper use depends on the grouping of elements in the
equation in which it appears.   Take, for example, the equation 2 times 3 plus 4.   If the
multiplication function is performed first, as in (2 times 3) plus 4, the result is 10.
However, if the addition function is performed first, as in 2 times (3 plus 4), the result is
14.

[8]Suppose that Congress wrote a statute which read, "A tax is hereby imposed on
income from the sale of apples and oranges."   This statute would likely be read to mean
both that "a tax is imposed on income from the sale of apples" and "a tax is imposed on
income from the sale of oranges."   The result would be the same if income from the sale
of any combination of apples and oranges were subject to the tax.   Under plaintiff's

(that of the plaintiff) would require that a toll charge vary by both of distance and time. The second would require that a toll charge vary by either of distance and time. The third would require that a toll charge vary by a combination of distance and time. The proper interpretation of § 4252(b)(1) must be deduced, then, from its context.

      1.     *A result which at first seems counterintuitive may be the most logical: why "and" can mean "or."*

"And" is a "function word" that can be used as a "reference to either or both of two alternatives." Webster's Third New International Dictionary 80 (1966). It is fundamental that "[i]n the construction of statutes, it is the duty of the court to ascertain the clear intention of the legislature. In order to do this, courts are often compelled to construe 'or' as meaning 'and,' and again 'and' as meaning 'or.'" United States v. Fisk, 70 U.S. (3 Wall.) 445, 447 (1865). "[T]he word 'and' is not a word with a single meaning, for chameleonlike, it takes its color from its surroundings." Peacock v. Lubbock Compress Co., 252 F.2d 892, 893 (5th Cir. 1958). In some contexts, "and" is used to connote that *both* of two connected words, phrases or clauses must be present before a specific result obtains. In others, it functions merely to set out alternatives.[9]

---

approach to statutory interpretation, however, only the sale of apples and oranges *together* would trigger a tax on the vendor's income.

     [9]See United States v. Gomez-Hernandez, 300 F.3d 974 (8th Cir. 2002) ("and" used in disjunctive when connecting two subparts of a statute defining crimes of violence); Bruce v. First Fed. Sav. & Loan Ass'n, 837 F.2d 712, 715 (5th Cir. 1988) ("and" should not be construed in the conjunctive "where strict grammatical construction will frustrate clear legislative intent"); Wirtz v. Ocala Gas Co., 336 F.2d 236, 243 (5th Cir. 1964) ("and" in decree applying to employees engaged in commerce and in production of goods for commerce construed in disjunctive); United States v. Cumbee, 84 F. Supp.

Consequently, "the word 'and' is not a word with a single meaning," and "the words 'and' and 'or' when used in a statute are convertible, as the sense may require." Peacock, 252 F.2d at 893 & n.1. As one modern dictionary aptly states, the word "and" is:

> the ordinary English word, constantly used in the law, with the same lack of precision. Sometimes it joins additional items; sometimes it doesn't. Sometimes it means *or*; sometimes it doesn't. *And* is inevitable and, like *or*, unreliable.

Mellinkoff's Dictionary of American Legal Usage 27 (West 1992).

Plaintiff argues that the word "and" should be construed in the conjunctive, while the Government maintains that it should be read disjunctively. The statute does *not* state that the charge must vary with "*both* distance and elapsed time" or otherwise indicate that the word "and" should not be read disjunctively. Accordingly, it is appropriate to look at other indicia of congressional intent.

To be sure, taxpayer's conjunctive reading of the word "and" has been adopted by several courts that have considered the issue. American Bankers Ins. Group, Inc. v. United States, 408 F.3d 1328, 1332-1333 (11th Cir. 2005), rev'g, 308 F.Supp.2d 1360, 1364-1365 (S.D. Fla. 2004); OfficeMax, Inc. v. United States, 428 F.3d 583 (6th Cir.

---

390, 391 (D. Minn. 1949) ("and" read in disjunctive in statute imposing punishment for crime of failing "to comply with any of the requirements of this subchapter and Part VIII of subchapter A of chapter 27"); Hensel, Bruckmann & Lorbacher v. United States, 126 F. 576, 577 (C.C.S.D.N.Y. 1903) (construing tariff act imposing a duty on "printing paper . . . suitable for books and newspapers" as "applicable to printing paper suitable either for books or for newspapers").

