## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF DELAWARE

MBNA America Bank, N.A.,                )
                                        )
      Plaintiff,                       )
                                        )
      v.                               )     Civil No. 05-cv-257
                                        )
United States of America,               )
                                        )
      Defendant.                       )

---

## DECLARATION OF ALAN PEARCE, Ph.D.

## SUBMITTED IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION
## FOR PARTIAL SUMMARY JUDGMENT AND IN FURTHER SUPPORT OF
## UNITED STATES' MOTION FOR SUMMARY JUDGMENT

---

1538906.2

**DECLARATION AND DATA CONSIDERED**

I, ALAN PEARCE, pursuant to 28 U.S.C. S.1746, declare and state as follows:

1. I am President of Information Age Economics, Inc. (IAE), a Washington D.C.-based research and consulting firm.  I founded IAE in March, 1978, after serving for approximately eight years in senior-level positions with the U.S. Government, first as Chief Economist and Special Assistant to two Chairmen of the Federal Communications Commission (FCC), Dean Burch and Richard E. Wiley, then as Chief Economist of the House of Representatives Telecommunications Subcommittee, under the Chairmanship of Cong. Torbert H. Macdonald and Cong. Lionel Van Deerlin, and finally as Senior Telecommunications Economist and Policy Adviser in the Office of Telecommunications Policy, Executive Office of the President.  I attended The London School of Economics and Political Science, University of London, as both an undergraduate and graduate student, and have a Ph.D. in Business and Telecommunications from Indiana University.  My resume, litigation experience, and publications are attached.

2. I have been retained by the United States Department of Justice, Tax Division, to research and draft a declaration outlining the pricing strategies of the nation's long distance telecommunications carriers from the mid-1960s to date, in connection with MBNA America v. United States of America, Civil Action No. 05-257 (USDC D.Del).  A list of the reference materials that I reviewed and analyzed is attached to this statement.  Additionally, I reviewed and analyzed Plaintiff's contracts with AT&T, invoices from AT&T to Plaintiff, the complaint, Plaintiff's objections and answers to defendant's first set of interrogatories, the declaration of Francis R. Faerber, and Plaintiff's opening brief in support of Plaintiff's motion for summary judgment on liability, dated February 10, 2006.

3.  The case revolves around the payment of approximately $3.74 Million in Federal Excise Tax on Virtual Telecommunications Network Services purchased from AT&T from January 1, 2001, through September 30, 2004.  Plaintiff's Complaint states: "AT&T's charges for Plaintiff's Services were based solely on the duration of each call, i.e., the 'elapsed transmission time.'"  A detailed analysis of AT&T's prices for an array of long distance services clearly demonstrates that the pricing for the services provided are more complex than Plaintiff asserts, and are certainly not based solely on any single factor, for example "elapsed time."  Moreover there are costs included in the service pricing that relate directly to distance, as the analysis that follows will show.

4.  I make this declaration to demonstrate:
   a.  That, based on the history of the telecommunications industry, the federal communications excise state, as written in 1965, correlated with the monopoly carrier's pricing structure, in order to tax the entire universe of telephone communications that used the public switched telecommunications network (PSTN);
   b.  That the toll charge for communications services purchased from AT&T by the plaintiff includes distance components buried in the calculations of the contracts, contracts which

1317613.1

require plaintiff to spend in excess of $50 Million a year on telecommunications services; and

c. That the telecommunications services purchased from AT&T by the plaintiff include services which are provided in connection with local telephone services.

Local vs. Long-Distance Telephone Service

5. Local calls and long distance calls travel on different networks, although long distance calls begin and terminate on local networks. Local service preceded long distance services in the United States, and it can exist as a stand-alone service. Generally speaking, people spend much more time involved in local calling than they do in long distance calling. Put another way, local service can exist without long distance, but long distance cannot exist without local service, because it is completely dependent on the existence of local networks for the origination and termination of traffic.

6. In a circuit switched network, such as the public switched telecommunications network (PSTN), a long distance communication or service must link up with one or more local networks serving distinct local communities. A substantial portion of the local telephone network that is used to provide local telephone service, such as the local loops that connect all buildings to the nationwide and global telecommunications-information infrastructure, is needed to originate and terminate long-distance calls. A significant proportion of the local telephone company costs are paid by the long distance carriers (also referred to as Interexchange Carriers or IXCs) for use of the local networks for the origination and termination of long distance calls.

7. Interexchange carriers, for example AT&T, MCI, and Sprint, the three largest in the U.S., depend upon local exchange carriers, for example BellSouth, Qwest, SBC Communications, and Verizon, for the origination and termination of their long distance calls. A substantial portion of all long distance company revenues are paid to local telephone companies for these critical services. These charges are known as local access charges in the telecommunications-information industry and are the fees that the long distance carriers pay to local telephone companies to make the originating and terminating local network connections, i.e., long distance, voice, video, or data transmissions. Both long distance carriers and end users – residential and business customers – pay local access charges. Generally, access charges paid by long distance carriers to local telephone companies account for approximately 40% of the long distance companies' total costs.

8. There are also distinct regulatory differences between local communications and long distance communications, and these differences are explained in this declaration.

Historical Overview of the Telephone Industry

9. For most of its history, the telephone industry has regarded itself as a single network, with end-to-end responsibility. Even so, the U.S. telephone network has always been owned by a wide variety of private companies. And from the start, local services have been regarded as different from long distance, both technologically and, more importantly perhaps, from a regulatory and public policy

1317613.1

perspective.

10. American Bell Company, which filed the first telephone patent in 1876, had concentrated its services on the most densely populated areas where it offered local service. It quickly formed a long distance subsidiary, the American Telephone & Telegraph Company (AT&T), in 1885, thus marking the technological difference between offering local and long distance service. Beginning in 1894, when the first telephone patents expired, a large number of independently owned local companies emerged. At this time both American Bell, which offered local service, and AT&T, which sold long distance service, refused to do business with the independents.

11. During this period, the company, known simply as AT&T, went through an aggressive program of expansion that ended in 1913 when it agreed to obtain federal approval before acquiring any more local telephone companies. By the early 1980s, before AT&T and the so-called Bell System, which included a manufacturing company, Western Electric, and a research and development arm, Bell Laboratories, was broken into ten different companies, the integrated entity offered local service to 80% of the American population, yet served only 31% of the land mass. This was because the best business prospects were focused on the densely populated cities where local connections were easier to install and the greater number of customers justified the costs and virtually guaranteed a quick and continuing profit.

12. After World War I, the Interstate Commerce Commission regulated the telephone industry, but in 1934 a separate regulatory body was established for communications, the Federal Communications Commission (FCC). Despite dramatic changes in technology, markets and services there was no substantial amendment to The Communications Act of 1934 until The Telecommunications Act of 1996. Between those dates, carriers had to petition the FCC to extend a "line" (a facility, were compelled to provide interconnections that were "necessary and desirable in the public interest"), were compelled to file "tariffs" of charges ("rates" that the Commission approved as "just and reasonable"), and had to avoid "unjust and unreasonable discrimination." The provision of local and long distance services fell under separate regulatory jurisdictions -- local and within a specific state coming under the regulatory authority of the States, and interstate and international services subject to the regulatory authority of the FCC.

13. Under this regulatory regime, where interstate matters were the responsibility of the FCC and within-a-state issues were subject to review by State Public Service Commissions (PSCs), AT&T brought unified control to the national network, which remained under divided ownership. AT&T developed what became known as the Bell System, an integrated company dedicated to supplying the telecommunications service and equipment needs of the nation.

14. In World War I, Bell Laboratories developed a primitive radio technology to transmit voice conversations without laying wire; in World War II, it improved the microwave technology and made it commercially practicable. Microwave would not only contribute to the national defense; it would also revolutionize domestic American long distance telecommunications services, thus solidifying the technological and the regulatory distinction between long distance and local services.

1317613.1

15. Microwave dramatically reduced the cost of long distance telecommunications services while the cost of local connections (still primarily pairs of copper wire) steadily increased. The telephone industry agreed with state and federal regulators that it would allocate a larger share of the fixed costs of the network (the cost of local connections), to its long-distance tariffs. This effectively shifted most of the costs of local services to long distance services. So, while AT&T's cost per interstate circuit-mile fell by 50% between 1950 and 1963, long-distance tariffs fell more slowly. The benefits to the nation's economy (and to the telephone industry) of this decision were obvious: It enabled all Americans to be able to afford local telephone service. From 1950 to 1980, the number of American homes with telephones rose from 62% to 96%. This type of price structure can only be maintained when the telecommunications system is regulated as a monopoly service with higher long distance prices helping to cross-subsidize the price of providing local service.

16. Cross subsidies were also used in other areas. In order to promote universal service, the regulators developed a system known as rate averaging, which averaged charges for long distance across the country so that a call from New York City to Denver, Colorado was charged the same per minute rate as a call from Minot, North Dakota to Key West, Florida. This policy meant that no matter where people lived, in densely populated urban areas where costs of providing service are lower because of higher calling volume, or sparsely populated rural areas where costs are higher because calling volume is low, the price of a long distance call was approximately the same. Rate averaging has proved to be of great value to rural America. In sum, politicians, regulators, and telephone companies collaborated in ensuring that a long distance call is priced at exactly the same per minute rate, regardless of whether the call was made between two high cost, low traffic density, rural centers or between two low cost, high traffic density, urban centers. Again, this pricing structure only makes sense in a non-competitive, regulated environment, where all companies agree to play by the rules imposed upon them by the States and the FCC.

Domestic Long Distance Service, 1940-1966

17. For approximately the first 100 years of telephony, long distance transmission facilities and services were controlled and provided by a single company, AT&T. Long distance service was extended to customers of independent local telephone companies under an arrangement known as "joint through service," a partnership between the independents and the Bell System.

18. By the end of World War II, the development of microwave technology lowered the costs of providing transmission between cities and made it economically feasible for firms other than the established common carriers to offer long distance services. The FCC did not immediately promote such competition.

19. Charges to customers for Toll service, which in regulatory parlance means long distance, grew faster than charges to customers for local service in the post-World War II period. As a consequence, long distance revenues from end-use customers exceeded those of local revenues from end-use customers, which was not the case in the early history of the Bell System. For example,

1317613.1

between 1880 and 1900, AT&T's long distance revenue growth was less than half the rate of local service revenue.

20. The deployment of new long distance technologies after World War II led to changes in the telecommunications industry's structure resulting in an era of emerging competition, greater customer involvement, and, in response, dramatic changes in public policy. In the late 1940s and early 1950s, microwave technology appeared to be the solution for the increasing demands for broadband, intercity transmission capacity. Microwave signals can also be relayed by satellite transponders, a technology introduced in the 1960s, but not generally available domestically in the U.S. until the mid-1970s.

21. In the mid-1950s, growth in the telecommunications needs of larger firms, industry groups, governmental entities and rural broadcasting stations presented additional opportunities for new long distance competition. In these instances, AT&T's refusal to interconnect with competitive service providers, such as railroads and major corporations, did not prevent the competitors from entry since they were large communications consumers themselves. Thus, they had sufficient internal demand to warrant construction of their own transmission facilities.

22. Regulatory changes followed as a result of pressure on the FCC from broadcasters and others. In 1958, the Commission determined that radio and television broadcasters could obtain permanent facility licenses, without regard to availability of established common carrier service. In 1959, the FCC issued a landmark decision in Docket 11866, Above 890 MHz (see Report and Order, 27 F.C.C. 359, 1959). This decision legitimized competition in the private microwave area of communications. The FCC found that private microwave systems could be constructed regardless of the availability or economic effects on established common carrier services.