2005)(petition for rehearing en banc pending); Nat'l R.R. Passenger Corp. v. United

States, 431 F.3d 374 (D.C. Cir. 2005)(hereinafter, "Amtrak"); Reese Bros., Inc. v. United

States, 94 A.F.T.R.2d 2004-7229, 2004 WL 2901579 (W.D. Pa. Nov. 30, 2004), appeal

pending, No. 05-2135 (3d Cir.);  America Online, Inc. v. United States, 64 Fed.Cl. 571,

577-78 (2005) (AOL), appeal pending, No. 05-5138; Hewlett-Packard Co., Inc. v. United

States, 2005 WL 1865419 (N.D. Cal. Aug. 5, 2005), appeal pending, No. 06-15052 (9th

Cir.); Fortis, Inc. v. United States, 2004 WL 2085528 at *6 (S.D.N.Y.), supplemental

opinion, 2005 WL 356827, appeal pending, No. 05-2518 (2d Cir.).  The United States

submits, however, those courts erred in straining to deny the existence of the palpable

ambiguity in this lengthy, highly articulated and technical statute.  It was the District

Court in American Bankers (as well as the dissent in OfficeMax), by contrast, that

properly acknowledged the ambiguity created by the use of the word "and," not only in

the context of the rest of the statute, but also in and of itself.  308 F.Supp.2d at 1365-1366.

That court, moreover, correctly adopted a disjunctive reading of the word as being the

only meaning that is in keeping with clear Congressional intent.

      It is no answer to observe, as did the Eleventh Circuit in American Bankers, 408

F.3d at 1332, that the word "and" is ordinarily presumed to have a conjunctive

meaning.  While this may be true, it simply begs the question.  It does not demonstrate

that a conjunctive meaning was intended here.  To the contrary, the circumstances here

cast substantial doubt on the reflexive assumption that Congress used "and" in its

"ordinary" sense.  Statutory construction is a holistic endeavor.  <u>Smith v. United States</u>,

508 U.S. 223, 233 (1993).  If a statute has a plain meaning, it must be the import of the

entire language and design of the statute as a whole, not a reading apparent only when

a word or phrase is read in isolation.  <u>Beecham v. United States</u>, 511 U.S. 368, 372 (1994);

<u>McCarthy v. Bronson</u>, 500 U.S. 136, 139 (1991).  The circumstances here are replete with

indications of ambiguity disregarded by all courts that have considered the issue,

except for the District Court in <u>American Bankers</u>, <u>supra</u>.

     2.     *"And" is used disjunctively elsewhere in the statute.*

Obviously, once Congress uses "and" disjunctively in one part of a statute, it is

more likely to use "and" disjunctively elsewhere in the same statute.  Here, the word

"and" is used disjunctively in other parts of the same statute, a fact pointedly ignored

by the Eleventh Circuit in <u>American Bankers</u>.  In the very sentence that contains the

phrase at issue, the word "and" is used to connect § 4252(b)(1) to § 4252(b)(2), and it is

undisputed that, because satisfaction of either prong would render the services taxable

as "toll telephone service," this latter "and" must be read as "or."  In addition, in

§ 4251(b), the statute imposes a tax on "communications services" and defines that term

as meaning "(A) local telephone service; (B) toll telephone service; *and* (C)

teletypewriter service" (emphasis added), but that, since each type of service "is a

separate and mutually exclusive type of service," the "and" in § 4251(b) must also be

read as "or."  Surely, no one would argue that in order to qualify as "communications

services" under the statute, the services would have to be simultaneously local telephone service, toll telephone service, and teletypewriter exchange service, since that is an impossibility. See American Bankers, 308 F.Supp.2d at 1365.

The statute's structure also shows that the intended use of the word "and" in the phrase "distance and elapsed transmission time" is unclear. In imposing the tax, Congress broadly defined the services that constitute "communications services" in § 4252. When Congress exempted a particular entity or a specific service, it did so in a specific provision spelling out the exemption. See § 4253 (providing 10 exemptions); see also § 4252(a), (d) ("private communication service" not taxable as "local telephone service" if separate charge therefor is made). Reading "and" in the conjunctive, at least if it exempted the long-distance calls involved here from tax, would deviate from the statutory pattern, since it would effectively create an exemption from the communications tax for individually-billed long-distance calls without a specific provision spelling out the exemption. On the other hand, reading "and" disjunctively would be consistent with the statute's pattern of stating broad taxing provisions, narrowed through exemptions where necessary.

The Eleventh Circuit's contrary analysis, in American Bankers, of the purportedly plain language of § 4252(b)(1) is unconvincing. According to the court, the language of § 4252(b)(1) "requires that to come within the definition of 'toll telephone service' the rate must vary by both 'distance and elapsed transmission time.'" 408 F.3d at

1334.  Section 4252(b)(1), however, does not contain either the word "rate" or the word

"both."  The court's use of words not contained in the statute, in an effort to show that

the language of the statute is plain, actually undermines its thesis, by showing the type

of language that a statute plain on its face would contain.