23. AT&T acted to reduce the threat of competition by altering its pricing policies for large users, the major potential purchasers of these "private" microwave systems. In 1961, AT&T filed its TELPAK tariff, which drastically reduced private line rates for the bulk leasing of channels. In the same year, AT&T also introduced its Wide Area Telecommunications Service (WATS), which offered reduced rates to large users of long distance services. WATS services are long distance, as opposed to local services. AT&T also began to reduce its long distance rates offered to the general public, also known as Message Telephone Service (MTS) in the 1960s, with rates based on time of day, duration of call, and distance (as opposed to local). The mileage band concept in existence in the 1960s, and specifically in 1965, remained through the break up of the Bell System. The distance part of the tariff, known as mileage bands, meant that a call cost a consumer more based on the number of mileage bands crossed. In 1965, there were more than 30 mileage bands developed by AT&T, which were subsequently reduced to 11 and were copied by its competitors following the breakup of the Bell System in 1984. The 30+ mileage bands went from 1-8 miles to one that was from 2,301 to 3000 miles. If private line service is excluded, AT&T provided 100% of long-distance service in 1965. Following the break up of AT&T and the Bell Operating Companies on January 1, 1984, the mileage bands were compressed into 11: Band 1, 1-10 miles; Band 2, 11-22; Band 3, 23-55; Band 4, 56-124; Band 5, 125-292; Band 6, 293-430; Band 7, 431-925; Band 8, 926-1910; Band 9, 1911-

-6-

3,000; Band 10, 3,001-4250; and Band 11, 4251-5,740. Bands 10 and 11 were designed specifically for Alaska and Hawaii, not other overseas destinations. These so-called mileage bands varied widely, for example calls made within mileage bands 8, 9, 10 and 11, could vary widely in actual miles traveled and still be subject to the same rate, i.e., there was no variation in the rate paid by the customer. As distance became less important as a cost factor, due initially to technological developments and later to competitive trends, the mileage bands were reduced and/or eliminated.

24. However, the regulatory and business distinction between local services and long distance services remains to this day, and until recently local services were offered by companies that focused primarily on the provision of local and within-state calls, e.g., BellSouth, Qwest, SBC, and Verizon, while long distance services were offered almost exclusively by long distance companies, e.g. AT&T, MCI-WorldCom, and Sprint. Clearly, this industry structure is subject to rapid change with the acquisition of AT&T by SBC, and the acquisition of MCI by Verizon. Nonetheless, even today the FCC defines local services as those provided by, and billed by, local telephone companies, see below. Long distance calls, on the other hand, are those in which the local telephone companies collaborate with the long distance companies, which charge the end-user and then pays the local telephone company for the local origination and local termination of those long distance calls. Local access charges that are levied by the local telephone companies on the long distance companies vary widely throughout the USA depending upon the costs associated with originating and terminating long distance traffic, but currently the nationwide average is approximately 5 cents a minute, and thus represents a significant percentage of the costs associated with long distance voice and data transmissions. There also remain a large number of companies that continue to focus their business energies exclusively on the provision of local telecommunications services. Indeed, Sprint-Nextel is currently in the process of spinning off a separate company that will focus exclusively on local services as opposed to long distance and wireless services.

Cost & Pricing Strategies and the Introduction of Competition

25. As FCC policies shifted toward the adoption of policies designed to encourage competitive entry, AT&T pricing strategy also shifted. Specifically, it moved from the "battlefield" of tariff restrictions or regulatory barriers to entry, to pricing adjustments in strategic long distance services. The magnitude of AT&T's 1961 private line and message services rate structures or pricing adjustments had few historical parallels. Such shifts did not occur again until more than two decades later – in the 1980s.

26. From World War II through the early 1960s, as technology lowered the costs of long distance, there were regulatory efforts directed toward lowering the charges imposed for long distance service, historically used to subsidize local telephone service, in order to encourage more people to make use of the long distance network. From 1942 to 1965, charges were lowered by $280.2 million as a result of changes in telephone "separations" -- the system by which costs are distributed among within-state and interstate long distance regulatory jurisdictions.

27. Over this period, regulatory shifts in the assignment of costs of providing long distance service

favored the states, furthering the subsidies flowing from interstate long distance services to local service. However, there was no noticeable impact on interstate long distance customers, because of the new technological developments, outlined above, and also the huge traffic growth in long distance, also known as Message Telephone Service or MTS, and Private Line Services. Thus, interstate services absorbed changes in cost assignment and subsidies, while long distance rates still fell because of the deployment of cost-cutting technologies that resulted in a dramatically increased demand.

28. Interstate long distance services grew much more rapidly than those of within-state and local services in the post-World War II period. Between 1948 and 1965, Bell System local line connections increased at a rate of about 4% per year, while interstate traffic grew at a level of about 7%. Since long distance revenue depends on use, i.e., the time that people spend telephoning other people, the traffic pattern resulted in a shift of revenue to interstate long distance and the resulting additional revenues were used in part to subsidize low cost, affordable, local exchange service. While long distance pricing was usage sensitive, i.e., the more calls you make and the longer you talk the more you pay, local service was priced at a monthly fixed rate, regardless of usage. This pricing mechanism of compensating local service providers with a share of the charges for long distance calls was, again, designed to stimulate the universal service goals of the federal and state governments and also the telephone companies, and was hugely successful in bestowing economic benefits on the nation.

29. In spite of the technological developments and the FCC's attempts to foster limited competition, by 1979, the Bell System still accounted for 81% of all metered toll revenues, $21.4 billion. The independent telephone companies accounted for 18.7%, $4.9 billion, and the so-called specialized carriers one percent, or $.15 billion. In private line services, which are services dedicated to a single corporate customer for intra-corporate communications only, the Bell System had 77% of the market, with $2 billion in revenues, the independents had 4.8%, or $.123 billion, while Western Union, the specialized carriers, the domestic satellite carriers, and the miscellaneous carriers accounted for the remainder of the market.

30. As a result, AT&T dominated the long distance telecommunications services market throughout a dynamic period of growth stretching from the close of World War II through 1980. In the mid-1960s, therefore, AT&T had no real competitors and its major regulator was the FCC, which pursued policies that carefully opened up limited competition while allowing long distance service revenues to subsidize fixed and relatively low priced local telephone rates.

31. In the mid-1960s all long distance rates, other than private line services, were charged according to duration of call, time of day, day of week, and distance. This was the traditional and historical way of billing for long distance calls. Private line services, as they began to evolve in the 1960s, developed different pricing methodologies where rates could be quoted on a flat or unit basis, where units could be measured in calls, bits per second, or by the use of other variables. In addition, private line services are quantity and quality dependent. Quality or grade of service distinctions depend on transmission characteristics, for example bandwidth, noise, delay, and reliability; switching features,

1317613.1

for example blocking rates, routing selectivity and overflow, storage and digital capabilities, etc.; and network characteristics.

32. In summary, in the mid 1960s, AT&T remained the dominant long distance carrier in the United States.

Long Distance Services in Transition, 1970-84

33. In 1965, AT&T had four major revenue streams: Traditional long distance services, also known as Message Telephone Service (MTS); Wide Area Telephone Service (WATS); Private Line Services (PLS); and Local Service.

(1) MTS, *i.e.* long distance service, was the largest, in terms of traffic volume and revenue levels, and the most publicly visible of the traditional telephone industry service offerings. The subsidy procedures previously mentioned, which determine the level of the local telephone network costs paid for by long distance services, resulted in MTS rates that were significantly above the economic cost of providing the long distance service. Most of the competition during the period from 1970-84 was in the MTS market, for example Execunet, MCI's MTS equivalent, Sprint, and a few others, were direct – although not necessarily perfect – substitutes for MTS along certain routes. Initially, the competition was restricted to selected markets, mostly large urban areas, giving rise to AT&T's allegations that the competitors were "cream skimming" or "cherry picking". During the period from 1950-84, there were two fundamental types of MTS, instate and interstate, the former regulated by the State Regulatory Commissions, the latter by the FCC. After the break up of the Bell System, however, there were three types of MTS: InterLATA-interstate, provided by AT&T and its competitors based on tariffs filed at the FCC; InterLATA-instate, again provided by AT&T and its competitors, with tariffs filed and approved by a state regulatory commission; and IntraLATA-instate, provided by the Regional Bell Operating Companies and other local telephone companies, subject, again, to state tariffs. LATA is shorthand for Local Access and Transport Area, and traffic within those LATAs was deemed to be primarily local, thus, again, differentiating it from long distance.

(2) Wide Area Telephone Service (WATS). There were two separate and somewhat distinct services offered by AT&T under its WATS tariffs. Out-WATS was a volume discount form of MTS, with some minor service restrictions. Out-WATS allowed large volume telecommunications services users to buy a long distance service from AT&T at bulk discounts, similar to what the contract agreements do today. In-WATS, the "in" referring to inward or incoming calls, is also commonly known as 800 service, and was designed as a bulk discounted long distance service that created an automatic reversal of the charges to the party subscribing to In-WATS, making it an automatic collect call. Out-WATS and In-WATS serve two quite distinct markets. Out-WATS was designed for companies and institutions that place large volumes of outgoing toll calls, while In-WATS is for companies and institutions that receive large volumes of incoming calls. WATS was a source of

-9-

1317613.1

considerable controversy in the 1960s and 1970s. In one of its decisions, the FCC found that there did not appear to be sufficient differences in the cost of providing WATS and MTS to justify the rate differentials incorporated into the tariffs. The FCC suggested that MTS and WATS should be integrated under a single public message service tariff, possibly with a volume discount for large users. WATS was such a popular service among many business groups that they strenuously objected to the FCC's attempts to eliminate it. The business groups prevailed before the D.C. Circuit Court of Appeals, which overturned the FCC's proposed integration of MTS and WATS tariffs.

(3) Private Line Services. Simply stated, private line services refer to dedicated, and at least initially point-to-point, communications facilities constructed to meet the needs of large users that require capabilities and features not available from the public telephone network. Although carriers offer a wide variety of private line services, most simply involve a leased channel of varying degrees of bandwidth between two or more points that is dedicated to the use of a single subscriber. These services are widely used by customers with large volumes of traffic between two or more points or with heavy data communications needs that cannot be satisfied under the MTS and/or WATS tariffs. Private line rates were subjected to extensive FCC investigation in the mid-1970s because of the emerging competitive private line services provided by the so-called Other Common Carriers (OCCs). One of the Commission's most intense investigations concerned TELPAK, where AT&T offered substantial quantity discounts to bulk users of private lines, i.e., those most likely to consider the construction of their own private microwave facilities. Private line rates are designed to reflect the actual costs of providing the service as opposed to the rate for plain long distance which, as noted previously, provides a built-in subsidy for local service.

(4) Local Service. The residential portion of local service was heavily subsidized during this period. The subsidies came from the higher rates charged on business lines and from long distance revenues. The monopoly structure of the industry permitted this situation to exist until the advent of meaningful competition in the late-1970s and early 1980s, and forced a mandated major FCC policy change to deal with the erosion of these subsidies following the break up of the Bell System on January 1, 1984. The average monthly cost of providing telephone service to a Bell System subscriber in 1981 was $26. The figure for a non-Bell subscriber was somewhat higher. Yet the average price charged to the subscriber in that year for basic service was only $9.16 a month. The difference – almost $17 a month – came mostly from cross subsidies from long distance calling for use of the local network in completing those calls. Generally speaking, the telephone industry adopted a fixed monthly price for local service as opposed to a usage sensitive price during the period from 1950 through the mid-1980s. Even today, there are still many residential customers who have relatively low fixed monthly charges for their local service.

34. FCC policies enunciated during this period gave opportunities for new companies to compete against AT&T. With all of these pro-competitive policies as a backdrop, the Antitrust Division of the Department of Justice (DOJ) launched an antitrust suit against AT&T in the fall of 1974

1317613.1

stimulated in part by an FCC investigation into Western Electric equipment prices and in part by complaints from MCI that AT&T was behaving anti-competitively. This suit was resolved in the DOJ's favor on January 8, 1982, with the Modification Final Judgment (MFJ), mandating the break up of the Bell System on January 1, 1984.