Moreover, Eleventh Circuit reached its conclusion despite the clear teaching of

the decision in <u>Slodov v. United States</u>, 436 U.S. 238 (1978).  There, the Supreme Court

recognized that a phrase using the word "and" can be a source of ambiguity in and of

itself.  The case concerned the scope of the trust fund recovery penalty, imposed by

§ 6672 on "[a]ny person required to collect, truthfully account for, and pay over any tax

imposed by this title" who willfully fails to do so.  The taxpayer argued that the word

"and" was used conjunctively and that the penalty could not be imposed unless he

failed to acquit all three duties, while the Government contended that liability attached

upon the failure to discharge any one of the three.  The Court concluded that "neither

construction is inconsistent with the language of the statute."  436 U.S. at 247.  The

Court went on to reject the taxpayer's conjunctive reading of the word "and," however,

as being "inconsistent with [the statute's] purpose."  <u>Id.</u>

Likewise, in <u>Amtrak</u>, the D.C. Circuit opined that the Governments position was

contrary to § 4252(b)(1)'s "unambiguous meaning," <u>see</u> 431 F.3d at 379, but did not

explain how the language of § 4252(b)(1) unambiguously required the amount of a call's

charge to vary with *both* distance and time.   Significantly, the court in <u>Amtrak</u> did *not*

dispute the Government's point that the Supreme Court in Slodov concluded that

"and" in I.R.C. § 6672 was susceptible of being read conjunctively or disjunctively, and

agreed with the Government that the Supreme Court in Slodov read "and"

disjunctively because a conjunctive reading was inconsistent with the statute's purpose.

The court in Amtrak, however, ultimately rejected the Government's argument that the

word "and" in § 4252(b)(1)'s phrase "distance and elapsed transmission time" should be

read disjunctively, because it concluded that a conjunctive reading "produces just the

result that Congress intended, i.e., a tax on MTS service." 431 F.3d at 376.  That

conclusion, however, was not based on a plain reading of the statute's language, but

rather on the court's examination of the state of the telephone service at the time that

the statute was enacted.

    As discussed elsewhere in this brief, an analysis of the legislative history and a

comparison of the actual language of § 4252(b) with the telephone service that existed in

1965 does not support the Amtrak court's conclusion that Congress sought to create a

narrow pigeonhole when it enacted § 4252(b)(1).   For example, if Congress had

intended § 4252(b)(1) to apply only to message toll service ("MTS"), to the exclusion of

other services differently billed, it presumably would have included time-of-day and

day-of-week factors in § 4252(b)(1) because they, too, were essential elements of the

MTS charge in 1965.  By omitting from § 4252(b)(1) two elements used in computing the charge for MTS, Congress described a service that was broader than MTS.[10]

Instead, as previously discussed, it is clear that Congress was interested in raising a substantial amount of revenue by taxing all long-distance service not specifically exempted.   To that end, Congress examined the long-distance services available and crafted a statute that would reach all of them.   The use of AT&T as a model reflected the fact that AT&T's method of charging for calls was the only one then available, not a desire to impose a limitation based on AT&T's billing practices. Indeed, it defies common sense to think that Congress intended that the substantial revenue that it intended to raise could be eliminated, as plaintiff contends, by a mere change in billing practices.

3.    *The statutory language also contains other ambiguous terms, such as "distance," which is shorthand for the applicable toll rate.*

Moreover, when placed in the context of § 4252(b)(1) as a whole, the meaning both of the term "distance," and of the clause in which it appears, are anything but plain.  It is important to remember that the statute's requirement of variation applies to

---

[10]Similarly, as discussed further in part III, <u>infra,</u> Congress understood wide area telephone service ("WATS") to be "a long-distance service whereby, for a flat charge, the subscriber is entitled make unlimited calls within a defined area (sometimes limited to a maximum number of hours)." H. Rep. No. 89-433, at 30 (1965); S. Rep. No. 89-324, at 35 (1965).  The service described in § 4252(b)(2), however, allows a "charge . . . [to be] determined [either] as a flat amount *or upon the basis of total elapsed transmission time.*" (Emphasis added.)  As such, § 4252(b)(2) encompasses more than the WATS service of which Congress was aware.

the *charge* itself.  It does not in terms require a variation in the distance of the call, or

even in the distance toll rate applied to the call.  It is the charge itself that must vary in

amount, with the distance and elapsed transmission time.  The charge can vary with

distance and time only if there is some type of implicit mathematical calculus, because a

*charge* is a measure of a dollar amount that cannot be determined by distance and time

without applying some mathematical formula.  As a matter of logic, a charge can never

vary with distance and time alone, because distance and time do not convert into a

dollar amount.  Congress must have intended something other than simply adding a

charge for elapsed time and a charge for distance, because calls were not billed in that

manner at the time of the statute's enactment in 1965.