Long Distance Services and Competition, 1984 to 2003

35. The break up of the Bell System resulted in massive changes in industry structure, pricing of services, and the level of competition. With regard to the provision of long distance services, AT&T prepared for the break up with a major tariff filing that was submitted to the FCC in October, 1983, promising that it would continue to provide end-to-end service, just as it did before. An end-to-end tariff meant that although AT&T was now restricted to the provision of long distance services, it would continue to use and pay for the use of the local networks, just as it did before the breakup, to originate and terminate its calls. Starting on January 1, 1984, AT&T needed the cooperation of the newly separated Regional Bell Companies that were permitted to charge for "access" to their local networks in the event that AT&T's long distance traffic originated and/or terminated on Regional Bell facilities, along with the cooperation of the independent local telephone companies. AT&T's competitors, primarily MCI and Sprint at the time of the break up, had to pay exactly the same charges for access to the local networks for the origination and termination of their traffic if they were given what is known as Feature Group D access, i.e., which was what the FCC determined to be equal access to the local network. In the event that the Regional Bells were unable to provide Feature Group D equal access, then the competitors were given a lesser Feature Group access at a significant discount. The discount was ordered by the FCC so that the Bells would be given an incentive to provide full equal access on an expedited basis. Because there was no direct relationship between the Bells and AT&T going forward, the FCC determined that long distance competition was to become a reality as soon as possible. However, although competition was real among the three major carriers, the price differentials during this period have proved to be miniscule. AT&T has remained as the price leader, with MCI and Sprint generally following – downward and upward.

36. Immediately after the break up, AT&T introduced new tariffs for long distance, WATS, and Private Line:

1) Long distance (MTS): AT&T reduced its MTS rates by an average of 10.5%, varying from a 1% to a 16% decrease depending upon the time of day and the distance being called. The 40-60% off peak discounts remained in effect after the break up as they had existed before. The initial rate reductions – and there have been several since – resulted in savings of $1.75 billion a year for customers.

2) DOMESTIC MTS RATE SCHEDULE, 1984

| Initial Period | | | | Additional Minutes Rate Step | | |
|---|---|---|---|---|---|---|
| Mileage Band | Old | New | $ Change | Old | New | $ Change |
| 1:  1-10 | $.32 | $.31 | .01 | $.16 | $.16 | 0 |

1317613.1

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2: | 11-22 | .40 | .39 | .01 | .22 | .22 | 0 |
| 3: | 23-55 | .48 | .47 | .01 | .28 | .28 | 0 |
| 4: | 56-124 | .57 | .56 | .01 | .37 | .32 | .05 |
| 5: | 125-292 | .58 | .57 | .01 | .39 | .34 | .05 |
| 6: | 293-430 | .59 | .58 | .01 | .42 | .35 | .07 |
| 7: | 431-925 | .62 | .61 | .01 | .43 | .35 | .08 |
| 8: | 926-1910 | .64 | .63 | .01 | .44 | .38 | .06 |
| 9: | 1911-3000 | .74 | .73 | .01 | .49 | .43 | .06 |
| 10: | 3001-4250* | .76 | .75 | .01 | .51 | .45 | .06 |
| 11: | 4251-5740* | .79 | .78 | .01 | .53 | .47 | .06 |

* For Offshore Rate Integration for Alaska and Hawaii
Source: Background of the Telecommunications Industry by Alan Pearce, 1983.

EXAMPLES OF MTS RATE CHANGES: % Reduction from Pre-Divestiture Rates

| Day Dial | Short Haul 10M | Medium Haul 925M | Long Haul 3,000M |
|---|---|---|---|
| 1 minute | -3.1 | -1.6 | -1.4 |
| 3 minutes | -1.6 | -11.5 | -7.6 |
| 5 minutes | -1.0 | -14.1 | -9.3 |
| 10 minutes | -.06 | -16.3 | -10.7 |

3) WATS: AT&T initially planned to reduce WATS usage rates by an average of 10.7%, but because of the FCC's Access Charge Order that implemented a $25 per line per month special services surcharge, the actual decrease was 6.9%.

4) Private Line: Private Line Services were the subject of the most intensive tariff realignment post-divestiture. On average, they were increased by 15.3%, again in part because of the FCC imposed surcharge that was designed to keep local rates from increasing too much.

37. The breakup of the Bell System and the development of the Local Access and Transport Area (LATA) concept left the Bell Companies not only providing "monopoly" local exchange service but also with substantial amounts of short-haul toll services, so long as they remained instate-intraLATA. Short-haul toll was not regarded as a competitive target in the years immediately following 1984 so provision of these MTS services was monopolistic. Generally speaking, the Bell Companies followed the AT&T, MCI, and Sprint pricing patterns charging by time of day, duration of call, and distance traveled. However, over time, "distance traveled" became less important because distance was not a major cost factor in determining the price of long distance services. Another factor was the fact that several of the "new" competitors decided to eliminate distance traveled as a separate price component, thus treating the long distance network transmission component of the call as a bundling of distance (as opposed to local) and elapsed time.

38. Until recently, long distance tariffs continued to fall, in part due to regulatory and competitive

pressures. The different distance bands used to price an interstate toll call within the continental United States was not abandoned by AT&T until 1997; MCI followed suit in 2000. In essence, mileage bands 1-9 have been aggregated for interstate calls. This was primarily due to the fact that most wireless carriers were offering fixed priced monthly plans with several hundred any time, anywhere minutes, thus abandoning the "twin" concepts of local and distance as completely different service offerings with completely different pricing components. Furthermore, it does not cost any of the long distance carriers any more for carrying a toll call ten miles or 3,000 miles. However, the long distance network, regardless of who is using it or who actually owns it, is still designed to handle telecommunications services on a nationwide and international basis, as opposed to the local network that handles local calls.

Trends in Local and Long Distance Telephone Service

39. Currently, although there are technological and regulatory imperatives that differentiate local from long distance services, there are major competitive and business trends, accompanied by the rapid development of packet switching technology spurred by the growth of the Internet and the World Wide Web, that promise to change the way telecommunications-information-entertainment services are marketed and priced. These industry-wide changes include:
• SBC's $16 Billion acquisition of AT&T, combining one of America's two largest local service providers with the nation's biggest long distance company.
• Verizon's $8.5 Billion acquisition of MCI, formerly WorldCom, thus bringing together into a single entity one of America's two largest local service providers with the nation's number two long distance company.
• The emergence of Voice over Internet Protocol (VoIP) which has become a cheaper alternative to traditional circuit-switched telephony for the provision of both local and long distance services. VoIP services are offered for a single rate without regard to number of calls made, length of calls, of even the distance called. VoIP, however, although it takes advantage of packet-switching technology, still depends upon the local companies for the both the origination and termination of calls.
• The rapid introduction over the past 20 years of nationwide and worldwide cellular, also known as wireless, services where time and distance of calls have become increasingly irrelevant. Wireless companies such as Cingular, jointly owned by SBC and BellSouth, Verizon, and Sprint-Nextel, offer a wide array of services including video, games, music, and information.
• The technological advance of what was once known as the cable television industry, where "cable telecommunications" companies today offer a wide array of video, audio, Internet, World Wide Web, along with telephone and wireless services in a feature rich environment. Major "cable TV" companies such as Comcast, Cablevision, Cox, and Time Warner offer their telephone services, both local and long distance, along with Internet connection, for a monthly fixed price, without regard to time or distance.

All of this portends a future in which the circuit-switched networks co-exist with the packet-switched networks and the wireless networks in offering a wide array of bundled telecommunications-information-entertainment services: local telephone combined with long distance, plus TV and other

-13-                                                                      1317613.1

video entertainment, movies on demand, video games, a plethora of audio services, along with wireless and information services, and much more. In such an environment, the length of a connection and the distance the service or communication travels will be of no consequence. In sum, the networks will be neutral to those traditional pricing practices, and those days are not all that far off.

Current Regulatory Distinctions between Local and Toll Calls

40. The major costs associated with long distance pricing since 1984 have been the access charges paid by the long distance carriers for the origination and termination of traffic on the local network. As we have seen above, a telecommunications service, which begins and ends on a local network but travels over a toll, i.e., long distance, network is designated in the communications business as a long distance telecommunications service, whereas the provision of access to the local network for all purposes, including long-distance access, is designated as local service. The charges for long distance telecommunications services are billed differently from local services – see below. There is an important regulatory and technological difference between the two: the long distance network has a distance component and the local network is used for local service. In regulatory parlance "toll" equates with long distance, and long distance is different from local from both a regulatory and a technological perspective even though long distance calls utilize the local network, and cannot exist without it. The amount charged does relate to distance because all long distance calls travel on a network designed to carry long distance, i.e., toll calls. Distance is an important and critical technological, regulatory, and pricing component because the price of a call is based not only on the efficient utilization of the long distance network, but also incorporates the value of the local network for origination and termination.

41. The FCC clarified the distinction between local and long distance telecommunications calls when it asserted jurisdiction over ISP-Bound Traffic and said that it is "Interstate Access Traffic," i.e., the same as Toll or Long Distance, in April, 2001, see 2001 WL 455869 (F.C.C.), 16 F.C.C.R. 9151. This public policy decision stemmed from the fact that ISPs were claiming to handle only "local telecommunications traffic." The FCC, however, applied an "end-to-end" analysis, noting that the communication generally extend beyond the ISP to websites that are out-of-state and around the world. The FCC thus determined that the calls were non-local. The FCC has defined a local call as one in which a local telephone company completes a call and is compensated accordingly, and a long distance call is one in which the local companies collaborate with a long distance carrier, which itself charges the end-user and pays out compensation to the local companies, see Local Competition Order, 11 F.C.C.R. 16013 (#1034) (1996). A more recent FCC Order ruled that AT&T's Phone-to-Phone IP Telephony Services are not exempt from access charges, see FCC Wireline Competition Bureau Docket No. 02-361, adopted April 14, 2004, released April 21, 2004, 19 F.C.C.R. 7457. This Order states that AT&T, and other long distance carriers, must pay access charges to LECs for Internet or VoIP telephony long distance services. Indeed, these access charges are already the subject of controversy because of the expense imposed on the provision of long distance services. In an article published earlier last year, "SBC TIPToP Tariff – A gift horse you CAN look in the mouth," Dr. Michael T. Hills, President, HTLT, wrote: "This tariff contains conditions under which

1317613.1

the rate can go as high as 30 cents a minute – hardly an economic proposition!" TIPTop is shorthand for True IP (Internet Protocol) to PSTN (Public Switched Telecommunications Network). It is a new tariff filed by SBC for 11 of its states and it quickly raised a firestorm of concern from VoIP providers and from the FCC, see article by Dr. Hills on his website, www.htlt.com.

42. In summary, under FCC rules and regulations, the difference between a Local Call and a Toll Call is as follows:
• A local call is specified by what is called a local exchange area with monthly billing and there is generally not a charge based on time used but all such calls are paid for as part of a monthly lump sum, without any call detail.
• A toll call is still defined as a long distance call since it travels for some portion of its route over a long distance network, using a variety of technological alternatives that are generally not used in local calling, and is clearly differentiated from a local call, even though it originates and terminates on a local network.
• A substantial percentage of toll charges compensate the long distance carriers for the local charges that they incur for the origination and termination of long distance voice and data services. In 2000, Integrated Communications Corporation conducted a comprehensive analysis of access charges paid by long distance carriers. A total of 1,435 local exchange company tariffs were analyzed in an effort to understand the range of prices paid by long distance carriers to local telephone companies. The study included both usage sensitive rate elements and flat-rated Pre-subscribed Interexchange Carrier Charges (PICCs) that were converted into a minutes of use (MOU) rate for each local company. The study was done in this way because local access charges are a mix of "postalized" and distance-sensitive rate elements. Rates ranged from a low of $0.009 per MOU to a high of $0.189 per MOU, see Interstate Switched Access Charges – A National Survey, prepared by Integrated Communications Corporation for the Association for Local Telecommunications Services (ALTS). Currently, the Regional Bells (BellSouth; Qwest; SBC Communications, now re-named AT&T following the acquisition of that company; and Verizon, which now owns MCI and its Internet Backbone affiliate, UUNET); and Sprint-Nextel, the five dominant local telephone companies in the US, are charging between 4 and 7 cents a minute for local access services provided to long distance carriers. Access charges represent the biggest cost of doing business for the long distance companies, representing approximately 40% of their total costs. For example, AT&T, the nation's biggest long distance company, paid 37.26% of its revenues in access charges and interconnection costs in 1995, according to AT&T's 10K filing with the SEC, which listed revenues of $47,227 Million, and access and interconnection costs of $17,618 Million. The figure for 2004 was a little over 34%, according to AT&T's annual report, Form 10-K/A, which states that total revenue for 2004 was $30,537 Million, while access and other connections amounted to $10,454 Million. Disconnect/connect?