In fact, there was an understood calculus for arriving at the charge for long-

distance calls when § 4252(b)(1) was enacted.  In 1965, AT&T computed the charge for

every traditional long-distance call by multiplying the elapsed time of the call by a per-

minute toll rate selected on the basis of the time and day on which the call was placed

and the mileage band in which the recipient of the call was located.  (Pearce Decl. ¶ 31.)

Because the same toll rate applied to all calls falling within each of AT&T's mileage

bands, which were quite wide, long-distance charges frequently did not vary among

calls of substantially different distances if the duration of the calls was the same.  Id.  In

effect, AT&T used time, not distance, as the primary variable affecting the amounts of

long-distance charges and used call distance within certain boundaries solely as a way

to select the toll rate applicable to each call.  Consequently, "distance"  clearly is

shorthand for toll rate.

The consequence is that because the variation in charge per call is the result of

multiplication of the duration of the call by the distance toll rate, as a matter of

mathematics, if either the duration of the call or the distance toll rate varies, the charge

per call will vary.  Thus, even if one of the two factors is a constant, the charge will still

vary as long as the other factor can vary.   What AT&T charges its customers also

depends on the identity of the customer, the duration of the call, and the cost to AT&T

in accessing the local network (which itself varies by distance).   (Pearce Decl. ¶¶ 42, 45-

47.)   The charge per call to the plaintiff, then, varies with (or as a function of) time and

distance.

**B.    The statute's structure, purpose, and legislative history demonstrate that the services at issue are taxable toll telephone service under § 4252(b)(1).**

"All statutes must be construed in the light of their purpose." <u>Haggar Co. v.</u>

<u>Helvering</u>, 308 U.S. 389, 394 (1940).  The statute should be read to further the evident

purpose of Congress in enacting both the communications excise tax and the 1965

amendments to it: to raise revenue through a tax on telephone services, among other

things.  In devising the tax, Congress plainly was looking for a "source of revenue."  S.

Rep. No. 89-324, at 35 (1965); *see also* H.R. Rep. No. 98-432, pt. 2, at 1129 (1984) (tax

extended "because of revenue needs"); 136 Cong. Rec. 30548 (1990) (tax made

permanent because it was a needed "revenue source").  The reading of the statute in

American Bankers and other cases, if it means a non-statutory exemption from tax would result, would defeat the revenue-raising purpose of the tax. The major long-distance carriers have eliminated the mileage bands that were used by AT&T in pricing its long-distance service in 1965, and under the reasoning of American Bankers, this change in billing practices is all that is needed to remove long-distance service from taxation. Congress could not have intended such a result.

A reading that requires the charge to vary by both elapsed time and distance (if, as plaintiff contends, it would result in a non-statutory exemption from tax) is also refuted by the legislative history. The 1965 Act was not intended to contract the tax base respecting long distance calls. Rather, it was housekeeping provision designed to move WATS line service into the "toll telephone service" category, since exemptions for long distance service under § 4253(b) and (d) logically should have been applied to WATS service.

The relevant legislative history demonstrates that, except for that addition, the definition of toll telephone service was "basically the same" as it was under prior law. Executive Branch Material at 8, 21. Under prior law, of course, "toll telephone service" encompassed all long distance service. The 1965 Act was meant to preserve and expand what was includible in "toll telephone service;" it was not designed to permit telephone service providers to remove most long-distance service from the types of services that were subject to the tax simply by changing their billing practices.

AT&T's use of distance as a shorthand for toll rate suggests that Congress intended the same usage in § 4252(b)(1). The statute's charge-variation requirement is best explained as Congress's way of identifying the elements in AT&T's 1965 toll-charge calculus for traditional long-distance calls, which was what Congress was attempting to describe. When, as we suggest, "distance" is construed to mean "applicable toll rate," the charge that varies with elapsed time and distance is simply the charge calculated by multiplying elapsed time by the applicable toll rate, the calculus which accurately describes AT&T's 1965 charge calculus for traditional long-distance calls and results in an accurate expression of Congress's intent.