43. It is clear from the above analysis that the provision of local and long distance services are integrally linked in order to provide universal and ubiquitous service to government, business, institutions and the public. Although the two networks, local and long distance, are interconnected, there are major technological and regulatory differences between the delivery of local and long distance telecommunications-information services. As a result of the interconnections between the

1317613.1

two types of network, significant costs of providing local connections for the origination and termination of long distance traffic must be borne by the long distance carriers.

Plaintiff's Contracts

44. With respect to the documents furnished by Plaintiff in this case, the complaint, paragraph 11, states: "AT&T apparently believed that the long distance telephone service it sold to Plaintiff constituted taxable toll telephone service under sections 4251 and 4252(b) of the Code." At paragraph 19, the complaint states: "The charges for Plaintiff's Services did not vary in amount with the distance of each individual communications (with the exception of charges for calls to and from Mexico for periods prior to March of 2003). AT&T's charges for Plaintiff's Services were based solely on the duration of each call, i.e., the 'elapsed transmission time.'" This statement is too simplistic because long distance transmission costs and charges (prices) are complex and are not based SOLELY on the duration of each call. As has been pointed out previously, long distance calls originate and terminate on local telephone company networks, and these "costs" are included in long distance prices and contracts. In fact, they represent the largest component of long distance service pricing. Furthermore, the contract tariffs themselves, as submitted by Plaintiff, provide ample proof of the complexity of telecommunications long distance service pricing, and, as we shall see, make numerous references to distance components. The complaint makes no mention of the fact that long distance telecommunications-information services travel via a long distance network specifically designed to transport services over "distances."

45. Along with the complaint, Plaintiff provided three copies of a Virtual Telecommunications Network Service (VTNS) tariffs, also referred to as parts of AT&T Tariff F.C.C. No. 12, dated March 2001, June 2002, and February 2003, and a VTNS Agreement, dated November 1995. The three VTNS tariff documents are almost identical with the exception of price changes. The VTN "provides voice and data service applications among stations in the United States (U.S.), Puerto Rico (P.R.) or the U.S. Virgin Islans (U.S.V.I.) or between stations in specific international locations and the U.S. Option 174 includes Measured Ports, Rate Option 1 and 2 Measured Remote Ports, Port Access Telephone Numbers (PATNs), Authorization Codes, Data Transmission Capabilities (DTCs), Voice Transmission Capabilities (VTCs), Satellite Transmission Capabilities (STCs) and VTNS Frame Relay Service (V-FRS)," see page 1 on all three documents. This opening paragraph is a description of a long distance network and the word "measured" when used in connection with "Measured Ports" and "Measured Remote Ports" are direct references to distance. The second paragraph on the same page refers to the regulatory authority of the FCC, the agency with primary jurisdiction over interstate and international long distance services. Pages 313-320 of the 2001 contract tariff, pages 7-12 of the 2002 contract tariff, and pages 6 to 12 of the 2003 contract tariff, refer to "Measured Charges," and make references to "Rate Mileage" applying to "All bands," informing Plaintiff that the traditional and historical mileage bands in long distance had been combined into a single band for purposes of domestic long distance calling. This change in pricing was due to competitive pressure brought on by marketplace and technological imperatives. All three contract tariffs stipulate that the minimum annual charges under the contract are $53 Million, see

-16-

1317613.1

page 320 of the 2001 document, page 14 of 2002, and page 13 of 2003. All three then move into Section 7.176.2. Rates and Charges, where there are several references to measured remote ports and charges per access mile, see pages 324-332 of the 2001 document, and pages 15-27 and 17-24 of the 2002 and 2003 documents. Additionally the 2001 contract tariff, on page 324, and the 2003 document, on page 15, there is a table that puts the 50 states into 9 separate groups for the purposes of "Measured Remote Port rates." One of many illustrations can be found on page 17 of the June 2002, contract tariff where a basic charge is listed in the final right hand column of the table, plus an additional charge for each "Access Mile." In the last section on the same page is a charge listed "per interoffice Mile." As has been pointed out repeatedly, these are merely a couple of examples illustrating that the network is a long distance network where mileage and/or distance is a vital component of price.

46. What the AT&T contract tariffs with MBNA are based on is a careful study and analysis, by AT&T, of MBNA's customer proprietary network information (CPNI). What this means is that AT&T knows a great deal about its customer's use of telecommunications-information services over time and can then include a calculation relating to distance and MBNA locations and bury them in what appears to the customer to be a simpler pricing structure, based upon the customer's willingness to spend in excess of $50 Million annually on long distance telecommunications-information services.

47. The VTNS Agreement of November 1995 refers to multiple attachments, (a) through (m), but none of the attachments were provided and thus cannot be reviewed and analyzed.
The VTNS Agreement, on page 3, 1.5, states: "AT&T represents and warrants that all provisions of this agreement, including all of its Attachments, that are required by the Communications Act of the rules or policies of the F.C.C., as they are amended from time to time, to be included in tariff provisions on file with the F.C.C. are included in Attachment A and will be included in, or, as required, added to AT&T Tariff F.C.C. No. 12 during the term of the Agreement." Among other rules, this section also refers to an FCC regulation known as Pre-subscribed Interexchange Carrier Codes (PICCs). These are the regulatory mechanism established by the FCC to determine which long distance company customers (residential or business, large and small) have selected to "carry" or transport their long distance telecommunications services. PICCs represent a regulatory and technological difference between local and long distance telecommunications services. There is no such regulatory mechanism for selecting a local telephone service provider. PICCs are thus a differentiator between local and long distance calling and the different networks over which those calls travel.

48. There is a widely believed misconception that a Virtual Private Network, or in this case a VTN, is, in fact, a Private Network, i.e., one dedicated to a specific large corporate and/or governmental organization. This used to be the case. Today, however, the long distance carriers have created VPNs/VTNs that rely heavily on the transport facilities provided by the PSTN, and are thus not private communications networks. In this case, the VTN provided by AT&T illustrates the point because it is designed to be a shared network with much of the traffic going over the PSTN. VPNs/VTNs, as currently offered by long distance carriers, have four categories of services, which

work like this:

    (1) Off-network to off-network:  This means that both the originating and terminating ends of a long distance service using the VPN must use the PSTN for its origination and termination, along with applicable access charges for origination and termination.

    (2) Off-network to on-network: This is where the communication originates off the network, i.e., on the PSTN, and is terminated "on" the VPN.  Since ALL communications originate on the PSTN, they are subject to originating access charges.

    (3) On-network to off-network: This is a situation where a call might originate in a ServiceMaster call center and terminate on a client's or customer's location.  These calls use and terminate on the PSTN, and are therefore subject to terminating access charges.

    (4) On-network to on-network: This, perhaps, represents a truly dedicated network where calls are limited to intra-corporate communications services, e.g., from one corporate office/location to another.  They do not go "off" network, i.e., they do not use, in the traditional sense, the PSTN, and, arguably, are not subject to the FET.  These calls are charged at a low rate because they avoid the payment of access charges for the origination and/or termination of traffic, thus significantly reducing the cost and the price.

The first three categories above depend upon local telephone companies and the PSTN for the origination and/or the termination of calls, and also incur charges for access to the local networks for at least one end of those calls.

49. The declaration of February 7, 2006, Mr. Faerber, Senior Vice President of MBNA Technology, Inc., states in paragraph 4: "Based upon the terms of these contracts, Plaintiff was charged for its telecommunications services based solely upon the elapsed transmission time of each call."  In paragraph 4, he asserts: "The distance of each call had no impact on the amount Plaintiff was charged for each individual call."  As stated previously, and been clearly demonstrated in this declaration, these statements are too simplistic and are thus inaccurate.  Furthermore, Mr. Faerber fails to include in his declaration any analysis or data in support of his simplistic assertions.  Plaintiff's Motion for Summary Judgment on Liability, dated February 10, 2006, suffers from the same flaw as Mr. Faerber's declaration, namely that the Summary of Argument, beginning on page 1, is simplistic and the entire document makes no attempt to explain and analyze the differences between local network traffic and long distance network traffic.

Pursuant to the provisions of 28 U.S.C. S.1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed February 28, 2006, at Washington, D.C.

_____
Alan Pearce, Ph.D.
Information Age Economics, Inc.

1317613.1

1317613.1

**APPENDIX ONE: LIST OF ACRONYMS & SIGNIFICANT TERMS**

Act     Also The Telecommunications Sct of 12996 and The Communications Act of 1934, as amended by the Telecommunications Act of 1996.  These are the federal statutes that define the relative jurisdiction of the FCC ans the State PSCs (Public Service Commissions).

ADSL    Asymmetric Digital Subscriber Line (or Loop) is a technology for transmitting digital information at a high bandwidth on existing telephone lines to homes and business.  Unlike regular dial-up phone service, ADSL provides continuously available, "always on" connection.  It is a public switched telecommunications service.

ATM     Asynchronous Transfer Mode is a dedicated connection switching technology that organizes digital   data into 53-byte cell units and transmits them over the network using digital signal   technology.  It can be used in both private and public networks.

CLECs    Competitive Local Exchange Carriers are relatively new entrants in the industry that have begun to offer local telephone and data services in direct competition to the Bell Companies and other ILECs.

CMRS    Commercial Mobile Radio Service and includes cellular or wireless telephone service, paging and PCS (personal communications service).

CO      Central Office is an office in a locality to which subscriber home and business lines are connected on what is called a local loop.  The CO has switching equipment that can switch calls locally or to long distance carrier networks.

Collocation   Collocation is the process by which one carrier installs it sequipment in the office of another carrier to interconnect their separate networks.

CPNI     Customer Proprietary Network Information represents a body of historical knowledge obtained and owned by the established telecommunications-information services providers about their clients' service requirements that are generally kept in strict confidence by the telecommunications companies and are often alleged, by newer and emerging competitors, to give incumbent firms a distinct competitive advantage.

Dark fiber   Dark fiber is the provision of fiber optic cable between two locations.

DID      Direct Inward Dialing is a service of a local telephone company that provides a block of telephone numbers for calling into a company's, government's, or institution's private branch exchange (PBX) system for intra-office routing.  It is a public switched network service.

1317613.1

DSO   Digital Signal, Level 0 (64kbps) is a transmission rate normally used for one telephone voice channel.

DS1   Digital Service, Level 1 (1.544Mbps) is used as the signal in the T-1 carrier and is 24 DFS0 signals transmitted using pulse-code modulation and time-division multiplexing.

DS3   Digital Service, Level 3 (44.736Mbps) is the signal in the T-3 carriers and carries a multiple of 28 DS1 signals or 672 DS0s.

DSL   Digital Subscriber Line is a technology for bringing high bandwidth information to homes and small businesses over ordinary copper telephone lines.

Frame relay Frame relay is a packet-switched data service, used for local area networks, wide area networks, and Internet access, etc.

ICB   Individual Case Basis is an individually negotiated contract with customer specific prices for telecommunications services.