American Bankers and Amtrak erred in adopting the view that, in 1965, Congress was acting to circumscribe the application of the communications excise tax to tax certain precisely defined services. 408 F.3d at 1333; 431 F.3d at 375-76. Other than noting the newly-created exception for private-communications services, the House and Senate reports do not state or otherwise indicate that Congress intended to "narrow" the types of service that were subject to tax. H.R. Rep. No. 89-433, at 29-30; S. Rep. No. 89-324, at 35. Rather, those reports demonstrate a concern with "updating" the definition of toll telephone service by including WATS as part of it and with "mak[ing] it clear that it is the service as such which is being taxed and not merely the equipment being supplied." Id.; see also Executive Branch Material at 21 (transferring WATS to

"toll telephone service" because "it would appear more properly to be classified as

[such]").

    **C.    Even if the services do not fall within a hypertechnical reading of §
4252(b)(1), the statute should not be construed in a manner so
demonstrably at odds with the intention of the drafters.**

"[T]he plain-meaning rule is rather an axiom of experience than a rule of law,

and does not preclude consideration of persuasive evidence if it exists." Pub. Citizen v.

United States Dep't of Justice, 491 U.S. 440, 455 (1989) (internal quotation marks and

citation omitted).  Statutory analysis "look[s] not only to the particular statutory

language, but to the design of the statute as a whole and to its object and policy."

Crandon v. United States, 494 U.S. 152, 158 (1990).

     *1.    The conclusion that the services are "toll telephone service" under
§ 4252(b)(1) is supported not only by the statute's purpose and legislative
history, but also by the conclusion reached in a longstanding Revenue
Ruling, which should be followed.*

The conclusion that the services constitute "toll telephone service" under

§ 4252(b)(1) is also supported by a longstanding agency interpretation of the statute,

which should be afforded great weight.  In Revenue Ruling 79-404, 1979-2 C.B. 382, the

IRS ruled that ship-to-shore communications that were charged according to a single

rate, without regard to the distance spanned by the communication, were subject to

§ 4252(b)(1).  In reaching that conclusion, the IRS did not consider whether the word

"and" in § 4252(b)(1) was used in the disjunctive.  Instead, it accepted the taxpayer's

contention that the communication did not fall within the literal language of

§ 4252(b)(1) because the charge did not vary with distance and examined the situation

presented under the principles in United States v. Am. Trucking Ass'ns, 310 U.S. 534

(1940).

The IRS looked to § 4252's legislative history, and it concluded that the intent of

the statute would be frustrated by a "literal" interpretation like the one urged by

taxpayer here.  The ruling states that, before the amendment of § 4252 in 1965,

communication services like the ones here at issue "would have been within the

definition of toll telephone service," Rev. Rul. 79-404, supra at 383.  The ruling further

states that the legislative history of the 1965 Act "indicates that Congress intended to

exempt certain private communication services from the tax and repeal the tax on

telegraph service and wire and equipment service" and that "[t]here is no indication

that Congress otherwise intended to make changes in the types of service subject to

tax."  Id.  As demonstrated previously, this analysis is an accurate rendition of § 4252's

legislative history, and it is at a minimum persuasive.

Under Chevron USA, Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984), a

court must follow an agency's interpretation of a statute unless that interpretation is

arbitrary, capricious or manifestly contrary to the statute.  Even before Chevron, the

Supreme Court held that the Commissioner's rulings were entitled to deference,

especially where they were consistently applied over a lengthy period of time.  United

States v. Correll, 389 U.S. 299, 306-307 (1967); Nat'l Muffler Dealers Ass'n v. United

States, 440 U.S. 472, 483-484 n.16-19 (1979); see Cottage Sav. Ass'n v. Commissioner, 499 U.S. 554, 563 n.7 (1991); see also United States v. Cleveland Indians Baseball Co., 532 U.S. 200, 220 (2001) (revenue rulings attract "substantial judicial deference" where they reflect the Commissioner's longstanding interpretation of his own regulations).

Unlike Treasury Regulations, which the Supreme Court has already ruled are entitled to Chevron deference (Atlantic Mut. Ins. Co. v. Commissioner, 523 U.S. 382, 387-389 (1998)), revenue rulings are not subject to notice and comment.  The Supreme Court has made it clear, however, that, while notice-and-comment rulemaking and formal adjudication almost always assure Chevron deference, the absence of such formalities does not preclude such deference, so long as it appears that Congress intended to grant the agency the power to make rules with the "force of law" and "the agency interpretation claiming deference was promulgated in the exercise of that authority."  United States v. Mead Corp., 533 U.S. 218, 226-227, 230-231 (2001); see also Barnhart v. Walton, 535 U.S. 212, 221-222 (2002) (according Chevron deference to a "longstanding" agency interpretation reached through "means less formal than 'notice and comment' rulemaking").  Revenue rulings clearly satisfy this standard.