ILECs  Incumbent Local Exchange Carriers are the incumbent local telephone companies, including the Bell Companies, and a host of others, offering predominantly local telephone services to their "local" subscribers, and local access services to the long distance companies.

Interconnection is the process by which two carriers interconnect their networks. Interconnection is usually achieved by collocation, and includes the payment of mutual compensation and access to UNEs (Unbundled Network Elements) and resale services.

ISDN  Integrated Services Digital Network is an advanced data service that can provide integrated voice, data and video communications over the same circuit.

ISP   Internet Service Provider is a company that provides individuals and companies with access to the Internet and the World Wide Web. An ISP has the equipment and the telecommunication line access required to gain access to the Internet for the geographic area served.

IXC   An Interexchange Carrier generally offers only long distance services, for example AT&T and MCI, among others. They generally provide connections between local exchanges in different geographic areas. As such, IXCs provide "inter-local" access and transport service as described in The Telecommunications Act of 1996. They are long distance as opposed to local service providers.

1317613.1

LATA      Local Access and Transport Area is the term in the US for a geographic area, or areas, served by a local telephone company, or companies. Such companies are legally referred to as Local Exchange Carriers.

LEC      Local Exchange Carriers provide local telephone services along with local access to the long distance companies for the origination and termination of long distance traffic.

Mutual Compensation is the rate paid between interconnected carriers for terminating and transporting traffic of the other carrier. When a call originates on Carrier A's network and is delivered to a customer on Carrier B's network, Carrier A pays carrier B for terminating the call.

PBX      Private Branch Exchange is a telephone system within an enterprise that switches calls between enterprise users on local lines while allowing all users to share a certain number of external phone lines. The main purpose of a PBX is to save the cost of requiring a line for each user to the telephone company's CO.

PCS      A recent generation of cellular/wireless service frequently provided over digital facilities. It typically includes wirerless telephone service, paging, and voice messaging into a single package, with further add-ons available for an extra cost.

PIC      Pre-subscribed Inter-exchange Carrier is when telephone users are required to designate a long distance carrier to which they are automatically linked as soon as they dial a long distance number. This is known as pre-subscription and it is the methodology by which the LECs determine to which long distance carrier a call must be routed.

PIC Change      PIC Change is when a customer switches from one pre-subscribed long distance carrier to another. A PIC change that occurs without a customer's authorization is known as "slamming."

POP      Point of Presence is an access point to the Internet and/or the Long Distance Network. It is an "office," or computer, maintained by a carrier that houses switching or other network equipment for transferring calls.

PSC      Public Service Commission is the generic term for a state regulatory agency, sometimes referred to as a PUC, or Public Utilities Commission.

PSTN      Public Switched Telecommunications Network refers to the world's collection of interconnecting, ubiquitous, public telephone networks. The PSTN lies at the heart of the vast majority of communications systems throughout the world, including wireless/cellular, Internet/World Wide Web, voice, data, and video.

1317613.1

SGATC         Statement of Generally Available Terms and Conditions, a tariff-like public document in which a Bell Company lists rates, terms and conditions for interconnection and resale.

Slamming      Slamming is a change in a customer's pre-subscribed long distance carrier without the customer's permission.

SS7           Signaling System 7 on the PSTN is a system that puts the information required to set up and manage telephone calls in a separate network rather than within the same network that the telephone call is made, thus resulting in faster and more efficient connections.

Tariff        A tariff is a public contract that lists the rates, terms and conditions under which a carrier offers its services.

UNE           Unbundled Network Element is a requirement of The Telecommunications Act of 1996.  The ILECs must break down their networks into discrete functional components and provide them to competitive carriers upon request.  Each discrete component is a UNE.

UNE-P         Unbundled Network Element-Platform is a combination of UNEs that reassemble all of the switching and transport functions that an ILEC provides between a customer premises and an IXC point of presence.

Universal Service is a federal and state subsidy program to reduce the cost of service to schools, libraries, people living in rural areas, and low-income and hearing-impaired subscribers.

VPN           Virtual Private Network is a network that makes use of the PSTN, maintaining privacy through the use of a tunneling protocol and security procedures.  A VPN can be contrasted with a system of owned or least lines that can only be used by one company.  Unlike a Private Network, which is exclusive, a VPN makes significant use of the PSTN.

xDSL          The "x" before DSL is a generic reference to a variety of DSL technologies that greatly expand the capacity of the existing copper facilities that bring telephone service  into homes and offices.

1317613.1

**APPENDIX TWO: REFERENCE & SOURCE MATERIALS**

AT&T Long Lines Rate Tables, effective February 1, 1965, and April 1, 1965, provided by AT&T's Washington D.C. office, January, 2004.

AT&T's 10K SEC filings re Access Charges paid to LECs.

"Congress proposes tax on all Net, data connections," by Declan McCullough, Staff Writer, SNET News.com, January 28, 2005.

"Senate Brokers Internet Access Tax Deal," by Roy Mark, Internet News, November 17, 2004.

"Phone Tax Fix Could Put Refund Suits on Hold," by Warren Rojas, Tax Notes, January 24, 2005, pp. 412-415.

Federal Communications Commission's Memorandum Opinion and Order, SBC Communications, Inc. and AT&T Corp. Applications for Aspproval of Transfer of Control, November 17, 2005. This document represents the approval of SBC's $16 Billion acquisition of AT&T, America's largest long distance company.

FCC's Memorandum Opinion and Order, Verizon Communications, Inc. and MCI, Inc. Applications for Approval of Transfer of Control, November 17, 2005. This document represents the approval of Verizon's $8.5 Billion acquisition of MCI, formerly WorldCom, America's second largest long distance company.

FCC Sixth Report & Order In CC Docket Nos. 96-262 and 94-1, Report & Order in CC Docket No. 99-249, Eleventh Report & Order in CC Docket 96-45, in the Matter of Access Charge Reform, CC Docket No. 96-262, Price Cap Performance Review for Local Exchange Carriers, CC Docket No. 94-1, Low-Volume Long-Distance Users, CC Docket No. 99-249, Federal-State Joint Board on Universal Service, CC Docket No. 96-45, Adopted & Released May 31, 2000, Cite as 15 F.C.C.R. 12962.

FCC Order on Remand and Report and Order in the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Intercarrier Compensation for ISP-Bound Traffic, CC Docket nos. 96-98 and 99-68. Westlaw cite: 2001 WL 455869 (F.C.C.), 16 F.C.C.R. 9151, 16 FCC Rcd. 9151.

FCC Order in the Matter of Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services are exempt from Access Charges, WC Docket No. 02-361, Adopted April 14, 2004. Released April 21, 2004. 19 F.C.C.R. 7457. This Order states that AT&T must pay access charges to local exchange carriers for the origination and termination of its Internet or VoIP telephony Long Distance Services.

1317613.1

FCC Notice of Proposed Rulemaking, Internet Protocol Enabled Services, WC Docket No. 04-36, released March 10, 2004.

FCC Order on Remand, WC Docket No. 04-313, and CC Docket No. 01-338, Unbundled Access to Network Elements & Review of the Section 251 Unbundling Obligations of ILECs, Adopted: December 15, 2004; Released: February 4, 2005.

FCC Detariffing Orders: (1) In the Matter of Policy and Rules Concerning the Interstate, Interexchange Marketplace, CC Docket No. 96-61, 11 FCC Rcd. 20730 (1996) (Daily Digest 11/1/96); (2) In the Matter of Policy and Rules Concerning the Interstate, Interexchange Marketplace, CC Docket No. 96-61, Order on Reconsideration, 12 FCC Rcd. 15014 (1997) (Daily Digest 8/21/97); (3) In the Matter of Policy and Rules Concerning the Interstate, Interexchange Marketplace, CC Docket No. 96-61, Second Order on Reconsideration and Erratum, 14 FCC Rcd. 6004 (1999) (Daily Digest 4/1/99); 4. MCI WorldCom, Inc. et al. V. FCC, Opinion, 2000 WL 390520, No. 96-1459, Order (D.C. Cir. 2000) (Court upheld FCC Orders)); (5) MCI WorldCom, Inc. et al. V. FCC, No. 96-1459, Order (D.C. Cir. May 1, 2000) (Court lifted the Stay); (6) Public Notice, May 9, 2000, Domestic Interexchange Carrier Detariffing Order Takes Effect, DA 00-1028 (Daily Digest 5/9/2000); (7) Public Notice, November 6, 2000, Common Carrier Bureau Extends Transition Period for Detariffing Consumer Long Distance Services, DA 00-2489 (Daily Digest 11/6/2000); (8) In the Matter of Policy and Rules Concerning the Interstate, Interexchange Marketplace, CC Docket No. 96-61, DA 00-2586, released 11/17/2000 (Daily Digest 11.17.2000); (9) In the Matter of 2000 Biennial Review Policy and Rules Concerning the International, Interexchange Marketplace, IB Docket No. 00-202, adopted October 12, 2000, released October 18, 2000, FCC 00-367 (News Release and Order on Daily Digest 10/18/2000); (10) Public Notice, February 5, 2001, Common Carrier Bureau Extends Transition Period for Detariffing Consumer Long Distance Services, DA 01-282 (Daily Digest 2/7/2001); (11) Public Notice, February 21, 2001, Common Carrier Bureau Extends Deadline for First Annual Certification of Compliance with Geographic De-averaging and Rate Integration Requirements to August 1, 2001, DA 01-473 (Daily Digest 2/21/2001); (12) News Release, March 16, 2001, FCC Adopts Detariffing and Streamlining Measures Regarding International Interexchange Services, IB Docket No. 00-202 (Daily Digest 3/19/2002); (13) In the Matter of 2000 Biennial Review Policy and Rules Concerning the International, Interexchange Marketplace, IB Docket No. 00-202, adopted March 16, 2001, released March 20, 2001, FCC 01-93 (Daily Digest 3/20/2001).

FCC: High-Speed Services for Internet Access: Status as of December 31, 2003, Industry Analysis & Technology Division, Wireline Competition Bureau, June, 2004.

FCC: Trends in Telephone Service, compiled and published by the Industry Analysis & Technology Division of the FCC's Wireline Competition Bureau.

FCC: Common Carrier Cases, 1936-1978, Digest, Index, Tables of Cases and Briefs of Federal Court Opinions.

1317613.1

Interstate Switched Access Charges – A National Survey, prepared for the Association for Local Telecommunications Services (ALTS), prepared by Integrated Communications Corporation, 2000.

IP-Enabled Voice Services – Impact of Applying Switched Access Charges to IP-PSTN Voice Services, QSI Consulting, Inc., O'Fallon, MO, 2005.

MCI Telecommunications Corporation: Customized Business Communications Service, Tariff F.C.C. No. 1.

National Exchange Carrier Association, Inc. Tariff F.C.C. No. 5, Access Service.

Newton's Telecom Dictionary, 16th ed., February 2000, Telecom Books, New York, NY.

Report by the Federal Communications Commission on Domestic Telecommunications Policies, September 27, 1976.

The Telecommunications Act of 1996 and The Communications Act of 1934.

Competition and Cross Subsidization in the Telephone Industry, by Leland L. Johnson, The Rand Corporation, Santa Monica, CA, December, 1982.

HTLT Telemanagement, Laurel, MD: Cost Per Minute prices for AT&T & MCI for provision of MTS, 1987 to 2001.

HTLT Telemanagement: SBC TIPToP Tariff – A gift horse you CAN look in the mouth, by Dr. Michael T. Hills, 2005.

Long Distance Pricing & Demand Post January 1, 1984, by Dr. Alan Pearce and Roger Peterson, TeleStrategies Publishing, McLean, VA, 1983.

The Telecommunications Policymaking Process & The Future Agenda: Implications for Service Providers, Manufacturers & Users, by Alan Pearce, Ph.D., International Data Corporation, Framingham, MA, 1981.