The IRS promulgates revenue rulings pursuant to its statutory authority to "prescribe all needful rules and regulations for the enforcement of" the Code.  26 U.S.C. § 7805(a); Treas. Order 111-2, 1981-1 C.B. 698, 699.  Revenue rulings are formal interpretative rulings involving "substantive tax law."  Treas. Reg. § 601.601(d)(2)(v)(a)

(26 C.F.R.).  They are issued by the IRS National Office and published in the Internal

Revenue Bulletin as the agency's "official" position to guide taxpayers and IRS officials

alike.  Treas. Reg. § 601.601(d)(2)(i)(a).  Both rulings and regulations are written and

reviewed at the same levels of the IRS and the Treasury Department.  Treas. Order

111-2, <u>supra</u>.  Like regulations, revenue rulings have legal force and effect in that they

constitute "precedents to be used in the disposition of other cases" that "may be cited

and relied upon for that purpose."  Treas. Reg. § 601.601(d)(2)(v)(d).  And a taxpayer's

disregard of applicable revenue rulings can result in the imposition of penalties.  26

U.S.C. § 6662; Treas. Reg. § 1.6662-3(b)(2).  Revenue rulings consequently have the

"force of law" within the meaning of <u>Mead</u>, and <u>Chevron</u> deference is therefore

required.  <u>Mead</u>, 533 U.S. at 227.

 Prior to the Supreme Court's decision in <u>Mead</u>, this Court held that "courts are to

give weight to IRS revenue rulings but may disregard them if they conflict with the

statute that they purport to interpret or its legislative history, or if they are otherwise

unreasonable."  <u>Geisinger Health Plan v. Comm'r</u>, 985 F.2d 1210, 1216 (3d Cir. 1993).

In the Government's view, revenue rulings, like Treasury Regulations, are also entitled

to <u>Chevron</u> deference, and in light of <u>Mead</u> and its progeny, we urge this Court to so

hold.  As the Court in <u>Mead</u> observed, moreover, under the decision in <u>Skidmore v.</u>

<u>Swift & Co.</u>, 323 U.S. 134 (1944), "[t]he fair measure of deference to an agency

administering its own statute has been understood to vary with circumstances, and

courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." Mead, 533 U.S. at 228 (footnotes omitted). Even if revenue rulings are not controlling precedent, they are certainly highly persuasive precedent that should be followed unless unreasonable. See Ammex, Inc. v. United States, 367 F.3d 530, 534-535 (6th Cir. 2004), cert. denied, 125 S.Ct. 1695 (2005).

The Eleventh Circuit in American Bankers predicated its refusal to defer to the Revenue Ruling on the misconceived conclusion that there was no ambiguity in the statute to construe. 408 F.3d at 1334-1335; accord, AOL, 64 Fed.Cl. at 580; Fortis, 2004 WL 2085528 at *10-11; Hewlett-Packard, 2005 WL 1865419 at *4. But as we have already shown, the language of the statute is anything but clear, and the District Court in American Bankers, 308 F.Supp.2d at 1371-1372, correctly concluded that the Revenue Ruling was worthy of deference.

    2.    *The longstanding agency construction, coupled with specific evidence of Congressional understanding that the tax applied to all long-distance calls, merits application of the reenactment doctrine.*

Revenue rulings expressing longstanding IRS and Treasury interpretations of the Internal Revenue Code are entitled to especially great weight where those interpretations have remained consistent through congressional reenactments of the Code provisions interpreted. "Treasury regulations *and interpretations* long continued without substantial change, applying to unamended or substantially reenacted statutes,

are deemed to have received congressional approval and have the *effect of law*."

Cleveland Indians, 532 U.S. at 220 (internal quotation marks and citations omitted; emphasis added); Cottage Sav. Ass'n, 499 U.S. at 561.  Evidence of actual Congressional knowledge of the IRS position is not a prerequisite to the application of the reenactment doctrine.  Id. at n.7.

Congress plainly understood all long-distance telephone calls, including so-called non-distance sensitive calls, to be subject to the tax.  Specifically, after Revenue Ruling 79-404 was published, Congress confirmed that it did not intend to limit the tax on long-distance service when it later extended, and then made permanent, the provisions of the 1965 Act.[11]  In the Conference Report accompanying the Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, § 10501, 101 Stat. 1330, 1438, the last of many extensions of the tax before it was made permanent, the conferees generally equated toll telephone service with long-distance service, explaining that under the extended provision, "[a] 3-percent excise tax is imposed on amounts paid for local telephone service, *toll (long-distance) telephone service*, and teletypewriter exchange service."  H.R. Conf. Rep. No. 100-495, at 998 (1987) (emphasis added).