Background of the Telecommunications Industry, by Alan Pearce, Ph.D., 1983.

Telecommunications 1987: Current Developments In Policy & Regulation, Practising Law Institute, 1987.

"The Growing Controversy Over Federal Excise Tax on Long-Distance Calls," by Thomas D. Sykes, in The Tax Executive, May-June, 2003.

Competitive Implications of Bell Operating Company Entry into Long-Distance

1317613.1

Telecommunications Services: Affidavit of Marius Schwartz, May 14, 1997.

Public Policy Effects on the Local Access Equipment Market, by Alan Pearce, Ph.D., and J. Richard Carlson, MBA, June, 1997.

The Paradox of Telecommunications Competition, by Alan Pearce, Ph.D., and J. Richard Carlson, MBA, February, 1996.

A Survey of Telecommunications Technologies and Services, by Alan Pearce, The Government Printing Office, December, 1975.

U.S. Public Telecommunications Marketplace, by Alan Stewart & Alan Pearce, Advanstar Communications, Inc., Cleveland, OH, 1993.

World Network Equipment Industry Recovery, 2002-2003, by Richard Thayer, Ph.D., Alan Pearce, Ph.D., and Philip M. Caughran, Telecommunications Industry Association B2B Publishing, Washington D.C., May, 2002, and reprinted by The Practising Law Institute, December, 2002.

1317613.1

**QUALIFICATIONS, PUBLICATIONS, AND PRIOR TESTIMONY**

Qualifications

Dr. Alan Pearce founded Information Age Economics in March 1978 after a senior level policy career in the U.S. Government from 1970-78.

As one of the prime architects of public policy at the Federal Communications Commission in the 1970s, Dr. Pearce helped lay the foundation of a new information era. Beginning in 1970, Dr. Pearce was chief economist and special assistant to FCC Chairman Dean Burch and later to his successor Richard Wiley. In that capacity, he was responsible for economic policy research and design pertaining to all major matters pending before the FCC. During a five year tenure in the Office of the Chairman at the Commission, Pearce oversaw the investigation of AT&T, which eventually led to the breakup of the company in 1984; the early policies that encouraged the convergence of computers and communications; the launching of domestic satellites to provide telecommunications-information-entertainment services to the public; the beginning of public policies encouraging the development of cable TV; and wireless and spectrum policies that resulted in the introduction of universal wireless services.

Dr. Pearce next became chief economist, Subcommittee on Telecommunications, U.S. House of Representatives, where he was responsible for developing legislation and monitoring the telecommunications-information-entertainment industry via hearings, consultations, and reports.

After leaving the House, Dr. Pearce joined the Office of Telecommunications Policy in the Executive Office of the President, as chief economist and senior policy adviser. He was responsible for coordinating policy research and developments emanating from the many federal departments and agencies that hold industry regulatory authority.

Since leaving the government, Dr. Pearce has provided professional services to telecommunications, wireless, satellite, cable TV, movie and program production companies, and broadcasting corporations, along with software and equipment manufacturers. He has also consulted with a wide variety of government organizations at the international, federal, state, and local levels.

Pearce has assisted clients in the U.S. and overseas with negotiations on privatizations and appropriate regulatory structures (Great Britain, France, South Korea, Australia, Mexico, etc.), antitrust issues and actions, mergers and acquisitions, appraisals and valuations, franchises, and service rates. He has lectured and written on international business and the telecommunications-information-entertainment industry both domestically and globally. He is the author of several books and is on the faculty of the Center for Telecommunications Management at the University of Southern California.

In addition, Dr. Pearce has worked with a number of successful entrepreneurial ventures, including the Adaptive Corporation and its parent, Network Equipment Technologies; Alert Systems, Inc.;

BrightLink; Ciena Corporation; CustomerLinx; HTLT Software; ITGlobalSecure; Link America; LynkLabs; Pete's Brewing Company; Quixotic Solutions, Inc.; and SignalSoft, among others.

Prior to coming to the U.S. in 1968, Pearce worked as both a newspaper and TV journalist, and was foreign editor of Independent Television News in London. He was also Chairman of The London Radio and Television Branch of the National Union of Journalists.

Dr. Pearce holds bachelor and master degrees from The London School of Economics and Political Science, University of London, and a doctorate in business and telecommunications from Indiana University.

1317613.1

<u>Publications</u>

1. Books

Great Ideas in Economics, Published by Robert Maxwell/Pergamon Press, Oxford, England, 1969.

NBC News Division and The Economics of Prime Time Access, two research papers published by Arno Press, a New York Times Company, New York, 1979.

Chapter, What News Costs at NBC, in The Rest of the Elephant: Perspectives on the Mass Media, published by Prentice-Hall, Englewood Cliffs, NJ, 1973.

Chapter 1. The Economic & Political Strength of the Television Networks, in Network Television & the Public Interest, published by Lexington Books, DC Heath & Co., Lexington, MA, 1980.

The Telecommunications Policymaking Process & the Future Agenda, International Data Corporation, Framingham, MA, 1981.

Long Distance Pricing & Demand Post January 1, 1984, with Roger Peterson, published by TeleStrategies, McLean, VA, 1983.

US Telecommunications Marketplace, with Alan Stewart, published by Advanstar Communications Books, Cleveland, OH, 1993.

World Network Equipment Industry Recovery, 2002-2003, with Richard Thayer, published by Telecommunications & Technologies International in association with the Telecommunications Industry Association, 2002.  This book was reprinted by The Practising Law Institute in December, 2002, as part of the 20th Annual Institute on Telecommunications Policy & Regulation Conference.

Chapter on Computers & Communications: Convergence, Conflict, or Policy Chaos? in Encyclopedia of Telecommunications, published by Marcel Dekker, Inc., New York, 1992.

2. Monographs & Papers

Background of the Telecommunications Industry, 1983, submitted to the House of Representatives Telecommunications Subcommittee as part of public policy hearings on the telecommunications-information-entertainment industry.

Cingular's Purchase of AT&T Wireless: An Economic Analysis, with J. Richard Carlson, Media Law & Policy, Vol. XIV, Number 2, Spring, 2005, pp. 6-20, New York Law School.

Global Internet Backbone Capacity, February, 2000, submitted to the FCC, the DOJ, and the EU in opposition to MCI-WorldCom's proposed acquisition of Sprint.

The Paradox of Telecommunications Competition, with J. Richard Carlson, February, 1996, published by CTIA, Washington D.C.

Videotex & Electronic Publishing: A Legal, Regulatory, and Economic Analysis, with Michael Botein and Michael Sprague, published by the Communications Media Center, New York Law School, New York, 1982.

The Competitiveness of the U.S. Telecommunications Industry: A New York Case Study, @ 6 Cardozo Arts & Entertainment Law Journal, 233-325, 1988, with Prof. Michael Botein.

Public Policy Effects on the Local Access Equipment Market, with J. Richard Carlson, June, 1997.

Analysis of the Syndication History of Original Network Run Variety, Comedy & Drama Series, for the Tax Division, Department of Justice, 1984.

A Survey of Telecommunications Technologies & Services, Government Printing Office, 1975.

Video Programming Availability & Consumer Choice, with Stuart M. Whitaker, May, 1990.

History of the Community Antenna TV & Evidence of Anti-Competitive Behavior, with Stuart M. Whitaker and Nancy Rooney, March 1990.

Future of the Electronic Mass Media: Broadcasting versus Cable Television, with Stuart M. Whitaker, February, 1990.

Professional & Technical Training Feasibility Study: Bellcore in Europe, July, 1995.

British PCN Policy Pitfalls: Implications & Lessons for the US, published by the Cellular Telecommunications Industry Association, March, 1993.

Bad Connections?  Foreign Ownership of U.S. Telecoms, in The Georgetown Journal of International Affairs, Winter/Spring, 2001.

The US Cellular Telecommunications Industry: An Overview Analysis of Competition & Operating Economics, published by the CTIA, August, 1992.

Cable Television: Promise versus Regulatory Performance, co-authored with Harry M. Shooshan, Henry Geller, and Karen Possner, published by the US Government Printing Office, 1976.

The Emerging Mobile Satellite Services Market: Is Demand Sufficient for Four Players? with J. Richard Carlson, May, 1996.

1317613.1

Wireless Carrier & Reseller Relationships: New FCC Policies needed for a Competitive Environment, with J. Richard Carlson, April, 1997.

As Chief Economist at the Federal Communications Commission (FCC) and, later, for the House of Representatives Subcommittee on Communications, I researched and wrote a variety of public policy papers on advertising directed toward children, sex and violence on television, the costs of cable TV regulation, the economic impact on professional sports of the anti-TV Blackout Legislation, the investigation of Western Electric and the Bell System, satellite and wireless communications systems, and international telecommunications.

3. Selected Articles

"How the Networks Turned News into Dollars," in TV Guide, August 23, 1980.

"Fed heads in the clouds?  It's time for FCC to address network invasions before the sky really falls," in America's Network, June 1, 1998.

"A new twist in the battle over privacy," in Wireless Integration, November-December, 1998.

"Another hectic year for the FCC!" in America's Network, January 1, 2001.

"AT&T Beats Competitors and Regulators to the Punch," in America's Network, October 15, 1995.

"AT&T to Offer Enhanced Payphone Services?" in The Operator, Vol. 1, No. 4, December, 1991.

"BellSouth to Offer Public Coin Messaging Service," in The Operator, Vol. 1, No. 4, December, 1991.

"Bill and Keep: One solution to the minefield of reciprocal compensation," in America's Network, August 1, 2000.

"Billed Party Preference – On the Policymaking Front Burner or About To Be Dumped Completely?" in The Operator, Vol. 1, No. 3, November, 1991.

"Bless those resellers: Keep your friends close, your 'enemies' closer," in America's Network, January 15, 1998.

"Bureaucratic burnout: Some FCC staffers will seek greener pastures," in America's Network, March 1, 1997.

"Can Cable Still Transform U.K. Telecommunications?" in Cable T.V. and New Media Law & Finance, October, 1995.

1317613.1

"Capitol Bill: Assessment of President Clinton's sweeping Telecomms Regulations Changes Mean to the Industry," with Alan Stewart, in Communications International, March, 1996.

"Carriers plot strategy, alliances in Global Market," in America's Network, May 15, 1995.

"CDMA-Standards: dispute or trade war," in Wireless Integration, January-February, 1999.

"Challenging White House and FCC Opposition, Telemarketing Legislation Passes Congress," in The Operator, Vol. 1, No. 4, December, 1991.

"Closing the gap: Smart taxation could be key in solving the problem of the digital divide," in America's Network, September 1, 2001.

"Competition breaks the ties that bind European Vendors," in America's Network, December 15, 1995.

"Competitive Bidding or Cooperation?" in America's Network, July 15, 1994.

"Comsat's white knight," in America's Network, November 15, 1998.

"D.C.'s dilemma for 1999: Can FCC develop a local competition policy that's stakeholder-neutral?" in America's Network, December 15, 1998.

"Deal-delayers: Feds worry WorldCom/MCI could tip the market," in America's Network, April 15, 1998.

"Deploying E-911 – a boon to wireless enterprise?" in Wireless Integration, January-February, 2000.

"Directory Services Distractions: LECs should focus on the real competition," in America's Network, October 1, 1996.

"EU Develops Proposals to Address New Regulatory Environment," in EuroWatch, April 19, 1996.

"Exciting times in Washington: FCC rulemakings gives us respite from sex, lies and videotape," in America's Network, October 15, 1998.

"FCC Approves NECA's Operator Transfer Service Tariff," in The Operator, Vol. 1, No. 3, November, 1991.

"FCC Expands its Regulatory Grip: This time it's Pay-Per-Call Services," in The Operator, Vol. 1, No. 2, October, 1991.

"FCC Rejects CNSI's Tariff as 'Patently Unlawful'," in The Operator, Vol. 1, No. 2, October, 1991.