Similarly, when Congress made the tax permanent in 1990, the Senate indicated that it also considered toll telephone service to be synonymous with long-distance

---

[11]When Congress enacted the 1965 Act, it scheduled the tax for repeal in 1969. The repeal never took effect because Congress repeatedly "found it necessary to extend the tax because of revenue needs."  H.R. Rep. No. 98-432, pt. 2, at 1129 (1984).

service when it provided an identical description in its explanation of the 1990 legislation.  136 Cong. Rec. 30548 (1990).  Further, when Congress later added a provision clarifying the circumstances in which prepaid telephone cards were taxable, it reiterated that toll telephone service encompassed "long-distance" service.  H.R. Conf. Rep. No. 105-220, at 557 (1997)  (describing toll telephone service as "long-distance" service); *see also* S. Rep. No. 105-174, at 181 (1998) (using same description in report for an amendment of the prepaid-telephone-card provision).  Also telling is the attempt to repeal the statute in 2000, after the major long-distance carriers changed their billing practices.  When Congress acted, due in part to projected budget surpluses, it provided revenue-loss estimates demonstrating its understanding that the so-called non-distance-sensitive telephone service was subject to the tax, just as the IRS had ruled.  See p. 16, supra.

The Eleventh Circuit refused to apply the legislative reenactment doctrine, based on the conclusion that the language of the statute was plain and on the conclusion that there was no evidence that Congress actually considered or was aware of Revenue Ruling 79-404.  American Bankers, 408 F.3d at 1335-1336; accord, AOL, 64 Fed.Cl. at 580-581; Fortis, 2004 WL 2085528 at *11-12; Hewlett-Packard, at 2005 WL 1865419 at *5.  In Cottage Savings, 499 U.S. at 563 n.7, however, there was likewise  no evidence that Congress ever expressly referenced the Treasury Regulation which served as the basis for invoking the reenactment doctrine there.  Here, moreover, the evidence of

congressional awareness that the statute should be interpreted as it was being

construed by the IRS is stronger than it was in <u>Cottage Savings</u>.  As discussed above,

after Revenue Ruling 79-404 was published, Congress on several occasions extended,

and then made permanent, the provisions of the 1965 Act.  The explanations in several

of the congressional reports accompanying those enactments demonstrate that

Congress did not intend to limit the definition of toll telephone service to a particular

type of long-distance service.  These statements demonstrate that Congress agreed with

the Revenue Ruling's conclusion that Congress intended to bring long-distance services

such as taxpayer's within the reach of § 4252(b)(1).

> **D.    Even under taxpayer's "distance sensitive" approach, the services are included in § 4252(b)(1).**

Plaintiff's telephone services are included in § 4252(b)(1) even under a reading

that would require a variation in the long-distance toll rate between calls spanning

different distances.  The critical fact remains that plaintiff was charged different rates

for calls of different distances.  The record shows that the rates, and consequently the

charges for calls, were calculated based on an analysis of plaintiff's estimated usage,

including, among other things, distance-based access charges.   (Pearce Decl. ¶¶ 42, 45-

46).  The applicable rate varied, depending on whether the call was being made to an

intrastate, interstate or international destination.  AT&T's toll rate had further

variations, depending on the location in which an intrastate call was placed and the

country to which an international call was placed. (See, e.g., Pearce Decl. ¶¶ 45-47;
AT&T Agreement (Faerber Decl. Exs.) at MBNA00014-22.)

If plaintiff's contention were accurate -- that the charge for the services at issue is
based only on call duration – then the contract provisions on rate would be much
shorter and simpler than those appended to the Faerber declaration. (See sealed
attachments at Docket No. 36). Various rates in the contract refer to charges "per mile."
(See, e.g., AT&T Agreement (Faerber Decl. Ex.) at MBNA00014-22.) The variation in
distance in the tariffs is no longer according to the mileage bands, but different
distances still continue to produce different charges. If the statute requires "distance
sensitivity," then, the charges to plaintiff had it.

III.    IF (AND ONLY IF) THE SERVICES DO NOT CONSTITUTE "TOLL
        TELEPHONE SERVICE" UNDER § 4252(b)(1), THEN THE SERVICES ARE
        "TOLL TELEPHONE SERVICE" UNDER § 4252(b)(2).