1317613.1

"FCC takes user approach to wireless networking," in Wireless Integration, September/October, 1998.

"FCC will serve as regulatory model for European Union," in America's Network, January 15, 1996.

"Fireworks on Capitol Hill?" in Wireless Integration, July-August, 1999.

"Getting a read on Reed: Has the FCC chairman lost his mind?" in America's Network, December 1, 1996.

"Historical amnesia: In abandoning universal service, we forget what made this country great," in America's Network, July 15, 1998.

"ILECs need lessons in sharing: They can free themselves from regulation but they've got to open up their lines," in America's Network, January 1, 2000.

"Internet and Web Policy Issues to Confront the New FCC," in Cable T.V. and New Media Law & Finance, Vol. XV, No. 8, October, 1997.

"Is satellite telephony worth saving?" in Wireless Integration, September-October, 1999.

"Is the customer still king?  Dropped, spurned, slammed and neglected – the rapid decline of customer care(less)," in America's Network, December 1, 2000.

"Is the local loop a natural monopoly?  The return of the local monopoly raises serious questions about its nature," in America's Network, June 1, 2001.

"Learning to say 'no': DOJ gets tough on big business mergers," in America's Network, June 15, 1998.

"Let competition rip: FCC should back off from wireless resale," in America's Network, June 15, 1997.

"Long Haul Carriers' Claims to Competition Overinflated," in America's Network, April 1, 1995.

"Manna from Heaven? Sprint Deal Gives FCC, U.S. Firms Leverage in Germany and France," in EuroWatch, October 6, 1995.

"Many Players Testing the U.S. Wireless Waters, with Clark W. Hand, in Cable T.V. and New Media Law & Finance, November, 1992.

"Misdirected anger: Kennard is paying for mistakes of the past," in America's Network, May 15,

1317613.1

1998.

"One very wireless day: The FCC steers policy to support broadband wireless, but critical issues remain unsolved," in America's Network, July 15, 1999.

"Opening the floodgates: Bell Atlantic's LD bid means the competitive dam has burst," in America's Network, February 1, 2000.

"Personal Communications Services – FCC Policy Evolves Slowly," in The Operator, Vol. 1, No. 3, November, 1991.

"Politically suspect: Fallout from the 700 MHz spectrum auction delay might result in some interesting alliances," in America's Network, September 1, 2000.

"Policy from the boardroom: Private coalition proposes changes in access charges that might be good for all," in America's Network, September 15, 1999.

"Public Policy Hurdles and Squabbles Continue to Hamper the Development of a Competitive Payphone and Operator Services Industry," Part I, in The Operator, Vol. 1, No. 1, September, 1991. Part 2 appeared in The Operator, Vol 1, No. 2, October, 1991.

"Reassembling Humpty Dumpty: The King's men in Washington seem oblivious to a telecom monopoly in the making," in America's Network, May 1, 2000.

"Regulating the 'Net: Why the FCC's hands-off approach won't work," in America's Network, March 15, 1998.

"Regulation in the U.S., U.K.: Similarities can be found, differences abound," in America's Network, January 1, 1997.

"Rebuilding the Monopoly: Will the WorldCom/Sprint merger lead to less competition and higher prices?" in Telecom Investor, December 1, 1999.

"Reshaping Public Access," a three-part series, co-authored with Alan Stewart, in Telecom Investor, October and December, 1999, and February, 2000.

"R.I.P.: Harold Greene: Judge Greene will be remembered for service in WW II, civil rights legislation, the breakup of AT&T … and, his sense of humor," in America's Network, March 1, 2000.

"Something wicked this way comes: Billions of Internet dollars are riding on a bad status quo," in America's Network, September 15, 1998.

"Southwestern Bell Wins FCC Approval of Two Payphone Related Tariff Changes," in The Operator, Vol. 1, No. 4, December, 1991.

"Storms over cockpit data," in Wireless Integration, November-December, 1999.

"Strained relations?  Canada is our good/bad telecom neighbor," in America's Network, March 15, 1998.

"Sustaining the beast: An all-consuming political process expands its realm," in America's Network, October 1, 2000.

"Tested to the limits: Policymakers take a hard look at telecom and what went wrong," in America's Network, October 1, 2001.

"Thanksgiving tele-feast: Will the feeding frenzy ever end?" in America's Network, November 15, 1999.

"The bell isn't tolling for CLECs," in America's Network, July 1, 2000.

"The broadband wireless reality," in Wireless Integration, May-June, 1999.

"The FCC's silver lining: Court emphasizes agency's regulating power," in America's Network, September 15, 1997.

"The Great Cisco Wars: Equipment makers beef up for fighting an 800-pound gorilla," in America's Network, August 15, 1998.

"The irrelevance of measuring minutes," in America's Network, June 1, 2000.

"The need for backbone: Why MCI WorldCom should divest UUNet – now," in America's Network, April 1, 2000.

"The resurrection of AT&T," in America's Network, April 15, 1999.

"A bit of homage to the Beltway: Like it or not, government support is critical to development of next-generation technologies," in America's Network, June 1, 1999.

"The politics of colocation," in America's Network, February, 2001.

"United States exports trend toward competition," in America's Network, April 15, 1995.

"Up to the Task? The FCC is overworked and under funded," in America's Network, July 15, 1996.

"What went wrong with Powell's FCC?" in America's Network, September 1, 2004.

"Wireless Would Grow If Pricing Changed, Fell," in America's Network, June 1, 1996.

"World War 3(G): Is Europe thumbing its nose at the ITU by adopting its own wireless standard?" in America's Network, February 15, 1999.

"Telecom reform on the money for GOP backers," in Network World, February 20, 1995.

"Republicans Spell Out Telecom Reform Action Items," in America's Network, January 15, 1994.

"Britain's Cable Industry: Harbinger of Things to Come," in America's Network, July 15, 1995.

"With the Telecom Bill signed, FCC must act quickly or else," in America's Network, April 1, 1996.

"World War 3(G)," in America's Network, February 15, 1999.
"Policy from the boardroom: Private coalition proposes changes in access charges that might be good for all," in America's Network, September 15, 1999.

"Competitive Bidding or Cooperation?" in America's Network, July 15, 1994.

"Strained relations? Canada is our good/bad telecom neighbor," in America's Network, March 15, 1998.

"Tested to the limits: Policymakers take a hard look at telecom and what went wrong," in America's Network, October 1, 2001.

"Bless those resellers: Keep your friends close, your 'enemies' closer," in America's Network, January 15, 1998.

"The Great Depression, redux?" in America's Network, February, 2002.

"Closing the gap: Smart taxation could be key to solving the problem of the digital divide," in America's Network, September 1, 2001.

"What's the fate of the FCC?" cover story in America's Network, October 1, 2000.

"Curb that xenophobia," in America's Network, November 1, 2000.

"Policy priorities: What lies ahead from an FCC chair who is like no other before him?" in America's Network, November 15, 2001.

"U.S. Equipment Companies Should Consider Alliances with European Firms," in EuroWatch,

January 26, 1996.

Plus columns, articles, and features in View Magazine, Telecom Insider, Computerworld on Communications, Telephone Bypass News, DataCable News, Shared Tenant Services News, Nikkei Communications, among others.

4. Articles Published in Network World

Network World, May 4, 1998, FEATURES; Pg. 89, 2110 words, Carrier Capitalization.

Network World, November 17, 1997, NEWS; Pg. 14, 302 words, Fasten your seatbelts: Even more mergers ahead.

Network World, July 7, 1997, OPINIONS; Message Queue; Pg. 44, 506 words, Message Queue.

Network World, June 16, 1997, OPINIONS; Telecom Regulation; Pg. 46, 663 words, Hundt's departure signals start of a new era for FCC.

Network World, February 12, 1996, OPINIONS; Regulatory reform; Pg. 37, 610 words, Telecom Act bodes well for users if they remain vigilant.

Network World, November 6, 1995, OPINIONS, POLICY AND POLITICS; Pg. 46, 917 words, AT&T's missteps in Washington point to a political learning disability.

Network World, August 7, 1995, OPINIONS, TELECOM REGULATION; Pg. 35, 697 words, Users should be coy when dealing with global suitors.

Network World, February 20, 1995, TOP NEWS; Pg. 1, 2885 words, Telecom reform on the money for GOP backers.

Network World, December 26, 1994 - January 2, 1995, FEATURES; Pundits Ponder; Pg. 50, 353 words.

Network World, June 6, 1994, OPINIONS; Telecom Legislation; Pg. 46, 952 words, Courts may steal the ball from Congress.

Network World, January 31, 1994, OPINIONS; Telecommunications Policy; Pg. 35, 898 words, MCI plan bodes well for users.

Network World, December 20, 1993, OPINIONS; Telecom Legislation; Pg.

29, 873 words, 1994 will ring in regulatory changes.

Network World, October 25, 1993, TOP NEWS; Pg. 1, 2299 words,
Industry upheaval sparks change; Policy-making process threatens telecom.
Network World, October 25, 1993, FEATURES; Pg. 65, 439 words,
Mega-merger mania.

Network World, August 16, 1993, OPINIONS; Regulatory Issues; Pg. 37,
819 words, Hundt a good choice for users.

Network World, January 25, 1993, OPINIONS; The Transition; Pg. 30,
496 words, Clinton-Gore drafting team of policymakers.

Network World, December 16, 1991, OPINIONS; Regulatory Affairs; Pg.
25, 874 words, FCC will proceed slowly but surely with action on PCNs.

Network World, November 4, 1991, OPINIONS; Regulatory Affairs; Pg.
43, 827 words, FCC has rocky road ahead in streamlining AT&T rules.

Network World, October 7, 1991, OPINIONS; Regulatory Affairs; Pg.
41, 742 words, Users won't see info services from the RBHCs this year.

Network World, September 16, 1991, OPINIONS; Regulatory Affairs; Pg.
31, 771 words, Dean Burch: The industry owes him a debt of gratitude.

Network World, May 13, 1991, OPINIONS; Pg. 41, 859 words,
Encouraging competition for the benefit of users worldwide.

Network World, March 18, 1991, OPINIONS; Regulatory Affairs; Pg. 39,
830 words, FCC threatens foreign administrators on users' behalf.

Network World, February 18, 1991, OPINIONS; Regulatory Affairs; Pg.
37, 794 words, The FCC should reallocate spectrum to benefit the public.

Network World, January 21, 1991, OPINIONS; The FCC; Pg. 31, 816
words, In a litigious environment, the whole industry loses.

Network World, October 15, 1990, OPINIONS; Regulatory Policy; Pg.
35, 814 words, MFJ restrictions force the RBHCs to invest overseas.

Network World, September 17, 1990, OPINIONS; AOS Providers; Pg. 37,
800 words, The FCC's about to take a tiger by the tail.

1317613.1

Network World, August 20, 1990, FEATURES; Features; Pg. 1, 3027 words, Bush's policy-making team one year later.

Network World, July 30, 1990, OPINIONS; Pg. 31, 1208 words, Will users benefit from telco entry into the cable industry?

Network World, July 23, 1990, FEATURES; Features; Pg. 26, 2746 words, Panic at the helm.

Network World, July 23, 1990, FEATURES; Pg. 28, 1108 words, The history of Computers I and II.

Network World, June 25, 1990, FEATURES; Feature; Pg. 1, 3389 words, Impending regulatory changes favor users.

Network World, May 28, 1990, OPINIONS; Regulatory Issues; Pg. 45, 890 words, Appeals Court ruling has far-reaching implications.

Network World, May 21, 1990, TOP NEWS; Pg. 1, 3715 words, NTIA Chief Obuchowski airs telecom policy views, By Alison Conliffe, Assistant Features Editor, and Alan Pearce, Contributing Editor.

Network World, April 30, 1990, FEATURES; Pg. 43, 2698 words, A capital question.

Network World, April 2, 1990, OPINIONS; Regulatory Policies; Pg. 31, 863 words, Current FCC rules are bad for American business.