Even if the Court were to conclude that the services were not includible in 26
U.S.C. § 4252(b)(1), under a cramped reading of that section, that finding would not end
the inquiry as to whether they constitute "toll telephone service." The services must
also fall outside § 4252(b)(2) in order not to be included in the definition of "toll
telephone service." That section defines "toll telephone service" as including:

> [A] service which entitles the subscriber, upon payment of a periodic
> charge (determined as a flat amount or upon the basis of total elapsed
> transmission time), to the privilege of an unlimited number of telephonic
> communications to or from all or a substantial portion of the persons
> having telephone or radio telephone stations in a specified area which is

> outside the local telephone system area in which the station provided with this service is located.

§ 4252(b)(2). Thus, § 4252(b)(2) includes as "toll" service any telephone service that (1) provides the right to an "unlimited" number of calls to points in a specified area "outside" the "local telephone system area" and (2) is subject to a charge that is both "periodic" in nature and determined either as a "flat amount" or "upon the basis of total elapsed transmission time." Id.

Here, the services do not escape taxation if the statute is read literally. Plaintiff had (1) an "unlimited" right to make calls (2) "outside" the local service area (3) in return for a "periodic charge" (4) based on "total elapsed transmission time." First, the conclusory declaration of Francis Faerber aside, nothing in the contracts plaintiff had with the various carriers limited the number of calls taxpayer could make or receive. Second, the services that taxpayer has put at issue are intrastate, interstate, and international long distance telephone service, which allow taxpayer to make calls to, and receive calls from, persons having telephones in an "area which is outside the local telephone service area." 26 U.S.C. § 4252(b)(2). Third, as to the existence of a "periodic charge," taxpayer received various bills stating a charge for services provided within a specified period. Plainly this charge constitutes one that is "periodic" according to the word's commonly understood meaning. Fourth, since § 4252(b)(2) refers to a charge that is "determined as a flat amount *or* upon the basis of total elapsed transmission time" (emphasis added), the charge need not be a "flat amount" if it is determined by

reference to "total elapsed transmission time."  All of the charges for calls were based on "elapsed transmission time" (<u>see</u> Faerber Decl. ¶ 4), which, if taken together, yield a bill based on "total elapsed transmission time."

Taking an approach wholly inconsistent with plaintiff's arguments regarding § 4252(b)(1), plaintiff refers the Court to legislative history and IRS publications.   In particular, plaintiff cites several Technical Advice Memoranda ("TAMs") to support its argument that its services do not constitute WATS service.  (Pl's Mem. Supp. Mot. Summary J. at 22-24.)  Unlike revenue rulings, the Internal Revenue Code expressly prohibits citation of private letter rulings or TAMs.   26 U.S.C. § 6110(k)(3).   As a result, the Court should not give weight to these rulings in the context of the present case.[12] In any event, however, plaintiff's position that the agency's position in these memoranda should control, notwithstanding the statute's language, is impossible to reconcile with its earlier interpretation of § 4252(b)(1).   Indeed, each of these memoranda find that the services at issue are properly taxable under § 4252(b)(1).

## CONCLUSION

For the foregoing reasons, the communications services at issue in this case are properly classified as "toll telephone service" under 26 U.S.C. § 4252(b), and the United

---

[12]P.L. 105-206 § 3509(b) amended Section 6110, by redesigning subsection (j) as subsection (k).  Technical advice memoranda may not be used or cited in any precedential way, and "citation of such rulings not only flatly ignores the plain language of section 6110(k)(3), but also threatens the careful compromise struck by the Congress in enacting that section."  <u>Vons Companies v. United States</u>, 51 Fed.Cl. 1, 12 (2001).

States is entitled to summary judgment.   However, as demonstrated in the United

States' motion for summary judgment, filed February 10, 2006, even if the Court were to

find the services are not properly classified as "toll telephone service," the services are

nonetheless subject to the same 3% tax under § 4252(a), and plaintiff is not entitled to a

refund of such tax.   Accordingly, the United States respectfully requests summary

judgment in its favor, denial of plaintiff's cross-motion for partial summary judgment,

and dismissal of plaintiff's complaint with prejudice.

      Dated:         February 28, 2006

                              COLM F. CONNOLLY
                              United States Attorney


                   By:       ____/s/_____
                              IVAN C. DALE (admitted *pro hac vice*)
                              Trial Attorney, Tax Division
                              U.S. Department of Justice
                              P.O. Box 227
                              Ben Franklin Station
                              Washington, DC 20044
                              Telephone (202) 307-6615

                              **Counsel to the United States**