Network World, December 4, 1989, FEATURES; Feature; Pg. 1, 2426 words, The lowdown on the new Bush FCC lineup.

Network World, September 18, 1989, OPINIONS; Regulatory Issues; Pg. 31, 941 words, The RBHCs still face roadblocks to MFJ relief.

Network World, July 17, 1989, OPINIONS; Tariffs; Pg. 31, 948 words, Congressional input valuable in telecom policy-setting.

Network World, May 29, 1989, OPINIONS; ONA; Pg. 27, 945 words, Problems continue to postpone the information age.

Network World, May 1, 1989, FEATURES; Pg. 53, 3155 words, Unfinished Business: The Bush administration, the FCC, the Justice Department and Congress have a roster of issues left over from the Reagan years.

1317613.1

Network World, April 17, 1989, OPINIONS; Tariffs; Pg. 31, 947 words, It's too early to give AT&T regulatory relief.

Network World, February 6, 1989, OPINIONS; ONA; Pg. 46, 552 words, The RBHCs should be urged to get on with it.

Network World, December 26, 1988 / January 2, 1989, FEATURES; Federal Regulation; Pg. 22, 569 words, What's in the cards; Industry experts look at the year to come.

Network World, October 3, 1988, FEATURES; Pg. 29, 3289 words, The making of a policy; The presidential candidates hold differing views on issues that will have a large effect on telecommunications policy.

Network World, August 15, 1988, FEATURES; Feature; Pg. 1, 2922 words, Is a radio days law fit for the Information Age?

Network World, July 18, 1988, OPINIONS; Modified Final Judgment; Pg. 35, 958 words, The Huber Report -- missing and presumed dead.

Network World, April 25, 1988, OPINIONS; ONA; Pg. 25, 952 words, The RBHCs' plans for ONA leave much to be desired.

Network World, April 4, 1988, FEATURES; Pg. 31, 2445 words, The men who would be president

Network World, February 8, 1988, OPINIONS; FCC Update; Pg. 26, 833 words, Lame-duck chairman.

Network World, November 30, 1987, OPINIONS; Telecommunications Law; Pg. 26, 837 words, Ginsburg's conversion.

Network World, November 9, 1987, OPINIONS; FCC Update; Pg. 30, 714 words, Then there were three.

Network World, October 19, 1987, OPINIONS; Modified Final Judgment; Pg. 36, 852 words, A second-rate decision.

Network World, September 14, 1987, OPINIONS; Regulatory Roundup; Pg. 26, 896 words, The trade imbalance.

Network World, August 3, 1987, OPINIONS; Revenue Regulation; Pg. 22,

749 words, Consider the alternatives.

Network World, July 13, 1987, OPINIONS; Washington Update; Pg. 26, 694 words, Democrat (Gore) is a technocrat.

Network World, June 8, 1987, OPINIONS; FCC Update; Pg. 22, 866 words, Influential intellectuals.

Network World, May 11, 1987, OPINIONS; Access Charges; Pg. 28, 700 words, FCC looks for trouble, gets it.

Network World, April 13, 1987, OPINIONS; Vendor Strategies; Pg. 22, 774 words, Don't underrate AT&T.

Network World, March 9, 1987, OPINIONS; Modified Final Judgment; Pg. 29, 648 words, Justice's Rx, with provisos.

Network World, February 9, 1987, OPINIONS; Washington Update; Pg. 37, 925 words, Au revoir, laissez-faire.

Network World, January 5, 1987, OPINIONS; Deregulation; Pg. 32, 1053 words, Slow wheels in motion.

Network World, November 17, 1986, OPINIONS; Regulation; Pg. 28, 1034 words, Prudent jurisprudence?

Network World, October 13, 1986, OPINIONS; Equal Access; Pg. 32, 831 words, Equal access a thorny issue.

Network World, September 15, 1986, OPINIONS; Standards; Pg. 30, 854 words, From Pots to Pans.

Network World, August 18, 1986 Correction Appended, OPINIONS; Policy; Pg. 26, 938 words, Modifying the Final Judgment.

Network World, July 14, 1986, OPINIONS; Policy; Pg. 29, 992 words, Scalia knows telecom industry.

Network World, June 9, 1986, OPINIONS; Washington, D.C.; Pg. 24, 961 words, How to regulate deregulation.

Network World, May 12, 1986, OPINIONS; Washington, D.C.; Pg. 22, 805 words, FCC musical chairs?

Network World, April 14, 1986, OPINIONS; Policy; Pg. 24, 1132 words,
FCC sets back STS.

Network World, February, 1986, WASHINGTON, D.C.; Pg. 10, 908 words,
Karl Brimmer, a Top FCC Aide.

Network World, December, 1985, WASHINGTON, D.C.; Pg. 16, 996 words,
1986: BOC Year of Living Flexibly?

Network World, November, 1985, WASHINGTON, D.C; Pg. 20, 862 words,
AT&T's CPE Victory: One Battle Won.

Network World, October, 1985, WASHINGTON, D.C.; Pg. 17, 868 words,
Will Court Upset FCC Control?

Network World, September, 1985, WASHINGTON, D.C.; Pg. 20, 706 words,
FCC's New Agenda: Computer III.

Network World, August, 1985, WASHINGTON, D.C., IBM/MCI/SBS The Deal;
Pg. 18, 994 words, IBM-MCI Deal: A Boon to AT&T?

Network World, July, 1985, WASHINGTON, D.C.; Pg. 20, 919 words, FCC
Accepts AT&T Private-Line Tariff.

Network World, June, 1985, WASHINGTON, D.C.; Pg. 17, 881 words,
Should Big Blue Have a Computer II of its Own?

Network World, May, 1985, WASHINGTON, D.C.; Pg. 15, 686 words, BOC
Coalition Scores FCC Victory.

Network World, April, 1985, NEWS ANALYSIS; Pg. 9, 706 words,
Southern Bells Attacked; Shared Tenant Services Questioned

Network World, April, 1985, WASHINGTON, D.C.; Pg. 20, 582 words,
RBOCs' Bold New Strategy.

Network World, March, 1985, WASHINGTON, D.C.; Pg. 20, 842 words.

Network World, February, 1985, WASHINGTON, D.C.; Pg. 11, 689 words.

Network World, January, 1985, WASHINGTON, D.C.; Pg. 18, 743 words.

1317613.1

Network World, October 3, 1984, WASHINGTON, D.C.; Pg. 14, 1314 words, BOCs Ask for Trouble; Greene Delivers.

Network World, September 5, 1984, WASHINGTON, D.C.; Pg. 13, 1293 words, AT&T Tariffs Inundate FCC.

Network World, August 1, 1984, WASHINGTON, D.C.; Pg. 13, 1264 words, Cable Wins, But Lacks a Full House.

Network World, May 2, 1984, WASHINGTON, D.C.; Pg. 12, 1297 words, The Great Quid Pro Quo.

Network World, March 14, 1984, WASHINGTON, D.C.; Pg. 10, 1284 words, When Weaning Turns to Warring.

Network World, January 18, 1984, WASHINGTON, D.C.; Pg. 9, 1319 words, AT&T at the Regulatory Forge.

5. Articles Published in New York Law Journal

New York Law Journal, August 11, 1995, Pg. 5, 1239 words, Global Telecom Alliances Benefit Users.  This article first appeared in Vol. XIII, No. 5 of Cable T.V. and New Media & Finance.

New York Law Journal, May 5, 1995, Pg. 5, 909 words, Wireless Competition Now, Consolidation Later.  This article first appeared in Vol. XIII, No. 1 of Cable T.V. and New Media Law & Finance.

New York Law Journal, March 24, 1995, Pg. 5, 1124 words, What Are Telecom Prospects In 104th Congress?  This article first appeared in Vol. XII, No. 11 of Cable T.V. and New Media Law & Finance.

New York Law Journal, April 23, 1993, Pg. 5, 1351 words, Telecommunications Policies in the Clinton Administration.  This article first appeared in Vol. X, No. 12, Cable T.V. and New Media Law & Finance.

New York Law Journal, October 18, 1991, Pg. 5, 1602 words, Is Path Cleared for RBOCs To Offer Info Services?  This article first appeared in Vol. IX, No 5, Cable T.V. and New Media Law & Finance.

New York Law Journal, February 20, 1998, Pg. 5, 826 words, WorldCom-MCI Merger Poses Several Thorny Policy Issues.  This article first appears in Vol. XV, No. 11, Cable T.V. and New Media Law & Finance.

New York Law Journal, November 29, 1996, Pg. 5, 804 words, Competition for Directory

Assistance: Of RBOCs & Others.  This article first appeared in Vol. XIV, No. 8, Cable T.V. and New Media Law & Finance.

<u>Prior Testimony:</u>

•Senate Judiciary Committee, June 10, 1981, re International Telecommunications Services.

• House Telecommunications Subcommittee, May 27, 1981, re telecommunications-information-entertainment industry structure and regulation.

• House Committee on Small Business, September 23, 1983, re cable television multiple ownership issues.

• Postal Rate Commission, November, 1980, re postal rates for books and recording materials.

• California Public Utilities Commission, November 21, 1983, re Intra-LATA competition in the telecommunications industry.

• Nebraska Public Service Commission, September 18, 1986, re deregulation of telecommunications services.

• New Brunswick Board of Commissioners of Public Utilities, May 7-19, 1984, re competitive and deregulatory conditions in the telecommunications-information industry.

• Newfoundland Board of Commissioners of Public Utilities, April 12-15, 1988, re competition and deregulatory conditions in the telecommunications-information industry.

• Federal Communications Commission – at various dates and on various issues, i.e., broadcasting, cable TV, telecommunications, etc., throughout the 1980s & 90s.

• U.S. Tax Court, December 12 and 13, 1989, re cable TV franchising.

• U.S. Tax Court, September 18, 1986, re TV program syndication and investment tax credits.

• U.S. Court of Claims, February 11 & 15, 1987, re TV program syndication and ITCs.

• U.S. Bankruptcy Court, February 7, 1987, re Dama Communications bankruptcy and Data General's acquisition of Dama.

• Federal District Court in Las Vegas, NV, December 1 & 2, 1986, in Wayne Newton vs NBC.

• Federal District Court in San Diego, CA, February 8 & 11, 1991, re M/A COM and Digital Termination Services.

1317613.1

• Deposed in MCA/Disney, et al vs Sony in the Spring of 1978.

• Deposed in Dr. Steven Shearing vs Johnson & Johnson, June 2, 1988, re the value of Dr. Shearing's patents.

• Deposed in a case against United Cable, January 18, 1990, re value of minority ownership in the Baltimore, MD, cable TV system.

• California Tax Board, San Francisco, December 4 & 5, 1997, and July 13 & 14, 1998, concerning tax issues associated with Viacom's cable TV systems and Viacom's purchase of Paramount Studios.

• Deposed in case involving AirTouch Wireless, 1997.

• Retained by Office of Chief Counsel, Internal Revenue Service, in case against AT&T & GTE Wireless re wireless company contracts and wireless industry churn rates, June, 2000-July, 2001. Case settled.

• June, 2003: PASCOM vs Nationwide Insurance.  Appraised the market value fire damaged fixed wireless equipment in an arbitration in Bethesda, MD, presided over by Judge John McAuliffe.

• December, 2003: Retained as expert witness for ITCDeltaCom in Wholesale Telecom Corporation v. ITCDeltaCom Communications, Inc., Case No. 03-60537, Federal District Court.

• 2003-2006: Retained by Department of Justice, Tax Division, in more than ten separate cases before the Federal District Court and the Court of Claims concerning Federal Excise Taxes imposed on Long Distance Telecommunications Services.

• 2005-06: Retained by The City of Portland, Oregon, in Qwest Communications & Time Warner, et al. v. City of Portland, USDC No. 04-CV-1393-MO.

1317613.1